Rev. 7/06
CO Hab Corp
AO 241 amd.

**FILED**

SEP 2 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CARLOS ENRIQUE LEHDER RIVAS
_____

NAME (Under which you were convicted)

#064-61-018
_____

PRISON NUMBER

_____

PLACE OF CONFINEMENT/ADDRESS
CARLOS LEHDER # 06461-018
320 First St. N.W. Room # 524 IMS
Washington DC 20534.

CARLOS ENRIQUE LEHDER RIVAS                    )
_____                )
(Full Name)            Petitioner              )
                                               )
    VS.                                        )
HARLEY G. LAPPIN, Bureau of Prisons)
PAUL CLEMENT. U.S. Attorney General)
ROBERT MUELLER. FBI Director.                  )
CHARLES SCHUMER, U.S. Congressman              )
                                               )
_____                )
(Name of Warden, Superintendent, Jailor, or    )
authorized person having custody of petitioner))
                Respondent                     )

Case: 1:07-cv-01733
Assigned To : Roberts, Richard W.
Assign. Date : 9/26/2007
Description: Habeas Corpus-2255

## PETITION FOR WRIT OF HABEAS CORPUS
### BY A PERSON IN CUSTODY IN THE DISTRICT OF COLUMBIA

### INSTRUCTIONS - PLEASE READ CAREFULLY

1.  This petition must be legibly handwritten or typed, and signed by the petitioner.  Any false statement of material fact may serve as the basis for prosecution and conviction for perjury.  All questions must be answered concisely in the proper space on the form.

3.  Additional pages are not permitted except with respect to the facts which you rely upon to support your grounds for relief.  No citation of authorities need be furnished.  If briefs or arguments are submitted, they should be submitted in the form of a separate memorandum.

4.  Upon receipt, your petition will be filed if it is in proper order and is accompanied by a $5.00 filing fee.  Your check or money order should be made payable to: Clerk, U.S. District Court.

5.    If you cannot afford to pay the filing fee, you may request permission to proceed in forma pauperis, in which event you must execute the affidavit on the last page, setting forth information establishing your inability to pay the costs. If you wish to proceed in forma pauperis, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account in the institution.

6.    Only sentences imposed by one court may be challenged in a single petition. If you seek to challenge sentences entered by different courts, you must file separate petitions as to each court.

7.    When you have completed the form, send the original and one copy to:
    Clerk, United States District Court for the District of Columbia
    Room 1225
    333 Constitution Avenue, NW
    Washington, DC 20001

9.    <u>Petitions which do not conform to these instructions may be returned with a notation as to the deficiency.</u>

## PETITION

1.    (a)    Name and location of court which imposed the sentence (or detention) of conviction you are challenging:
    UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF FLORIDA
    JACKSONVILLE DIVISION.

2.    (a)    Date of the sentence (or detention): First sentence, July 21, 1988 re-sentenced January 19, 1994.

3.    Length of sentence: FIFTY FIVE (55) YEARS (not parolable)

4.    Nature of offense involved (all counts): 21 U.S.C. 841, 952, 960, 963, and 848. Conspiracy to import cocaine and Continuing Criminal Enterprise 848.

5.    (a)    What was your plea? (Check one):
    ☒    Not guilty
    ☐    Guilty
    ☐    Nolo Contendere (no contest)
    ☐    Insanity

(b)    If you entered a guilty plea to one count or charge, and a not guilty plea to another count or charge, give details: _____

_____

_____

_____

_____

_____

_____

6.    Have you previously filed any petitions, applications, or motions with respect to this sentence in any court?

    ☒ Yes    Rule 35, was granted in that reduced Petitiner's sentence.

    ☐ No

7.    If your answer to Question 10 was "Yes," give the following information:

(a)    (1)    Name of Court:    UNITED STATES DISTRICT COURT, JACKSONVILLE,

      (2)    Nature of the proceedings:    Motion under 28 USC 2255

_____

_____

      (3)    Grounds raised:    THE COURT AT A Rule 35(b) Proceeding, in 1994, DENIED evidentiary hearing and dismissed Petitioner's Notice of Appeal as untimely. Petitioner moved for a reinstatement of Appeal the Court denied both Grounds.

      (4)    Did you receive an evidentiary hearing on your petition, application or motion?

          ☐ Yes

          ☒ No

      (5)    Result:    2255 Motion DENIED.

      (6)    Date of result:    June 1995.

(b)    As to any second petition, application, or motion, give the same information:

      (1)    Name of Court:    U.S DITRICT COURT, JACKSONVILLE DIVISION.

      (2)    Nature of the proceedings:    Second Motion for post-conviction relief under 28 U.S.C. 2255 (March 28, 1997)

_____

      (3)    Grounds raised:    Newly discovered evidence, Prosecutorial misconduct, failure to disclose Bradly material. Conviction for both CCE and conspiracy vilated the double jeopardy clause, ineffective assistance of counsel.

      (4)    Did you receive an evidentiary hearing on your petition, application or motion?

          ☐ Yes

          ☒ No

      (5)    Result:    The Court only granted relief dismissing Pe-tioners Count One, Conspiracy due to double jeopardy. DENIED all other grounds.

**D.    GROUND FOUR:**

(a)    Supporting FACTS (Do not argue or cite law. Just state the specific facts that support your claim:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

9.    If any of the grounds listed in 12A, B, C, or D were not previously presented in any other court, District of Columbia or Federal, state briefly what grounds were not so presented, and give your reasons for not presenting them:

The Petitioner could not raised the thirty (30) year sentence limitation by Treaty agreements, as well the 30, year reduc- tion of sentence, "Equal to if not lesser than, General Noriega's sentence" until March 22, 2007, when Petitioer finisehd serving his statutory 30 year sentence, and obviously until General Noriega finished serving his statutory 30 Year sentence, on Sept 9, 2007.

PLEASE SEE INCORPORATED SUPPORTIVE MEMORANDUM AND EXHIBITS ATTACHED.

10.    Do you have any petition or appeal pending in any other court, either, District of Columbia or Federal, as to the sentence (or detention) under attack?

☐    Yes

☒    No

(a)    If so, give the name and location of the court and case number, if known: _____

_____

_____

_____

11.    Do you have any future sentence to serve after you complete the sentence (or detention) under attack?

☐    Yes

☒    No

(a)    If so, give name and location of court which imposed sentence to be served in the future:

_____

_____

_____

A.    GROUND ONE:

(a)    Supporting FACTS (Do not argue or cite law. Just state the specific facts that support your claim:    Respondents are in violation of the Extradition Treaty sentencing limitations and agreements. Petitioner is a Colombian national extradited to the United States in 1987. On March 22, 2007, Petitioner completed serving thirty (30) years, maximum term permitted under the Treaty. The Respondents to this date, still helding and caused the Petitioner to continue incarcerated at a U.S. federal prison (Witness Protection BoP Facility) Petitioner is not challenging his conviction, only the illegal lenght of his excesive 55 year sentence.

B.    GROUND TWO:

(a)    Supporting FACTS (Do not argue or cite law. Just state the specific facts that support your claim:    Respondents are in material breach of the cooperation agreement with the Petitioner. Petitioner Lehder entered into a Cooperation agreement to testify in case, U.S. V. MANUEL NORIEGA, The agreement explicitly incorporated the 30 year sentence limitation under the Treaty. Also, as promised, that the Petitioner Lehder, would be re-sentenced to a term EQUAL TO, IF not lesser than, General Noriega's Own sentence. Noriega's final sentence was thirty (30) years. On Sept 9, 2007, Noriega finished serving his statutory sentence and was released from Bureau Of Prison's Custody to the U.S. Marshals Custody. Petitioner finished serving his 30, years under the Treaty on March 22, 2007, and Respondents continue to hold him in prison.

C.    GROUND THREE:

(a)    Supporting FACTS (Do not argue or cite law. Just state the specific facts that support your claim:    Respondent Charles Schumer, engaged in a conspiracy to Obstruct Justice, interferring with Petitioner's reduction of sentence process. Using the power of his seat, Congressman CH Schumer, corruptedly persuaded the U.S. Attorney's in charged of Petitioner's freedom process, to breach the binding cooperation agreementand ignore the Extradition Treaty sententencing limitation. Respondent Schumer interference caused the Government & Court to sentence that will keep the Petitioner incarcerated, until the age of 74, years old. All in violation of US Laws, the Petitioner's constitutional, Civil and Due Process rights, and in violation of the Extradition Treaty subsequent agreement signed between the United States and Colombia.

Page 7

(b)    And give date and length of sentence to be served in future: _____

(c)    Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

        ☐    Yes
        ☐    No

        Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Petitioner's Signature

_____
Date

CERTIFICATE OF INTERESTED PARTIES

1.  RESPONDENT PAUL CLEMENT, IS THE CURRENT ATTORNEY GENERAL OF THE
    UNITED STATES OF AMERICA. WASHINGTON DC.

2.  RESPONDENT HARLEY G. LAPPIN, IS THE DIRECTOR OF THE UNITED STATES
    BUREAU OF PRISONS. WASHINGTON DC.

3.  RESPONDENT ROBERT S. MUELLER III, IS THE DIRECTOR OF THE FEDERAL
    BUREAU OF INVESTIGATION, WASHINGTON DC.

4.  RESPONDENT CHARLES E. SCHUMER, IS A UNITED STATES CONGRESSMAN
    UNITED STATES SENATE, WASHINGTON DC.

5.  MARY LEE WARREN, IS THE UNITED STATES DEPUTY ATTORNEY GENERAL
    DEPARTMENT OF JUSTICE,-CRIMINAL DIVISION- WASHINGTON DC.

6.  UNITED STATES ATTORNEY PAUL PEREZ, MIDDLE DISTRICT OF FLORIDA
    TAMPA, FLORIDA.

7.  ASSISTANT U.S. ATTORNEY JAMES KLINDT CHIEF DEPUTY, U.S. ATTORNEYS
    OFFICE, MIDDLE DISTRICT OF FLORIDA, JACKSONVILLE .

8.  CAROLINA BARCO, AMBASSADOR. REPUBLIC OF COLOMBIA.
    EMBASSY OF THE REPUEBLIC OF COLOMBIA, WASHINGTON DC.

9.  PETITIONER, CARLOS ENRIQUE LEHDER RIVAS. EXTRADITED COLOMBIAN NATIONAL.
    CONFINED AT THE BUREAU OF PRISON'S WITNESS PROTECTION UNITS.

( i )

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

CARLOS ENRTQUE LEHDER RIVAS          ]

              Petitioner,          ]

                         ]

    VS.          ]

                         ]    INCORPORATED SUPPORTIVE MEMORANDUM

HARLEY G. LAPPIN, Director          ]    PURSUANT TO TITLE 28 U.S.C. 2241.
U.S. Bureau Of Prisons.
PAUL CLEMENT, Attorney General          ]
of the United States of America.
ROBERT S. MUELLER, Director          ]
Federal Bureau Of Investigation.
CHARLES E. SCHUMER, Senator,          ]
United States Congress.

                         ]

Respondents, all sued in their          ]
individual and official capacities.

---

PETITION FOR A WRIT OF HABEAS CORPUS
AND COMPLAINT FOR INJUCTIVE, DECLARATORY AND OTHER RELIEF

NOW COMES the Petitioner, CARLOS ENRIQUE LEHDER RIVAS,

("Petitioner" or "Lehder") a federal prisoner acting Pro-Se, submits this

Petition against Respondents for habeas and other relief. Carlos Lehder is a

Colombian national extradited to the United States in year 1987, under the rules

of the extradition Treaty between the United States and the Republic of Colombia.

On March 22, 2007, Lehder completed serving a thirty (30) year statutory sentence

the maximum term permitted under the Treaty"s subsequent agreement between the

two countries. The Respondents to this date, still held and caused the Petitio-

ner to continue incarcerated at a U.S. federal prison.  Respondents are in

violation of the extradition treaty sentencing limitation and agreements.

(    1    )

**FILED**

SEP 2 6 2007

NANCY MAYER WHITTINGTON, CLERK

07 1733

1.    Petitioner is not challenging his conviction, only the illegal length of his sentence.  He has been held in prison, in violation of the US Laws , international Treaties and the United States Constitution. The Court shall grant Writ in this case because Petitioner is been held illegaly by the Respondents , after having served his sentence under the rules of the extradition Treaty and an specific cooperation agreement.

2.    TIMELINESS OF PETITION. The date in which the factual Treaty and constitutional violations presented in this claim began to take place on March 22, 2007 The petitioner is within the ONE YEAR spand applicable to Petitions for a Writ, and Petitioner comes timely to the Court.

3.

    THE DEFENDANT'S RIGHTS DERIVES FROM THE SUPREMACY OF TREATIES
    UNDER ARTICLE VI OF THE CONSTITUTION OF THE UNITED STATES.

    In Rauscher, Supra, The Court referred to the doctrine as a "right
    conferred upon persons brought from foreign country into this [country]"
    Id. at 428, 7  S.Ct. at 243; see also id. at 434, 7, S.Ct. at 248 ,
    (Gray J. concurring) ("any person prosecuted in any Court within the
    United States has the right to claim the protection" of the sepeciality
    provisions of the Treaty)

    US V. RAUSCHER, 119 U.S. 407, 7, S. Court 234, 30 L Ed 425 (1886)


INTRODUCTION

THE EXTRADITION TREATY BETWEEN THE UNITED STATES AND COLOMBIA

**4.**    Petitioner Lehder, was extradited  to the United States by the Government of the Republic Of Colombia, in year 1987, the document -Act Of Surrender- was signed by the representatives of both Governments at his arrival in the USA.

                    Please see:  Act Of Surrender    EXHIBIT : # 01

5.    The Treaty of Extradition between the United States and the Republic of Colombia was signed at Washington on September 14, 1979. Please See EXHIBIT:# 02

6.    On year 1989, The Executive branch of the United States and Colombia, entered into a subsequent mutual agreement, limiting to a maximum of **thirty (30)** **years,** any sentence to be imposed to an extradited Colombian national.

(    2    )

7.    Recognized and honored by the Attorney General's Office as well by the

United States Federal Courts, aproximatedly four hundred (400) extradited

colombian nationals have been sentenced to this date, to terms which do not exceed

the thirty (30) year limitation. U.S. V. Abello-Silva 948, F 2d, 1168 (10th Cir)

"The accused must not be sentence to more than thirty years and the death penalty
may not be sought"  ..."1. The length of appellant's imprisonment is limited
by agreement between the United States and Colombia" Please See EXHIBIT: # 03

8.    On October 20, 1989, The Embassy Of the United States in Colombia, reques-

ted the extradition to the United States of Mr Jose Rafael Abello Silva.

Within said request,  page 2 (b) the U.S. Embassy (US State Dept) states:

"The fugitive will not be required to serve a period of incarceration in excess
of thirty years for the offences for which extradition may be granted pursuant
to this request" Please See US State Dept Abello-Silva.Case EXHIBIT: # 04

9.    On year 2003, in case United States V. Fabio Ochoa No: 99-6153 CR MOORE,

Southern District Of Florida, the Government's sentencing recommendation states:

"A sentence of life in prison or to a number of years significantly higher
than 360 months, could irreparably harm the United states' efforts to
extradite Colombian citizens charged with United States crimes.

We respectfully request that this Court rely upon statements in consi-
dering the Government's request that Ochoa be sentence to 360 months'
imprisonment"              Please See Ochoa sentence memo- EXHIBIT: # 05


INDICTMENT UNITED STATES V. CARLOS LEHDER CASE No: 81-82-Cr-J--12 M.(1981)

10.    The indictment charged Lehder and others, with importation, possession and

intent to distribute cocaine, plus violation of 21 U.S.C. CCE § 848. (The conspi-

racy charge was dismissed by the Court under Rutleage, Supra) Petitioner  went to

trial held at US Federal Court, Jacksonville Florida. Lehder was found guilty as

charged and sentenced to consecutive terms which added to 135, years, plus one

consecutive term of LIFE in prison. (1988)  Please See: INDICTMENT EXHIBIT: # 06

[Under the CCE §848, Petitioner can not be paroled]

<u>THE COOPERATION AGREEMENT BETWEEN THE UNITED STATES AND C.LEHDER</u>

**11.**    In August 1991, the Petitioner entered into a written and oral **Multi-District** cooperation agreement with the United States Government. Said multi-district agreement compelled Lehder to assist the Government and to testify in federal Court, case <u>United States Vs. Manuel A. Noriega et al, # 88-79-CR-HOEVELER.</u> Miami, Southern District Of Florida. The Government under the Rule 35, Statute, and concrete promises was bound to recommend the Court -Jacksonville, Florida- to reduce Lehder's LIFE sentence to a sentence which will not exceed the limitations established by the Extradition Treaty's **subsequent 1989 agreement between both nations,of thirty (30) years.**

**12.**    In year 1994, the Jacksonville U.S. Attorneys Office, in noncompliance with the cooperation agreement commitments and in violation of the extradition Treaty's sentencing limitations, and opposing an Evidentiary Hearing (Rule 35) recommended the Court to sentence federal witness Lehder, to a term of FIFTHY FIVE (55) YEARS, so he would only be release from prison in year 2024, at the age of SEVENTY FOUR (74) years old. (Not parolable). SENTENCE- <u>EXHIBIT: # 07</u>

**13.** The Petitioner, on March 22, 2007, finished serving the 30 year, statutory maximun sentence permissible under the Treaty, supported by the cooperation agreement written document, however, the U.S. Attorney General's Office as well the U.S. Attorney's office from the Jacksonville, Florida District, still refuses to process Petitioner's release and freedom.

**14.**    US. BUREAU OF PRISONS COMPUTATION OF THE 30 YEARS SERVED BY PETITIONER.

In the year 2002, the Petitioner requested from the Federal Bureau of Prisons, the computation of his release date, under a 30, year sentence. the Bureau of Prisons responded :

15.    "Attached is the calculation performed on a 30 year sentence.
Note your release date will be March 27, 2007. (STA REL DT)
......If you received a 30 year sentence, your release date with
these five days of extra good time will be **March 22, 2007**"

Please See: Bureau of Prisons STATUTORY RELEASE DATE -30 YEARS- EXH.# 08

## PARTIES

16.    The Petitioner, Carlos Enrique Lehder Rivas, born September 7, 1949,
in the Republic Of Colombia. Since his extradition to the USA, has been under
the custody of the Attorney General of the United States, (Dept Of Justice)
and remains currently at an undiclosed Bureau Of Prisons' witness protection
Unit/facility.

17.    **RESPONDENT** PAUL CLEMENT, the Attorney General of the United States
commands the entire U.S. Department of Justice, has authority  over the Peti-
tioner and is responsable for all the judicial decisions of the -Criminal Divi-
sion- in Washington, which supervises all extradition cases, as well commands
the decisions in extradition cases, taken by the U.S. Attorney's Office, Jack-
sonville, Florida Division. Middle District Of Florida.

18.    **RESPONDENT** HARLEY G. LAPPIN, as Director of the United States Bureau of
Prisons, has control over Petitioner's direct custody. His staff supervises
daily and permanently secure confinement conditions. Mr Lappin, is responsable
is responsable for the U.S. Bureau Of Prisons institution and the undisclose
Witsec Unit/facility where Petitioner is presently incarcerated.

19.    **RESPONDENT** ROBERT S. MUELLER III, present Director of the Federal
Bureau of Investigation, in year 1991, was the chief of the -Criminal Division-
in Washington. He was personally instrumental in **approving** Petitioner's multi-
district cooperation agreement between the United States and the petitioner,
persuant the United States case against the military strongman of Panama Manuel
Noriega. Mr. Mueller was in frequent  contact with the US Prosecution team

(    5    )

20.    As well received instructions from the U.S. Attorney General  William Barr
and the Director of the D.E.A. Robert Bonner, all supporting a -Quid Pro Quo-
agreement with Petitioner, as well Petitioners eventual freedom, under the
Rule 35 (b) Statute and the Extradition Treaty between the two countries.

21.    **RESPONDENT** CHARLES E. SCHUMER, a United States Congressman, who since
year 1992, initiated a -conspiracy to obstruct justice- by tampering and reta-
liating against the 15, immunized federal witness, inciuiding Petitioner, which
testified for the Government and made posible the conviction of General Manuel
Noriega.  The Petitioner submitts to the Court, he comes with the evidence that
Respondent Charles E. Schumer -obstruction of justice- conspiracy, was and is
the cause and perjudicial effect why, the U.S. Attorney's in Washington and
Jacksonville, Florida,  unexpectedly, reversed their position refusing to honor
the cooperation agreement binding commitments and reneged on all their obligati-
ons under the Treaty, dispossesing Petitioner of the promised maximum 30 year
sentence and freedom in March, 2007.

All ocurred right after the US Attorneys Office from Miami and Jacksonville
Divisions of Florida, as well the U.S. Attorney General and the -Criminal Divisi-
on- in Washington, received the first written adverse document issued by Congress-
man Charles E. Schumer, titled "THE NORIEGA PROSECUTION: WHAT PRICE THE GENERAL ?"
and under the title, states "This report has not been reviewed or approved by
                                  any other Members of the Subcommittee" (1992)

Please See: CH. SCHUMER DOCUMENT EXHIBIT: # 09.

Respondent, CHARLES E. SCHUMER, is responsable for a continious violation
of Petitioner's constitutional rights to Due Process, and interfearing and
tampering with the freedom process of a Government's ..witness.

( 6 )

## JURISDICTION

**22.**   This petition for a Writ of Habeas Corpus, arises under the Constitution laws and treaties of the United States, incliuding Article IV, "Supremacy of Treaties" and the First, 4th, 5th, 8th and 14 Amendments.. Title 28 U.S.C. § 1331, 1361, 1391 and Habeas Corpus, 28 § 2241 and 2242, 5 U.S.C. § 702, the All Writs Act (28 U.S.C. § 1651) 42 U.S.C. § 1981, the BIVENS doctrine [Bivens V. Six Unknown Named Agents of the Federal Bureau of Narcotics] 404 U.S. 388 (1971) The EXTRADITION TREATY between the United States and the Republic Of Colombia supported by the "Rule of Speciality" persuant to U.S. V. Rauscher, 119 U.S. 407 S. Court 234, 30 L. Ed 425 (1886), as well international Law.

**23.**   This Court possesses subject matter jurisdiction under Title 28 U.S.C. § 1350, 1361, and 1391, 5 U.S.C. § 702, as well Habeas `statute`, Title 28 U.S.C. § 2241 and All Writs Act, 28 U.S.C. § 1651.

**24.**   This Court has personal jurisdiction over the Parties and petitioner : Respondents HARLEY G. LAPPIN, Director of the United States Bureau of Prisons, PAUL CLEMENT, Attorney General Of The United States, ROBERT S. MUELLER III, Director of the Federal Bureau Of Investigation and Congressman CHARLES E. SCHUMER, have at present official positions, offices and also reside in Washington D.C. The Petitioner, confined by the Attorney General at an undesclose Bureau of Prisons witness protection unit/facility, for the las 16 years, has as a public address, Washington DC. [Carlos Lehder # 06461-018, 320 First St. N.W. Room # 524 IMS, washington DC 20534].  The Embassy of the Republic of Colombia which serves the witness in this litigation, is located in Washington.

**25.**   VENUE is proper in this Court under 28 U.S.C. § 1391(b) and (e) since the Petitioner is an extradited alien and substantial part of events, acts, and omissions give rise to this claim occurred in this District and a Respondent(s) may be found in this District.

26.             THE COOPERATION AGREEMENT SIGNED BETWEEN THE
                GOVERNMENT AND CARLOS LEHDER, EXPLICITLY AND
                IMPLICITLY COMPELS THE GOVERNMENT TO COMPLY WITH
                THE EXTRADITION TREATY'S SUBSEQUENT SENTENCING
                AGREEMENT BETWEEN THE TWO CONTRIES (1989)

RESPONDENTS, The Attorney General of the United States, and the former

chief of the -Criminal Division- Robert S. Mueller, who approved the cooperation

agreement between the United States and C. Lehder, knew and were aware that the

United States and Colombias EXECUTIVE BRANCHES, had concerted in 1989, a valid

subsequent agreement limiting the sentences of extradited Colombian nationals

to a maximum term of thirty (30) years.

27.    The Colombian amended extradition law, states: "(B) The extradition of a
       citizen shall not be granted in any case where the requesting State does
       not fully guarantee that it shall not impose a term of imprisonment of
       more than thirty (30) years"

          Please see: Copy and official translation of Decree/Law EXHIBIT:# 10

28.    The United States Court of Appeals, recognized and honored the 1989

       subsequent agreement on sentencing limitation, and stated in 1991:

       "(Page 1171) before MOOR, and McWilliams, Circuit Judges, and KANE
       senior District Judge. Appellant Jose rafael Abello-Silva, a citizen
       of the Republic Of Colombia, was extardited to the United States to
       face drug charges...Abello was convicted of both counts. He was senten-
       ced  to concurrent terms of 30 years imprisonment on each count..."

        "(1) The lenght of appellant's imprisonment is limited by agreement
         between the United States and Colombia..." In Abello-Silva EXHIB: # 03

29.  Petitioner assures the Court, the **heart** of the negociated cooperation

     agreement, was the -Quid Pro Quo- of incorporation of the new 1989 Rule,

limiting to a maximum of thirty (30) years, sentences under the Treaty.

Petitioner was extradited in 1987, the new Rule, was to be applied **retroactively**

to Petitioner future new sentence under Rule Statute. The -Quid Pro Quo- nego-

ciation entrusted Petitioner with the dangerous and complicated mission to assist

in the investigation and render Court testimony as -star- witness against the

former military leader of Panama, General Manuel A. Noriega.

**30.** Petitioner fully and successfully complied with the agreement, and the chief

Prosecutor states in his Affidavit:  Quote:

> "(3) That cooperation agreement require, inter alia, that Carlos
> Lehder testify for the United States in the Noriega prosecution.
> Lehder did so, and was one of the most significant and important
> witnesses that the Government utilized at trial.
> His forthright and accurate testimony was vital to the government's
> case, and was undoubtedly a major reason for the jury's veredict
> of guilt"

( Michael P. Sullivan, Senior Litigation Counsel  <u>AFFIDAVIT EXHIBIT **# 11**</u>

**31.** The U.S. Attorney's Office -Miami Division- recommended to the U.S.

Attorney's Office -Jacksonville Division- the following reduction of

sentence for Petitioner Lehder : Quote :

> "Lehder was on the witness stand for a total of five days, longer
> than any other government witness. During a two day direct, Lehder
> explained his ties to the Medellin cartel and to Panama. Lehder's testimony was corro-
> borated by multiple witnesses, incluiding civilians and other traffickers as
> well. Lehder's testimony was devastating to the defendant (Noriega).
>
> All and All, Lehder has been very useful to us. While we at no time promised
> Lehder a specific recommendation, we ask that his reduction of sentence be
> substantial and meaningful based on his extraordinary significant cooperation"

(Assistant U.S. Attorney  Guy Lewis, SLC Michael P. Sullivan) <u>EXHIBIT: **#12**</u>

**32.** In 1994, the Court, prior to sentencing, **denied** a Pro-Se motion for an

evidentiary hearing, and **denied** a Pro-Se motion, seeking a public defender

to represent the Petitioner at sentencing. The Court sentencing the Petitioner

-by mail- as the Government recommended, to a FIFTHY FIVE (55) YEAR term, assu-

ring that the petitioner obtains his release only at the age of 74, years old,

in year 2024. Please see Jacksonville-AUSA's Recommendation  <u>EXHIBIT : **# 13**</u>

**33.**  Prior to sentencing also the Petitioner acting Pro-Se, filed four (4)

motions under Rule 35, statute, due to the Governments opposition and without

oppinion the Court **denied** every motion :

34. Quote: "ORDER, This cause is before the Court on the following Pro-se motions filed by the defendant. 1) in camera motion for a Rule 35, hearing (Doc S-42); 2) in camera motion to compel production of information relating to excecutive branch extradition and sentencing agreements (Doc S-44); 3) in camera motion requesting issuances of five subpoenas [One of the subpoenas called the Colombian Consul from Florida] (Doc S-46) and in camera motion to compel performance of cooperation agreement (S-48)

The Court has reviewed all of the defendant's motions and upon due consideration will **deny** them. Accordingly, it is ORDERED and ADJUDGED.."

Please see: copy of the Court's denial of 4 motions.  EXHIBIT  : **# 14**

35.                    PETITIONER's NOTICE OF APPEAL, SEEKING TO APPEAL THE
                       55, YEAR SENTENCE, WAS DISMISSED BY THE DISTRICT COURT
                       AS AN UNTIMELY NOTICE OF APPEAL.

    On January 19, 1994, Petitioner was sentenced -by mail- no prior

hearing, to a fifty five (55) year sentence, Petitioner received the Court's

sentencing ORDER on February 9,  Petitioner having no lawyer, filed a notice

of appeal Pro-Se, and the Court dismissed his notice of appeal as untimely.

Petitioner after "extraordinary cooperation with the Goverment" was dispossessed of his right to appeal the disproporcionated 55, year sentence.

    Please See: FIFTY FIVE (55) YEAR SENTENCING ORDER.  EXHIBIT  : **# 07.**

36.    Constitutional Right of Extradited prisoner to be protected  from

            Treaty violations under Rauscher, Supra. Petitioner invokes the

Rule of Speciality under the Treaty and denounces the violation of the Treaty's

sentencing limitations, and his constitutional right to Due Process.

For openers, Petitioner did not received a -real- reduction of sentence.

Case Law: "An unjust sentence reduction should be open to the same review
          **as no reduction at all**" ea.
          U.S. Distasio, 820  F 2d. 20- First Circuit (1987) Page 24.

APPRENDI, Supra, is applicable in this case **today** because "the disputed 'fact'
               enlarges the applicable Statutory maximum, and the defendant's
               sentence exceeds the original maximum"
               CABA 241 F 3d. At 101 Id. U.S. V. La Freniere 236 F3d 41-49-50.

                              (   10   )

**37.**   EXTRADITION TREATY: In compliance with the Colombian Government's docu-

ment "ACT OF SURRENDER of Carlos Lehder to the authorities of the

United States" The U.S. Government as co-signer agreed to honor the Treaty,

and its Article 15, "Rule Of Speciality". [Act Of Surrender Exhb; # 01].

In Rauscher, supra, The Supreme Court incorporated the speciality principle into

American law. The defendant's right's derives from the supremacy of treaties

under Article VI, of the Constitution.

**38.**   Looking at the Extradition Treaty [Exhb: # 02] Article 15, "Rule of

Speciality" stated in year 1987,:"(1) (b) The defendant is subject to be
          sentenced to a period of incarceration which does not exceed that
          provided for offenced which that person was extradited."

The Colombian Executive branch in year 1989, modified  the abovecited

statute, and superseded it by a subsequent agreement between Colombia and the

United States as cited in Abello-Silva, "The accused may not be sentence to more

than thirty (30) years.." Petitioner is invoking the Court's protection under

Rauscher, Supra, because under the cited cooperation agreement for the Noriega

case, the main guarantee of eventual freedom was the **retroactive** application

of the 30, year sentence, subsequent agreement on 1989. since Lehder was ex-

tradited in year 1987. to that concrete evidence the word of the United States

imprinted into the cooperation agreement document, and states :

"It is understood that the United States will comply with the ACT
OF SURRENDER document pursuant to which  Carlos Lehder was extradited
from Colombia.."

[Petitioner explains, Jacksonville AUSA Ernst Mueller (R) on his own
hand writing and inicialed, continues "Act of Surrender, a copy of which
is attached hereto"  [The Prosecutor incorporated the Act Of Surrender
to the Cooperation agreement document and continued] ..unless said
document is **superseded by a subsequent agreement between the United
States and Colombia"**

Please see: COOPERATION AGREEMENT DOCUMENT  (1991) EXHIBIT: **# 16.**

TOTAL  'USE' IMMUNITY   DOCUMENT     EXHIBIT: **# 15.**

(    11    )

**38.** The Petitioner states although, the prosecutors have the monopoly over the
judicial language imprinted in cooperation agreement documents, the Peti-
ioner demanded from AUSA Ernst Mueller a written guarantee of the retroactive
application of the thirty (30) year extradition Treaty statute, be placed into-
the agreement, immediatelly after he placed such guarantee he signed the coop-
eration document, 3 days before the Noriega, trial began, August 1991.
The same AUSA E. Mueller, years later, recommended to the Court to sentence the
witness in the Noriega case, to be release at the age of 74, years old.

**39.** Contrary to AUSA Ernst Mueller, -Jacksonville Division- recommendation,
in November 1993, Senior Litigator Counsel Michael P. Sullivan, Miami
Division, issued a "water down" affidavit regarding his oral promises to Peti-
tioner and his then lawyer.

> "Specifically, I have informed Ms Talbot and Lehder what the sentences
> were of general Noriega's co-defendants, as well as the sentences imposed
> on other testifying co-conspirators who were convicted in other districts.
> I also told them that I thought it likely that Lehder would receive a
> sentence reduction to a level equal to, if not lower than, General
> Noriega's own parolable sentence, which was 40 years". EXHIBIT: **# 11 (2)**

**40.** The Petitioner assures the Court that SLC Michael P. Sullivan, promised
the Petitioner that his office would recommend a 30, year sentence. Almost two
years later, his cocrete verbal promise, turned into a non specific "I also
told them I thought it likely". Today, the U.S. Judiciary is aware that General
Noriega was released from US Prison, on Sept 9, 2007, after serving his statu-
ory thirty (30) year sentence, (not 40, year sentence), and the -star- witness
remains incarcerated.    Regarding contradictions on agreements, In Harris,
the Court stated "Written plea agreement will be viewed against the background
     of negociations and should not be interpreted to directly contradict an
     oral understanding, in addition, all ambiguities in the agreement must be
     construed against the Government" HARRIS 376, F 3d. 1282 (11th Cir 2004).

**41.**     Arguendo, the written and oral understanding was the retroactive appli-
cation to Petitioner Rule 35, of the subsequent 30, year sentence limitation
under the Treaty. Even under the light of U.S. Supreme Court, TEAGE, Supra
"New rule to be retroactively applicable to cases on collateral review" Peti-
tioner' reduction of sentence proceeding, **had** to take into consideration the new
subsequent 30, year sentencing limitation which entered into the US Judiciary
procedures in year 1989. Petitioner was re-sentenced in year 1994, "cases on
collateral review" In TEAGE, Supra "Order and Liberty" (RETROACTIVITY) "New
rule is the one that breaks new ground"   Applying it was essential to the
fundamental fairness of the reduction of sentence proceeding, (Rule 35)
specially in view that over 400 extradited Colombian nationals since 1989,
have been applied the said "new rule' non has been sentenced exceeding **30 years.**
Petitioner in year 1994, was similarly situated, and TEAGE, Supra is law.

TEAGE, LANE 489, U.S. 28, 109 S. Ct 1060, 103, L Ed 2d 334, (1989)

Also in Re- Extradition of Burt, the Court stated :

> "The Due Process requirements surrounding immunity and cooperation
> agreements also apply during extradition proceedings"
> Extradition of Burt 737 F 2d 1477, 1484 (7th Cir)

**42.**       SIMILARLY SITUATED EXTRADITION CASES SINCE 1989

In year 2003, extradited Colombian, Fabio Ochoa, was sentenced by the
United States District Court, Southern District Of Florida -Miami Division-
to a thirty (30) year term, in case No: 99-6153- CR-MOORE. Mr Ochoa, did not
cooperated with authorities, and the Government's sentence recommendation states:

> "A sentence of life in prison or to a number of years significantly
> higher than 360 months, could irreparably harm the United States'
> efforts to extradite Colombian citizens charged with United States
> crimes.

(     13     )

**43.**     The Government has attached  as exhibits the formal statements
from two officials of the Government most familiar with the
issue of extradition of Colombian citizens to the United States.

We respectfully request that this Court rely upon statements in
considering the government's request that Ochoa be sentenced to
360 Months' imprisonment."   Please See EXHIBIT **# 05**

**44.**   Similarly situated, extradited Colombian, Alejandro Bernal, one of

Fabio Ochoa's co-defenders, was sentenced by the federal Court -Miami Division-

to **fourteen (14½) year term.** Alejandro Bernal, became a government witness ,

entering into a cooperation agreement with the government. He testified in Court

against Fabio Ochoa. The U.S. Attorney's office -Miami Division- honoring the

thirty (30) year limititation on sentences under the Treaty, as well complying

with the binding cooperation agreement, recommended a fair and judically sound

sentence for a federal witness, **14½ years.**     Please see MEDIA NEWS EXHIBIT **# 17**

**45.**   VIOLATION OF THE DUE PROCESS CLAUSES OF THE FIFTH AMENDMENT AND
UNJUSTIFIED DISPARITY IN SENTENCES IN VIOLATION OF THE EIGHT AMENDMENT.

The Disproportionated and unjustified disparity in the sentences of convic-

ted offender, General Manuel Noriega, to a 30 year term, and the Prosecution's

-star- witness, Lehder, sentenced to 55 years, to be released at the age of 74,

years old in year 2024, constitutes not only an unprecedental illegitimate

breach of a cooperation agreement but worst yet, a cruel and unusual punishment.

The government witness is been held at a -higher standard- than convict general

Noriega, who, amongs other crimes, is responsable for killing 23 US soldiers

and wounding over another one hundred, immunized because his POW status.

General Manuel Noriega, has served his time and released from US Custody.

Case Law: "Unjustified disparity in sentencing is violative of the 8th
Amendment" State V. Clark wash App Div. 2, 844 P 2d 1029
68 wash App 592 (1993).

Over 400 extradited Colombians, with and without cooperation with authorities

have received federal sentences which do not exceed thirty (30) Years.

46.        ID. PEOPLE V. BROADIE." A Punishment challenged as being cruel
and unusual is to be compared with punishment described in the same
jurisdiction for other offenses and also with punishments for the
same and similar offenses prescribed in other jurisdictions"

People V Broadie, (1975) 332 N.E. 2d 338, 37 N.Y. 2d  100, 371 N.Y.
S 2d. 471. Cer denied, 96 S.Ct. 372, 423 U.S. 950, 46 L Ed 2d 287.

Also, Apprendi, supra, may be applicable as relief to the herein case:
"Apprendi applies solely to such super-maximum sentences"
U.S. V. Garcia 240   F 3d,  180, 183, (2nd Cir 2001)

47.        **GROUND ONE:** Petitioner has extensively demostrated through documented
evidence, U.S. and international law, that Respondents, since March 22, 2007
are holding him illegally in federal prison, after having served his statutory 30
years under the Treaty, all in violation of the extradition Treaty and its Act
of Surrender, as much in violation of the constitution, treaties and laws of the
United States.  Petitioner plea for justice is done under Rauscher, Supreme Court.
"Rauscher gave extradited defendants the right to claim the rule's protection"
U.S. V. Vreeken 803. F 2d. 1085, 1088 (10th Cir 1986)

48.        **GROUND TWO:** Petitioner has fully demostrated under several standards
of review, that Respondent's breached the cooperation agreement document
and the verbal -Quid Pro Quo- agreement, by having Petitioner be sentence to a
fifty five (55) year term, **25 years in excees** of the 30 years agreed and promised.
25, years in excees of the Extradition treaty sentencing limitations. Also the
Respondents breched the United States promise, that Petitioner would receive a
sentence equal to, if not lower than General Manuel Noriega's sentence. General
Noriega, already served his statutory thirty (30) year sentence, and was rele-
ased from U.S. Custody on September 9, 2007. Petitioner remains incarcerated.
"If the Government breaches an immunity and cooperation agreement and violates
Petitioner's due process right's Courts have "Sufficient reasons to grant
habeas relief in the face of a request for extradition"
Extradition Of Drayer, 190, F 3d  410 (6th Cir) 1999.

**GROUND THREE** : DOCUMENTED INVESTIGATION AND EVIDENCE

**49.** CONSPIRACY TO OBSTRUCT JUSTICE, AIDING AND ABETTING GENERAL MANUEL NORIEGA
A FOREIGN PRISONER OF WAR (POW)  BY RESPONDENT CHARLES E. SHUMER,CONGRESSMAN.

JUDICIAL, EXCECUTIVE AND MILITARY HISTORY OF FEDERAL CASE
U.S. V. MANUEL NORIEGA No: 880079-HOEVELER (1988) -Miami Division-

On the year 1989, the President of the United States, George W. Bush,
addressed the american union via T.V. and radio, announcing that he had ordered
the United States military forces to invade the nation of Panama to capture
General Manuel Antonio Noriega, the military leader of Panama, to be brought to
the United States Courts to stand trial for cocaine and racketeering charges, as
well for the U.S. military to safe guard the interoceanic functioning and securi-
ty of the Panama Canal, the U.S. Canal Zone.

**50.**    The United States Military, using over 24.000 soldiers, supported by hund-
dreds of U.S. Air Force planes and U.S. Navy vessels, invaded the nation of
Panama, confronted and defeated its military and militias, capturing the fugitive
General Manuel Antonio Noriega.

**51.**    General Manuel Noriega, was transported to the United States and placed
in front of a federal Judge at the U.S. District Court for the Southern District
of Florida, Miami Division. Honorable Sr Judge Hoeveler, recognized the paname-
nian General as a -prisoner of war- (POW) a military enemy of the United states
captured in battle. General Noriega's confinement was in accordance with his POW
status under the Geneva Convention statutes.    NORIEGA's POW STATUS EXHIBIT: **#21**

**52.** Judicially, the famous trial beggan in Miami Federal Court, in year 1991,
the fifteen main witnesses testified, confessing their participation in the in-
dicted conspiracy to traffick colombian cocaine through Panama to the USA, under
the paid, logistical and military protection of General Manuel A. Noriega.
The General was convicted on seven counts by the jury, cocaine trafficking ,
Racketeering and Money  Laundering.

**(    16    )**

**53.**    GENERAL MANUEL NORIEGA WAS SENTENCED TO A THIRTY (30) YEAR TERM.

Upon conviction, the Court sentenced Noriega originally to a 40, year term. later, the Court modified his sentence to a **30 year term**, due to unjusti- fied disparity between Noriega's sentence and the sentences given to co-defen- ders. The Government did not opposed said modification.

**54.**    General Manuel Noriega, finished serving his thirty (30) year statutory sentence on September 9, 2007, and was released from U.S. Custody.

**55.**    The entire COST to the United States for bringing the military dictator of Panama to justice, was over $ 200 Million Dollars. 23 U.S. Soldiers were killed and over one hundred wounded by Noriega's military forces.

To this date, two of the federal witnesses agaisnt general Manuel Noriega, have been assessinated, one in Miami, and the second one in Colombia.

OVERSEAS INDICTMENTS AND SENTENCES AGAINST GENERAL M. NORIEGA

**56.**    General M. Noriega, has a pending ten (10) year sentence in Paris, France.

In Panama, the Tribunals have sentence General M. Noriega to the following:

1-P) A 20 year sentence -in absentia- for the torture and assessination of Coronel Grimaldi and 9 other panamenian officers who attempted to arrest General Noriega prior to the U.S. invation of Panama.

2-P) A 20 years  sentence -in absentia- for the kidnapping/assessination of the Colombian Catholic prist, father Gallego.

3-P) A 20 year sentence -in absentia- for the kidnapping, torture and assessi- nation of oppositio politician Hugo Espadafora.

**57.** The former US Secretary Of State, Larry Eagleburger, publicly stated that the United States estimates General Noriega's fortune hiden in secret bank acco- unts overseas, in around $ 200 million U.S. Dollars (1989).

Reportedly, General Noriega spent over $9. Million U.S. Dollars in his legal defense team, incliuding a Public Relations firm.

58. General Noriega's panamenian record shows, that while controlling the nation of Panama for many years, Noriega egaged in imense clandestine and illegal dealings with global criminal organizations and mercenaries, but also with operatives from foreign intelligence services hostile to the USA; all which made General Noriega more powerful, very rich, very dangerous and almost untochable.

59. The Petitioner presents pivotal evidence, solidly connected to the **grounds for relief**, pertaining to the dangers that prosecuting General Manuel Noriega represented for the U.S. Judiciary as well for the witnesses against the General. Excerts from the investigation that writer Andrew Cockburn developed and discused in his book titled "Dangerous Liaison" sub-titled "The man behind the General".

Please See -excerts- from several pages attached as INVESTIGATION. <u>EXHIBIT:</u> **# 1 8.**

60. ADDITIONAL INFORMATION KNOWN TO THE CENTRAL INTELLIGENCE AGENCY, <u>are</u> the following clandestine operations executed by General Noriega in behalf of Israeli intelligence operatives in Panama in year 1985. Under Noriega's orders, Israeli operative Mike Harari, was given 10,000 new blank panamenian passports with blank ID cards as well a box of panamenian Government ruber seals, as requested by Mr Harari.  Mike Harari was for many year Noriega's security adviser.

61. In Year 1987, General Manuel Noriega's Lear Jet, transported Noriega and Israeli operative Mike Harari  from Panama to Habana, Cuba. In Habana, General Noriega introduced Mike Harari to the -de facto- president of Cuba, Fidel Castro.

62. THE U.S. STATE DEPARTMENT, had placed an EMBARGO to any sales of U.S. weapons aircraft, or any aircraft parts to the Noriega regime. Operative Mike Harari, using a Miami based Israeli Government company, "Commodore Aviation" at Miami, Florida, supplied Noriega's air force with all parts and equipment, circunventing the United States embargo  against the Noriega regime.

Petitioner incorporates excerts from Cockburn's investigation, please see following parragphs, **63, 64, 65, and 66.**

EXERT FROM INVESTIGATION EXHIBIT # 18

# 10. The Man Behind the General



63.

IN THE SPRING of 1984, an honor guard assembled at the Kirya, the compound of the Israeli Ministry of Defense. They had gathered to greet a foreign general, a small, squat figure known to his detractors as "pineapple face," thanks to his unfortunate skin. The general looked resplendent in full dress uniform, with his Israeli paratrooper wings pinned just above his left breast pocket. Manuel Antonio Noriega, "Tony" to his friends, had flown thousands of miles from his home in Panama for the occasion. Flanked by Moshe Levi, commander in chief of the Israeli Defense Forces, and other top IDF commanders, Noriega had come to receive a decoration, reportedly for services performed providing fraudulent "end user" certificates for Israeli weapons secretly destined for Iran. For such requirements, Panama was a country of easy virtue and its commander in chief was ever available.

246    DANGEROUS LIAISON

64.

all saluting while the anthems of Israel and Panama fill the air—with the exception of one man. A lean, dark figure standing in the shadow of the Panamanian dictator, he wears a simple, expensive black suit and a carefully knotted silk tie. His black hair is slicked back and large sunglasses obscure his features. Michael Harari had once been chief of clandestine operations for Mossad. He was now inseparable from Manuel Noriega and had earned the reputation as the "brains" behind the General. The aging spy, known to Panamanians as "Mad Mike," had carved out a powerful and lucrative niche for himself as General Noriega's best friend, business associate, and as the general once said, his "mentor."

EXCERT FROM INVESTIGATION EXHIBIT # 18

*The Man Behind the General*    247

**65.**

departure in the dead of night in December 1989, "the friend," as he was known at the Israeli Embassy in Panama, was accorded every privilege of a top Israeli official. As one former embassy employee observed, "This tale that Mike Harari operates in Panama as a private party has no basis in reality. Mike Harari enters the embassy in Panama not like a household member, but like an owner. I know this from close acquaintance, and I can say that Mike Harari enjoys all possible services in the Israeli Embassy in Panama. He uses the diplomatic mail, and in fact, he knows everything that occurs in the embassy, including secret cables."[1]

**66.**

With a guiding hand from Mike Harari, Israel did a brisk business with Panama, shipping $500 million worth of arms during the 1980s. At least $100 million worth of rifles, machine guns, explosives, and advanced communications equipment was dispatched *after* Noriega had been exposed by the Senate Foreign Relations Committee in early 1988 as being heavily involved in narcotics trafficking. Harari's orders for Panama were filled without protest. As one Israeli commentator put it, the Ministry of Defense in Tel Aviv "routinely approves all arms and equipment sales requested by Harari." Harari was influential enough in Jerusalem and Panama City to fire both Panama's ambassador to Israel and Israel's ambassador to Panama. He was sensitive to the extensive security needs of a man like General Noriega, who was adept at collecting enemies. Harari "provided Noriega with sophisticated Israeli-made eavesdropping and security equipment—installed by Israeli experts—which allows Noriega to spy on political opponents." Along with the equipment came advisers. Israeli military advisers, recruited by Harari to serve as Noriega's elite bodyguards, supervised the crackdown on political opponents.

67.     In late 1987, several Israeli intelligence representatives arrived in
        Cuba with operative Mike Harari and were received by Fidel Castro at the
President's headquaters. The leading Israeli official was Rafael Eitan, chief
of "LAKAM" the -Secret Scientific Intelligence Unit- from Israel.

68.     Said Israeli representatives and agents, remained in Cuba for ten days,
six mutual agreements were accorded through out the negociations. LAKAM became
the main supplier of state of the art electronic survillance equipment, enormous
amounts of telephone and radio waves interception devises. Special computer
software to analyze population activities and utility services, as well  advance
decoders and Cryptic comunication machines, hiden cameras, bugging and remote
/ satelite control of observation devises, etc, all to equip the -Seguridad del
Estado- comunist Cuba intelligence service. All and all, bussines between both,
Cuba and Israeli intelligence services multiplied. Rafael Eitan (LAKAM) persona-
lly opened an office in Habana Cuba, General Manuel Noriega, was the arquitect
of such connected relationship between Israeli intelligence and Fidel Castro.

69.     Mr Rafael Eitan, chief of LAKAM, was the controlling agent for Robert
        Maxwell. Master spy and bussines mongul Robert Maxwell, had offices in New
York city, and a long relationship with Congressman Charles E. Schumer, of New
York.The same and only U.S. Congressman which produced, mailed and utilized to
pressure the U.S. Justice system, the adverse document titled "THE NORIEGA
PROSECUTION: WHAT PRICE THE GENERAL  ?" (1992).

CONGRESSMAN CHARLES E. SCHUMER's CONSPIRACY TO OBSTRUCT JUSTICE
DEPRIVING FEDERAL WITNESSES OF THEIR REDUCTION OF SENTENCE ENTITLEMENTS

70.  Upon General Manuel Noriega's federal conviction, Respondent Charles Schumer
     issued, produced and mailed to the U.S. Attorney's Office -Miami Division- to
the -Jacksonville Division- (Fla) and to the Criminal Division of the U.S. Dept
of Justice and others, his adverse document titled "THE NORIEGA PROSECUTION:
WHAT PRICE THE GENERAL  ?"  The Cover page states the Following :

(     21     )

EXCERT FROM INVESTIGATION EXHIBIT # 09



RECEIVED
NMATE MONITORIN
PROGRAM

# The Noriega Prosecution:

# What Price the General?

April 1992[1]

---

[1]Chairman Charles E. Schumer of the House Judiciary Committee's Subcommittee on Crime and Criminal Justice directed the Subcommittee majority staff to prepare this report. This report has not been reviewed or approved by other Members of the Subcommittee.

71.    "Chairman Charles E. Schumer, of the House Judiciary Committee's
       Subcommittee on Crime and Criminal Justice directed the Subcommittee
       majority staff to prepare this report. **This report has not been
       reviewed or approved by other Members of the Subcommittee**" ea.

72.    Petitioner alleges, that prior and during the federal trial in case

       United States V. Manuel Noriega, Respondent Charles E. Schumer, initiated

and conducted an investigation of the 15, main witnesses against General Noriega

in aid to the Noriega defense. Also Charles E. Schumer , investigated the prose-

cutors, their procedures and negociations to persuade convicted co-conspirators

to cooperate with the United States, under the Title 18, Rule 35(b) statute.

Thereafter, Respondent Charles Schumer, issued and adverse -report- document.

Petitioner cites some of the most intimidatory aparts from the document:

73.    RESPONDENT CHARLES E. SCHUMER DOCUMENT "THE NORIEGA PROSECUTION..."

       On INTRODUCTION, page 1, line 4, "..THE UNPRECEDENTED COST PROSECUTORS
       INCURRED IN CUTTING DEALS WITH SCORES OF CONVICTED DRUG TRAFFICKERS AND
       OTHER FELONS WHO HELP BUILD THEIR CASE"

       Page 1, Parr 5. "BUT CLEARLY SOMETHING HAS GONE AWRY WHEN DEFENSE LAWYERS
       ARE BOASTING ABOUT GETTING THEIR CLIENTS A "DEAL OF A LIFE TIME" AND FORMER
       PROSECUTORS ARE BLASTING THEIR OLD COLLEAGES FOR MAKING PACT WITH LIARS"

       Page 1, Line 1, Parr 6. "THE LENIENT TREATMENT OF THE FELONIOUS FIFTEEN
       IS MARKED DEPARTURE FROM NORMAL PRACTICES IN THE SOUTHERN DISTRICT OF
       FLORIDA, WHERE THE NORIEGA CASE IS BEEN TRIED"

       Page 2. Parr 1. "DESPITE THIS RECORD, THE MIAMI PROSECUTORS ROUTINELY
       DEPARTED FROM THEIR OWN SENTENCING PRACTICES AND THE FEDERAL GUIDELINES
       IN ARRANGING DEALS FOR NORIEGA WITNESSES"

       Page 2. Parr 2. "ANOTHER PARTICULARLY QUESTIONABLE TACTIC WAS GIVEN
       THESE CRIMINALS-TURNED-COLLABORATORS CASH PAYMENTS FROM FEDERAL LAW
       ENFORCEMENT FUNDS"

       Page 2. Parr 5. "BASED ON THESE PRELIMINARY FINDINGS, CHAIRMAN CHARLES E.
       SCHUMER, **WILL SEND A LETTER TO THE ATTORNEY GENERAL** REQUESTING A COMPLETE
       ACCOUNT OF THE PLEA BARGAINS STRUCK WITH THE JUSTICE DEPARTMENT's NORIEGA
       WITNESSES.

74.    Continious "CHAIRMAN SCHUMER ALSO **WILL ASK THE U.S. ACCOUNTING OFFICE (GAO)** TO PERFORM A FULL-SCALE AUDIT OF THE FEDERAL LAW ENFORCEMENT FUNDS AND OPERATIONS" ea.

75.    Petitioner alleges, that using the power and prestige of Congressional seat, Respondent Charles Schumer is infering that the prosecution team in case U.S. V. Manuel Noriega, engaged in -subornation of perjury- and -bribery of witnesses- and other illegalities and in writing asked the U.S. Attorney General and the U.S. Accounting Office (GAO) to investigate the valiant and professional prosecutors.

76.    On page 10. subtituled **CARLOS LEHDER -RIVAS**

Page 11, Line 1, Parr 3 : "FINALLY, LEHDER HOPES THE GOVERNMENT WILL AGREE THAT HIS COOPERATION WARRANTS IMMUNITY FROM ALL OTHER OUTSTANDING CHARGES AND A SHARP REDUCTION IN HIS CURRENT SENTENCE, SO THAT HE MAY GO FREE AFTER FEW MORE YEARS"

77.    Petitioner respectfully argues, Respondent Charles E. Schumer assessment is a mixture of incendiary especulations and judicial facts. For example, the "Act Of Surrender" document signed in 1987, by the authorities of the United States and Colombia, guarrantees that, quote:

> "the person extradited **can only** be adjudicated for the charges which are set forth in Indictment No: 81-82-Cr-J-M, returned on September 18, 1981 in the United States District Court for the Middle District Of Florida" Act Of Surrender, Exhibit : # 01.

Not only all other cited indictments were not applicable by Treaty, the Prosecution team did nothing wrong. And yes, Petitioner in 1991, told the Court and the Noriega's jury, that he expected his eventual freedom by cooperating.

78.    On Page 11, Line 1, parr 5, Respondent Charles Schumer states, Quote

"IF LEHDER IS EVER ALLOWED TO LEAVE THE UNITED STATES, AS SOME HAVE FEARED"

This very -one liner- from a U.S. Congressman to prosecutors, who are approved to be AUSAs by the U.S. Congress and promoted with official recommendations, could be construed as a tacit -direct order- to dispossess federal witness C. Lehder, of his agreed reduction of sentence under the Treaty entitelments.

79.    As an irrefutable consequence, two years later, the Jacksonville prosecutor'

recommendation to the resentencing Court read : Quote,

"If the foregoing recommendation is accepted, Mr Lehder would be
seventy-four (74) years old upon his release" Exhbit: # 13.

Petitioner alleges, he was not sentenced to the Treaty and agreements to

a maximum of 30, years as general Manuel Noriega did, but to what Respondent

Charles E. Schumer demanded, (Schumer) "If Lehder is ever allowed to leave the

United States, as some have feared".

80.    The Petitioner is motioning the Court for the granting of a DISCOVERY

motion. The Court and the Petitioner as a victim, constitutionally must obtain

and study any and all written or electronic mail and comunications, letters that

Respondent Charles Schumer and his office staff [Washington and New York] has

sent or given to the Attorney General Of United States, then Janet Reno, the

US Dept Of Justice -Criminal Division- and to all U.S. Attorney's, **through out**

**all this years,** regarding federal witnesses  case U.S. V. Manuel Noriega,

incluiding and specifically Carlos Lehder.

IT is known that Respondent Charles Schumer complained to Attorney General

Janet Reno about the "Questionable tactic" by the Government "arranging deals

for Noriega's witnessess" Etc. Attorney General Janet Reno, ordered that Carlos

Lehder's file be placed at her office.

81.    Petitioner's limited investigation developed that Respondent Charles

Schumer, **has not** intervened against federal Witnesses in any other case.

His specific agenda and target were the 15 witnesses from the Noriega, case.

82.    The immediate REPERCUSSION after the U.S. Attorney's from Jacksonville Fla,

office received  the adverse document "THE NORIEGA PROSECUTION..." (1992)  was

internally to declare witness C. Lehder "persona non grata". Petitioner as a

victim, witnessed a complete change for the worst in the prosecutors personal

(    25    )

83.    And judicial attitude towards Petitioner. Petitioner's phone calls and

correspondence were then (1992) and continue to be to this date **unanswered.**

Ignoring this witness, the Prosecutors from the Jacksonville office, began to

repudiate and recant, one by one, on all written and oral promises made their

witness Lehder, to this very date there is no communication what so ever.

CIRCUMSTANCIAL EVIDENCE PERTAINING TO RESPONDENT CHARLES
SCHUMER's RELATIONSHIP WITH ISRAELI REPRESENTATIVES AND AGENTS

84.    Petitioner submitts his limited investigation of Charles Schumer's conspi-

racy to obstruct justice, has proven it was totally aimed to aid and abett

panemenian general Manuel Noriega, a foreign prisoner of war, an enemy of USA.

Also the investigation so far revealed that specific Noriega Israeli associates

lounched an opeartion in the United States to judicially aid the convicted Gene-

ral. In the Republic Of Panama (1997) Sandra Noriega, the daughter of General

Noriega, who lived in Israel, has mentioned that her father's Israeli friends

"love the General very much, and had lounched an opeartion in the United States

tending to lobby and aid the General solve his judicial problems".

Similar statements were manifested by the Noriega family to dominican nationals

associated to the familiy' bussines in Dominican Republic.

85.    Petitioner assures the Court, the introduction of the following evidence

is firmly connected to the grounds for relief as well incriminating in nature:

THE RELATIONSHIP BETWEEN RESPONDENT CH. SCHUMER AND -AIPAC-

Documentedlly, Charles E. Schumer, for many years has maintained a very

solid relationship at many levelswith the directorship and staff of "AIPAC"

-American-Israeli  Public Affairs Committee- in Washington D.C. and New York

City.  Charles E. Schumer, has assisted -AIPAC- in hundreds of issues of natio-

nal and international dimension. AIPAC, is a legitimate properly register orga-

nization which propels,  promotes and defends Israeli interest in the USA.

(    26    )

86.        However, according to FBI and federal Court records on AIPAC, several
of its excecutives have been duly indicted under the Espionage Act. Most
reacently, the 2005, indicments by the U.S. Federal Court of Alexandria, VA,
charging Mr Steven Rosen and Mr Keith Weissman, both senior AIPAC executives.
[Petitioner is attaching the Indictment case #: 1:05-Cr-00225-TSE All Defendants.
only, because a third co-defendant already pleaded guilty to the charges and was
sentenced to 10 and 14 years -concurrent terms-]   See Indictment EXHIBIT: # 19.


    THE RELATIONSHIP BETWEEN CHARLES SCHUMER AND ROBERT MAXWELL "LAKAM"

87.    Documentedlly, Robert Maxwell's espionage activities have done enormous,
irreparable and long term harm to the United States startegic weapons defences.
Spy R. Maxwell, using the "Enhance Promise" modified computer software in U.S.
territory, conducted the penetration and stealing of top U.S. weapon secrets
from Los Alamos, New Mexico, nuclear laboratories. Mr Maxwell, also penetrated
several other classified strategic nuclear instalations in the United States.

88.    Beggining in year 1985, Robert Maxwell and its LAKAM espionage network
infiltrated U.S. Government nuclear weapons laboratories by selling them
computer systems with a "Troyan horse" trap door, fitted and secretly incorpora-
ted into the system. The self-destroy microship (Troyan horse) will come into
play when ever LAKAM operatives, using a modem, typed secret code words at a
pre-arranged time, to gain full access to specific programs under review at such
exact time  by scientist at U.S. nuclear facilities. LAKAM operatives overseas
electronically obtained the top secret weapons information. Such stolen infor-
mastion was delivered then to the headqueaters of the -Secret Scientific
Intelligence Unit- (LAKAM's chief, Rafael Eitan.)  in the nation of Israel.

89.    As a logistical part of such espionage operation, spy Robert

Maxwell, had priorly established several corporations/compnies in England,

Austria and United States, incluiding "Information On Demand" (IOD). Said

company, operated in the USA over 250 computer data bases. Its legal front

provided information to the public in two main categories, research and document

delivery. It sales division, sold the "bogged" Enhance Promise, modified com-

puter software to targeted U.S. Defense facilities.

        Please See:   FBI, Documented Evidence INVESTIGATION , EXHIBIT: # 20.

90.    Robert Maxwell's controlling agent was LAKAM's Chief, Mr Rafael Eitan.

  Chief Rafael Eitan, was also de controlling agent for U.S. convicted spy

Jonathan Pollard, a U.S. Navy analyst, serving a life sentence for espionage

operations against  his  own country, the United States.

Chief Rafael Eitan, is not allowed in U.S. Soil. Thanks to General Noriega's

introduction connecting israeli intelligence operatives to the Cuban leadership

Mr. R. Eitan [LAKAM] controls a sales and training office in comunist Cuba.

91.    On Parragraphs 29 & 30, page 8. the history record found Chief Rafael

Eitan and operative Mike Harari,  together doing bussines with Fidel Castro.

Harari was an adviser and chief of security for General Manuel Noriega in

Panama, as the investigation by Andrew Cockburn titled him "The Man Behind  the

General" [Exhibit # 18 ]. Respondent Charles E. Schumer, no longer meets with

spy Robert Maxwell in New York City, Mr Maxwell has perished.

        VIENNA, capital of the neutral nation of Austria, is a wonderful city,

but also, as the FBI and CIA reports confirm, it's the main center of operations

for the Israeli intelligence services in Europe. Respondent Charles E. Schumer

international traveling records show, the Congressman has the proclivity of

visiting Vienna, very often.

92.        CLAIMS FOR RELIEF UNDER GROUNDS ONE, TWO AND THREE

The Petitioner has fulfilled the preponderance of the evidence' standard to obtain relief. The exceptional and **extraordinary circumstances** of the herein case reafirms transparently that the US Judiciary branch, is not in the bussines of breaching agreements with federal witnesses, or violating their Due Process Rights, neither in violating international extradition Treaties....all the numerous and continious statutorial and constitutional violations against the Petitioner, cited in Grounds : ONE, TWO and THREE, ocurred unprecedentally and **only**, when a single member of the U.S. Legislative branch, Charles E. Schumer, encroached into the U.S. Judiciary branch, exercising the power of his high office and personal plan, interfearing, tampering and retaliating against U.S. Government witnesses, all in behalf and benefit of foreign agents and General Manuel Noriega, a POW, and military enemy of the United States.

"If Lehder is ever allowed to leave the USA, as some have feared" CH. Schumer.

93.    Petitioner is a foreigner,the Supreme Court has held that any discrimination against aliens not involving government employees, is subject to strict scru- tiny. UNDER THE ALIEN TORT CLAIMS ACT, Respondent's can not continue to hold Petitioner, an immunized government witness, for an **extra unduly 25 years,** when Lehder has already served his statutory thirty (30) year sentence, and General Manuel Noriega, has been already discharged, after serving his statutory thirty (30) year sentence.    Please See  NORIEGA's sentence ended Sep 9. EXHB: **#** 21
                                                [News Herald/ Associated Press]

94.  Petitioner submitts, that originally, the United States by Respondents U.S. Attorney General and Robert S. Mueller, intented to obtain a sentence specifically as the verbal and written agreements promised under the Treaty: "**Lehder would receive a sentence equal if not lower that, General Noriega's own parolable sentence**" **[30 years].**

**95.**     PETITIONER HAS EXHAUSTED ALL FORMAL AND JUDICIAL PLEAS TO
OFFICIALS THAT HAD AUTHORITY TO CORRECT HIS ILLEGAL SENTENCE

In February 15, 2007, Petitiner extensively notified United States Attorney
PAUL PEREZ. Middle District Of Florida, Tampa Office. That Petitioner's sentence
under the Treaty and supportive cooperation agreement commitments would be com-
pletly served by him on the 22 day of March, 2007. and requested the Government
to process his release from U.S. Federal prison.  Notice by certified mail # 7000
1670 0003 4259 7403, returnedreceipt  presented as EXHIBIT : # 22

**96.**   In Feb 15, 2007, Petitioner also extensively notified Assistant U.S.

Attorney James Klindt, Chief Deputy, U.S. Attorney's Office, Jacksonville, FLA
Office.Certified returned receipt presented as  EXHIBIT : # 23

**97.**   In February 2007, Petitioner extensively notified the U.S. Deputy Assistant
Attorney general, Ms Mary Lee Warren, -Dept Of Justice- Criminal Division-
950 Pennsylvania Ave, Room 2115, Washington DC 20530. That Petitioner's sentence
under the Treaty, supported by cooperation agreement commitments, would be comple-
tedly served by Lehder, on the 22 day of march, 2007. Requesting the Attorney
General's Office to order the processing of his release from federal prison.
Ms M.L. Warren, Deputy Assistant Attorney general, in washington is the main
specialist and superviser of all extradition cases between the United States and
the Republic Of Colombia. Petitioner verifies that to this very date, neither
U.S. Attorney Paul Perez, nor AUSA James Klindt, (Middle District Of Florida)
neither Ms M.L. warren,(Attorney General's Office) have ever responded in any
way to Petitioner's  notices of february 2007.
Wherefore, Petitioner has dutifully exhausted all formal and judicial pleas
to U.S. Officials that had authority to correct his illegal sentence.

( **30** )

98.      "As a general rule, the fundamental fairness component
         of the Due Process Clause of the Forteenth Amendment
         requires prosecutors to honor bargains made with criminal
         defendants"  Please See :Mabry V. Johnson 467 US 504, 104
         S. Ct. 25 43. 81  L Ed 2d. 437 (1984).

         "A sentence of life in prison or to a number of years significantly
higher than 360 months, could irreparably harm the United States' efforts
to extradite Colombian citizens charged with United States crimes"

U.S. Attorney recommendation US V. OCHOA (2003)   Exhibit : # 05.


## PRAYER FOR RELIEF

99.

   WHEREFORE:  Petitioner Prays this Court to grant him the

following relief:   1- Issue a writ of mandamus or issue an Order directing

to show cause why a writ of habeas corpus should not be granted and why Lehder

should not be immediately released.

2-   If an Order to Show Cause is issued, to include as part of the Order a

prompt schedule to receive briefing from the parties, on the issues raised in

this Petition, followed by a hearing before this Court on any contested factual

or legal issues, and produccion of Petitioner Carlos Lehder.

3-   After notice and hearing, determine and declare that Petitioner's incarce-

ration violates the Constitution, laws, treaties, specificly the extradition

Treaty new senetencing limitations and rules accepted by both nations, the

United States  and Colombia, and that Petitioner's continuing incarceration is

unconstitutional.

4- After notice and hearing, issue a writ of mandamus that directs the Respon-

dents to obey their clear, nondiscretional duty to follow the Constitution, laws

regulations and treaties of the United States, and therefore to release Petitio-

ner Carlos Lehder, immediately.

5- Grant a writ of habeas corpus on behalf of Petitioner Lehder, ordering his

immediate release from federal prison.

                          (      31      )

100.     6- Grant such other further relief on behalf of Petitioner Lehder and against the Respondents as this Court deems just and proper.

Date: _____

Respectfully Submitted:

................................
Carlos Enrique Lehder Rivas
Federal Prisoner # 06461-018

Address:

Carlos E. Lehder
# 06461-018
320 First St. N.W.
Room # 524 IMS
Washington DC 20534

Copy To: Embassy Of The Republic Of Colombia
         Carolina Barco, Ambassador
         Washington DC.

(    32    )

CERTIFICATE OF SERVICE

I hereby certify that on this day....of September 2007, I have

I have hand-delivered to Bureau Of Prisons staff, a true and correct

copy of the foregoing Petition for a Writ, addressed to Respondent,

HARLEY G. LAPPIN, U.S. Bureau Of Prisons,Director. 320 First St. N.W.

Washington DC 20534. -certified return receipt mail - #

7006 2760 0002 6516 8585

Also I have hand-delivered to Bureau Of Prisons Staff, on  this date

.......September, a true and correct copy of the foregoing Petition for

a Writ, addressed to Respondent PAUL CLEMENT, Attorney General Of The

United States. -certified return receipt mail  7006 2760 0002 6516 8547

Also I have hand-delivered to the Bureau Of Prisons staff, on this date

...September, a true and correct copy of the foregoing Petition for a

Writ, addressed to  Respondent ROBERT S. MUELLER, FBI Director, via

-certified return receipt mail-   7006 2760 0002 6516 8561

Also I have hand-deliverd to the Bureau Of Prisons staff, on this date

...September, a true and correct copy of the foregoing Petition for a

Writ, addressed to Respondent CHARLES E. SCHUMER, United States Congress.

-certified return receipt mail-    7006 2760 0002 6516 8554

I, Petitioner Carlos Lehder, hereby certify that I have served copies

of Petition and all exhibits to the Respondents in this case in fron of

the United States Distric Court for the District Of Columbia.

Carlos E Lheder # 06461-018          Sincerely:
320 First St. N.W.
Room # 524 IMS
Washington DC 20534.                 ...........................
                                     Carlos Enrique Lehder Rivas

Sep 21 2007

## LIST  OF  EXHIBITS

EXHIBIT # O 1-   ACT OF SURRENDER - EXTRADITION (1987)

EXHIBIT # O 2-   EXTRADITION TREATY BETWEEN THE UNITED STATES AND COLOMBIA

EXHIBIT # O 3-   U.S.Case Law: U.S. V. ABELLO-SILVA (1991) [EXTRADITION]

EXHIBIT # O 4-  DOCUMENT BY THE U.S. EMBASSY IN COLOMBIA ASSURING THE
COLOMBIAN GOVERNMENT MR ABELLO-SILVA WOULD BE SENTENCE TO 30 YEARS MAXIMUM.

EXHIBIT # O 5-  RECOMMENDATION AS TO EXTRADITED DEFENDANT FABIO OCHOA
                TO BE SENTENCE TO A 30 YEAR TERM -MIAMI DIVISION-

EXHIBIT # O 6-  INDICTMENT U.S. V. CARLOS LEHDER No: 81-82-Cr-J-12 (1981)
                MIDDLE DISTRICT OF FLORIDA   JACKSONVILLE FLA DIVISION.

EXHIBIT # O 7-  ORDER by the Jacksonville Federal Court :
                SENTENCING LEHDER TO A FIFTY FIVE (55) YEAR SENTENCE.(1994)

EXHIBIT # O 8-  U.S. BUREAU OF PRISONS 30 YEAR SENTENCE  CALCULATION.

EXHIBIT # O 9-  CONGRESSMAN CHARLES E. SCHUMER' DOCUMENT
                "THE NORIEGA PROSECUTION: WHAT PRICE THE GENERAL ?" (1992)

EXHIBIT # 1 O-   COLOMBIAN DECREE/ LAW LIMITING SENTENCES TO 30 YEARS (1991)

EXHIBIT # 1 1-   AFFIDAVIT BY CHIEF PROSECUTOR NORIGA CASE
                 SLC MICHAEL PATRICK SULLIVAN (1993)

EXHIBIT # 1 2-   RECOMMENDATION FOR A REDUCTION OF SENTENCE FROM THE MIAMI
                 U.S. ATTORNEYS TO THE JACKSONVILLE U.S. ATTORNEY"S OFFICE.

EXHIBIT # 1 3-   RECOMMENDATION BY THE JACKSONVILLE U.S. ATTORNEYS
                 TO SENTENCE LEHDER TO A 55 YEAR TERM

EXHIBIT # 1 4-   ORDER BY THE JACKSONVILLE FEDERAL COURT DENYING LEHDER'S
                 PRE SENTENCING MOTIONS. (January 1994)

## LIST OF EXHIBITS

EXHIBIT # 1 5-   LETTER OF TOTAL 'USE' IMMUNITY BY MIAMI AND JACKSONVILLE.

EXHIBIT # 1 6-   MULTI-DISTRICT COOPERATION AGREEMENT DOCUMENT (1991)

EXHIBIT # 1 7-   SENTENCING OF EXTRADITED ALEJANDRO BERNAL TO 14½ YEARS.
                 MIAMI HERALD NEWS ARTICLE. ( 2004)

EXHIBIT # 1 8-   INFORMATION REGARDING NORIEGA & ISRAELI INTELLIGENCE OPERATIVES
                 BOOK "DANGEROUS LIAISON" CHAPTER page 235.

EXHIBIT # 1 9-   FEDERAL INDICTMENT/CASE 1:05 CR.225. U.S V. STEVEN ROSEN
                 KEITH WEISSMAN et al.  U.S. DISTRICT COURT ALEXANDRIA VA.

EXHIBIT # 2 0-   FBI DOCUMENTED EVIDENCE INVESTIGATION OF ROBERT MAXWELL

EXHIBIT # 2 1-   GENERAL NORIEGA FINISHED SERVING HIS SENTENCE ON SEPT, 9, 2007.
                 MIAMI HERALD INTERNET NEWS/ NEWS HERALD (Florida).

EXHIBIT # 2 2-   CERTIFIED RETURN RECEIPT MAIL, U.S. ATTORNEY PAUL PEREZ
                 U.S. ATTORNEY OFFICE TAMPA, FLORIDA (Middle District)   (2007)

EXHIBIT # 2 3-   CERTIFIED RETURN RECEIPT MAIL. AUSA JAMES KLINDT, (2007)
                 U.S. ATTORNEYS OFFICE, JACKSONVILLE FLORIDA (Middle District)

TRANSLATION

ACT OF SURRENDER OF MR. CARLOS LEHDER RIVAS BY THE
AUTHORITIES OF THE REPUBLIC OF COLOMBIA, TO THE AUTHORITIES OF
THE UNITED STATES OF AMERICA, IN COMPLIANCE WITH RESOLUTIONS 79
OF MAY 8, 1984, AND 101 OF JUNE 8 OF THE SAME YEAR.

In Tampa, Florida, on the fifht day of February, 1987,
Lt Colonel Teodoro Campo Gomez, representing the Colombian
Government and Richard L. Cox, Jr., representing the United States
Government, met in order to proceed, to take action, the first to
surrender, and the second to receive, Mr. Carlos Lehder Rivas, iden-
tified with citizenship identification No. 19.082.128 of Bogota, in
compliance with the provisions of Resolutions No. 79 of May 8, 1984
and 101 of June 8 of the same year.

It is made known to the officials who receive the afore-
mentioned gentleman, that in accordance with the referenced reso-
lutions and with the fundamentals of the valid Treaty between the
two countries, the person extradited can only be adjudicated for
the charges which are set forth in Indictment No. 81-82-Cr-J-M,
returned on September 18, 1981, in the United States District Court
for the Middle District of Florida.

The aforementioned is based on Article 15 of the Treaty,
which establishes that the person extradicted cannot be adjudicated
and punished by the requesting state for acts which are different
than those for which the extradition has been granted.

( 1 )

Exhibit # 01

Let it be known that the Colombian Government, through
its corresponding Consul in the United States, who will have it
within the scope of his designated authority, will keep watch on
the trial which will be carried out against Mr. Lehder Rivas, so
that he may prepare his defense and so that his universally recog-
nized human rights are respected.

We turn over to the North American officials who participate
in this action, authentic photocopies of resolution 79, of May 8,
1984, and 101 of June 8, 1984.

(END PAGE 1)

PAGE 2.

As evidence, the present act is signed by those who
participated in, read, and approved it.

( SIGNATURES )

Lt. Col. Teodoro R. Campo          Richard L. Cox Jr
National Police                    U.S. Marshal
Colombia                           Middle District of Florida.

( 2 )                          Exhibit # 01

ACTA DE ENTREGA DEL SEÑOR CARLOS ENRIQUE LEHDER RIVAS, POR PARTE DE LAS AUTORIDADES DE LA REPUBLICA DE COLOMBIA A LAS AUTORIDADES DE LOS ESTADOS UNIDOS DE AMERICA, EN CUMPLIMIENTO DE LAS RESOLUCIONES 79 DEL 8 DE MAYO DE 1984, Y 101 DEL 8 DE JUNIO DEL MISMO AÑO.

En _TAMPA FLORIDA_, a los _CINCO_ días del mes de febrero de 1987, se reunieron el Teniente Coronel TEODORO CAMPO GOMEZ, en representación del Gobierno Colombiano, y _RICHARD L. COX, JR_ en representación del Gobierno de los Estados Unidos, con el fin de proceder, el primero a entregar y, el segundo a recibir al señor CARLOS ENRIQUE LEHDER RIVAS, identificado con la cédula de ciudadanía No. 19.082.128, de Bogotá, en cumplimiento de lo estipulado en las Resoluciones números 79, del 8 de mayo de 1984, y 101, del 8 de junio del mismo año.

Se hace saber a los funcionarios que reciben al mencionado señor que, de acuerdo con las resoluciones citadas y con fundamento en el Tratado vigente entre los dos países, el extraditado solo podrá ser juzgado por los cargos que se le imputan en el auto de llamamiento a juicio (INDCTMENT) N° 81-82-Cr-J-M, dictado el 18 de septiembre de 1981, por la Corte Distrital de los Estados Unidos, para el Distrito Medio de la Florida.

Lo anterior con fundamento en el artículo 15 del Tratado, que establece que la persona extraditada no puede ser juzgada y sancionada en el Estado requirente por hechos diferentes a aquellos por los cuales se ha concedido la extradición.

Se deja constancia que el Gobierno Colombiano, a través del Cónsul correspondiente en los Estados Unidos y en desarrollo de las funciones que le competen a este funcionario, vigilará el juicio que se seguirá contra el señor LEHDER RIVAS, para ejercitar su defensa y para que se respeten los derechos humanos universalmente reconocidos.

Se entrega a los funcionarios norteamericanos que intervienen en esta diligencia, fotocopia auténtica de las resoluciones números 79, del 8 de mayo de 1984, y 101 del 8 de junio de 1984.

Exhibit # 01

2.

Para constancia se firma la presente acta, por quienes en ella intervinie-
ron, una vez leída y aprobada.

Exhibit # 01

**1168**          **948 FEDERAL REPORTER, 2d SERIES**

of defendant, Dr. Calhoon. (Order and Judgment of December 12, 1989, Record Vol. II, Items 156, 157.)

In sworn statements, Dr. Calhoon denied that he ordered tests to determine plaintiff's AIDS status. (Vol. II, Item 128, Exhibits "A," "B"). Dr. Calhoon first learned that plaintiff was HIV positive on May 5, two days following the operation.

Plaintiff's argument that the tests were ordered by Dr. Calhoon is pure speculation and contrary to the evidence presented to the trial court. In lab reports submitted by plaintiff himself, several other doctors are noted as requesting tests—i.e., Doctors Gilcher, Crook, Camp, and "Non–Staff M.D." (Record Vol. II, Exhibits to Item 133.)

On the basis of affidavits and depositions presented on the issue the trial court made these findings:

The plaintiff has filed his supplemental response and, in addition to failing to explain his exhibit "B," has failed to submit sufficient proof to controvert the evidence submitted by the defendant that he did not order or authorize either of the two AIDS tests. To the contrary, the only credible evidence establishes that the initial test was ordered by Dr. Crook and the subsequent test was automatically required by the Baptist Medical Center's blood bank due to the results of the HTLV–III test.[4]

Plaintiff failed to submit any evidence to controvert defendant's evidence that Dr. Calhoon was not the one who ordered the AIDS test. The trial court properly dismissed the § 652B complaint because there was no genuine issue of conflicting material facts on the issue.

The rulings and judgment of the trial court were correct in all respects, and the Judgment is AFFIRMED.



---

**4.** See Depositions, Record Vol II, Exh. A to Docket 153 and Docket 154, Deposition of Caro-

---

UNITED STATES of America, Plaintiff–Appellee,

v.

Jose Rafael ABELLO–SILVA, Defendant–Appellant.

No. 90–5161.

United States Court of Appeals, Tenth Circuit.

Nov. 6, 1991.

Defendant was convicted in the United States District Court for the Northern District of Oklahoma, Thomas R. Brett, J., of conspiracy to import cocaine and marijuana and to possess them with intent to distribute. Defendant appealed. The Court of Appeals, Kane, Senior District Judge, sitting by designation, held that: (1) second superseding indictment complied with specialty doctrine forbidding requesting country from prosecuting extradited defendant from more than it set out in extradition request; (2) pretrial publicity did not entitle defendant to transfer of venue; and (3) dismissal of state marijuana possession charge against Government's star witness in light of his cooperation with federal authorities was not material, and, thus, prosecutor's failure to disclose dismissal did not violate due process.

Affirmed.

**1. Extradition and Detainers ⟳19**

Extradited defendant could raise specialty doctrine himself, and, thus, dispute whether defendant or asylum country raised objection was irrelevant.

**2. Extradition and Detainers ⟳19**

Colombian law did not control dispute under specialty doctrine whether separate matter was charged by second superseding

lyn Taylor, Baptist Medical Center Blood Bank.

Exhibit # 03

**U.S. v. ABELLO-SILVA**
Cite as 948 F.2d 1168 (10th Cir. 1991)

**26. Criminal Law ⟨=⟩1166(10.10)**

Standard of materiality required to set aside criminal conviction for violating *Brady* depends on specificity of defendant's request and prosecutor's conduct. U.S.C.A. Const.Amends. 5, 14.

**27. Constitutional Law ⟨=⟩268(5)**
**Criminal Law ⟨=⟩700(4)**

Prosecutor's failure to disclose dismissal of state marijuana possession charge against star witness in light of cooperation with federal authorities violated due process clause under *Brady* if suppressed evidence might have affected outcome of trial; defendant specifically requested disclosure of all benefits conferred upon prosecution witnesses. U.S.C.A. Const.Amends. 5, 14.

**28. Criminal Law ⟨=⟩723(5), 1037.1(2)**

Prosecutor's closing argument that defendant laughed at American justice secure in comfort of Colombian corruption and was the "biggest fish landed by the United States out of that Colombian sea of narcotics" did not use ethnicity or nationality to manipulate prejudices of jury and was not plain error in prosecution for conspiracy to import cocaine and marijuana and to possess them with intent to distribute. Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 401(b)(1)(A), 406, 1010(b)(1)(B, G), 1013, 21 U.S.C.A. §§ 841(b)(1)(A), 846, 960(b)(1)(B, G), 963; Fed.Rules Cr.Proc.Rule 52(b), 28 U.S.C.A.

**29. Criminal Law ⟨=⟩726**

Defendant's closing argument that Government manufactured alleged drug conspiracy through perjured testimony, that prosecution assembled massive fraud on court, and that defendant was targeted by prosecution to obtain notoriety invited rebuttal closing argument that prosecutor was not sufficiently good or motivated to get 22 people to lie on witness stand; defendant's testimony accused every Government witness of lying.

**30. Criminal Law ⟨=⟩721½(2), 726**

Prosecutor's rebuttal closing argument that defendant failed to call FBI agent as witness was permissible reference to defendant's opening statement that he would call agent and was invited by defendant's suggestion that agent was at controls of government conspiracy to trap defendant.

Tony M. Graham, U.S. Atty. (David E. O'Meilia and Kathryn H. Phillips, Asst. U.S. Attys. with him, on the brief), Tulsa, Okl., for plaintiff-appellee.

Randy Schaffer P.C., Houston, Tex., for defendant-appellant.

Before MOORE, and McWILLIAMS, Circuit Judges, and KANE *, Senior District Judge.

KANE, Senior District Judge.

Appellant, Jose Rafael Abello–Silva, (hereafter Abello) a citizen of the Republic of Colombia, was extradited to the United States to face drug conspiracy charges. Indicted for conspiring to import cocaine and marijuana in violation of 21 U.S.C. §§ 963 and 960(b)(1)(B), (G); and conspiring to possess with the intent to distribute and distribution of cocaine and marijuana in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), Abello was convicted of both counts. He was sentenced to concurrent terms of 30 years imprisonment on each count and fined a total of $5,000,000 [1]

Abello challenges his conviction by raising the following points of error: 1) the circumstances of his extradition violate the doctrine of specialty because he was tried on a second superseding indictment which was not part of the extradition request served on the Colombian government; 2) the extensive pre-trial publicity made the

* Honorable John L. Kane Jr., United States Senior District Judge for the District of Colorado, sitting by designation.

1. The length of appellant's imprisonment is limited by agreement between the United States and Colombia. The Republic of Colombia has been under martial law for most of the past 30 years. Presidential Decree No. 1860 dated August 18, 1989 authorizes the extradition of Colombian nationals and defines the circumstances under which extradition may take place. Article 8(a) of Decree No. 1860 restricts the term of imprisonment for extradited Colombian nationals to no more than 30 years.

Exhibit # 03

RECEIVED
OFFICE OF INTERNATIONAL
AFFAIRS

89 NOV 15 AM 9: 46

CRIMINAL DIVISION

No. 812

The Embassy of the United States of America presents its
compliments to the Ministry of Foreign Relations of the
Republic of Colombia and has the honor to request the
extradition of José Rafael Abello-Silva in accordance with
the Government of Colombia's Decree No. 1860, dated August
18, 1989 and applicable principles of international law. The
Embassy considers this request to be urgent. Mr.
Abello-Silva was the subject of the Embassy's diplomatic note
No. 785, dated October 11, 1989, which requested his
provisional arrest for the purpose of extradition.

Mr. Abello-Silva is the subject of superseding
indictment No. 87-CR-140-B, returned in the United States
District Court for the Northern District of Oklahoma (Tulsa)
on October 7, 1987 charging him with:

— Count I: conspiracy to import cocaine into the
United States, in violation of 21 U.S.C. 963; and

— Count II: conspiracy to distribute and to possess
with intent to distribute cocaine, in violation of 21 U.S.C.
846.

A warrant for the arrest of Mr. Abello-Silva was issued
on October 7, 1987 by order of the above court.

The facts of the case indicate that in 1986 and 1987,
Abello-Silva actively participated in the planning of a
shipment of 500 kilograms of cocaine into the United States
from Colombia. The proposed shipment was planned by
Abello-Silva and his associates at meetings in both Colombia
and Aruba, but was ultimately abandoned because of

Exhibit A

Exhibit # 04

- 2 -

difficulties in communication among the co-conspirators.  At
least one of the co-conspirators has been taken into custody
by law enforcement authorities in the United States.

The Embassy has the honor to include authentic
documents, along with corresponding translation, supporting
the above-mentioned request for the extradition of Mr. José
Rafael Abello-Martínez.

Narcotic drug offenses are covered by Article 4 of
Decree 1860, dated August 18, 1989.

The Embassy has been informed that the Government of
Colombia will not grant extradition pursuant to Decree No.
1860 of August 18, 1989, absent assurances regarding those
matters which are the subject of Article 8 of that decree.
Accordingly, in order to secure the extradition of José Rafel
Abello-Silva from Colombia, the Embassy hereby assures the
Government of Colombia that, if the Government of Colombia
extradites José Rafael Abello-Silva from Colombia to the
United States pursuant to Decree 1860 and this extradition
request,

(a)  The death penalty will not be imposed for the
offenses for which extradition is now requested, inasmuch as
the death penalty is not now, nor may it be in the future,
applicable to those offenses;

(b)  The fugitive will not be required to serve a period
of incarceration in excess of thirty years for the offenses
for which extradition may be granted pursuant to this request;

Exhibit # 04

- 3 -

(c) In conformity with the requirements of the Constitution and laws of the United States, José Rafael Abello-Silva will not suffer any adverse discriminatory treatment in any criminal proceeding or in the conditions of his incarceration, solely by virtue of his citizenship or national origin; and,

(d) The United States will be responsible for the payment of any expenses arising from the translation of any documents submitted in support of this request for José Rafael Abello-Silva's extradition and transportation to the United States upon the granting of extradition from Colombia to the United States pursuant to this request.

The Embassy wishes to inform the Ministry that José Rafael Abello-Silva is a Colombian citizen born on November 20, 1954. He is described as six feet tall, weighing 230 pounds with blond hair and brown eyes. The index finger on his right hand is missing, and he often wears glasses. He is also known as "El Mono", "Pecoza", Manuel Abello, and Raúl Ernando Avello. The Embassy understands that Mr. Abello-Silva is presently in custody in Colombia.

The Embassy of the United States of America avails itself of this opportunity to renew to the Ministry of Foreign Relations of the Republic of Colombia the assurances of its highest consideration.

Embassy of the United States of America

Bogotá, October 20, 1989

Exhibit # 04

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.    99-6153-CR-MOORE(s)(s)(s)(s)**

UNITED STATES OF AMERICA, )
                              )
                              )
                              )
v.                            )
                              )
FABIO OCHOA                   )
                              )
       Defendant.            )
                              )
_____/



## REQUEST FOR UPWARD DEPARTURE IN SENTENCING

The United States of America, by and through its undersigned Assistant United

States Attorney, hereby requests that this Court depart upward from the Offense Level

of 38 and sentence Defendant Fabio Ochoa to 360 months' imprisonment.

Ochoa's Total Offense Level, set at 38 pursuant to USSG § 4A1.3, does not

adequately reflect Ochoa's extensive criminal history.   As written, the Presentence

Investigation Report (PSI) places Ochoa in Criminal History Category I.    While

Category I might be appropriate for a first-time offender, it grossly under-represents

Ochoa's criminal history.

At trial, the government introduced unchallenged and unrebutted historical

Exhibit # 05

United States. Ochoa should plainly not be sentenced as a first time offender.

However, the government respectfully requests that this Court limit any departure to 360 months' imprisonment. A sentence of life in prison or to a number of years significantly higher than 360 months could irreparably harm the United States' efforts to extradite Colombian citizens charged with United States crimes. The government has attached as exhibits the formal statements of two officials of the government most familiar with the issue of extradition of Colombian citizens to the United States. We respectfully request that this Court rely upon these statements in considering the government's request that Ochoa be sentenced to 360 months' imprisonment.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By: _Edward Ryan_

EDWARD RYAN
Assistant United States Attorney
500 East Broward Blvd., Suite 700
Ft. Lauderdale, FL 33394
Fax: (954) 356-7336
Tel : (954) 356-7255, ext. 3514
Court No. A500053
Email: Ed.Ryan@usdoj.gov

5

Exhibit # 05

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,

v.                                  Case No. _81-82-Cr-J-M_

                                    21 USC §§ 841,952,960,963
                                    (15 yrs./$25,000/both,
                                    plus special parole term)

CARLOS ENRIQUE LEHDER-RIVAS,
a/k/a JOE LEHDER                    21 U.S.C. §848
JACK CARLTON REED                   (10 yrs. min.-Life max.
JÜRGEN SCHMIDT                      $100,000/both - plus
HEINRICH ROGOLL                     forfeiture)

_____/

### INDICTMENT

The Grand Jury charges:

### COUNT ONE

From in or about the month of June 1978, and prior thereto,
and continuing thereafter through in or about September, 1980,
in the Middle District of Florida and elsewhere,

> CARLOS ENRIQUE LEHDER-RIVAS, a/k/a/ JOE LEHDER,
>
> JACK CARLTON REED,
>
> JÜRGEN SCHMIDT, and
>
> HEINRICH ROGOLL,

defendants herein, did unlawfully, knowingly and intentionally
combine, conspire, confederate and agree together, with each other,
and with other persons whose names are to the Grand Jury known, and
unknown, to commit offenses against the United States, to wit:
to import into the United States, from places outside thereof cocaine,
a Schedule II drug controlled substance; in violation of Title 21
United States Code, Section 952.

### OVERT ACTS

In furtherance of the aforesaid conspiracy and to effect the
objects thereof, the following overt acts, among others were
committed in the Middle Judicial District of Florida and elsewhere:

1.  Prior to June 14, 1978, Carlos Enrique Lehder-Rivas had
conversations with Edward Hayes Ward in which they agreed that Edward
Hayes Ward would transport cocaine from Colombia to Norman's Cay,
Bahamas, and from Norman's Cay, Bahamas to the United States for
Carlos Enrique Lehder-Rivas.

Exhibit # 06

- 2 -

2.    On or about June 14, 1978, Edward Hayes Ward caused the incorporation of Caribbean Ventures Leasing, Inc., in the State of Florida.

3.    On or about September 6, 1978, Edward Hayes Ward held a meeting at Norman's Cay, Bahamas, with Charles Gregory Von Eberstein, Paul Sullivan Alexander, Jr., Stephen Daniel Von Eberstein, Leverett Merrill Francis, and Robert L. Crouser, and other persons, at which time Edward Hayes Ward informed the group that he was planning to start smuggling cocaine from Colombia, South America, to the United States, for Carlos Enrique Lehder-Rivas, utilizing Norman's Cay, Bahamas, as a base of the operations.

4.    On or about September 27, 1978, Edward Hayes Ward paid Cessna Aircraft Company $100,000, which he had received from Carlos Enrique Lehder-Rivas, as a down-payment on the purchase of a Swearigen Merlin III Aircraft, Serial Number T205E, U.S. Registration Number N4BC.

5.    On or about November 14, 1978, Edward Hayes Ward paid Cessna Aircraft Company $504,000, which he had received from Carlos Enrique Lehder-Rivas, for the balance due on the Swearigen Merlin III Aircraft, U.S. Registration Nmber N4BC.

6.    In or about the months of October, November and December, 1978, Edward Hayes Ward, Charles Gregory Von Eberstein, Robert L. Crouser, and Leverett Merrill Francis attended Flight Safety International Flying School, San Antonio, Texas for flight instructions in the operation of the Swearigen Merlin III Aircraft, U.S. Registration Number N4BC.

7.    In or about January 1979, Edward Hayes Ward, Carlos Enrique Lehder-Rivas, and Leverett Merrill Francis flew a Swearigen Merlin III Aircraft, U.S. Registration Number N4BC to Colombia, South America and picked up approximately 500 kilograms of cocaine, which they then transported back to Norman's Cay, Bahamas.

- 3 -

8.    In or about February 1979, the exact date being unknown to the Grand Jury, Edward Hayes Ward and Leverett Merrill Francis flew from Norman's Cay, Bahamas, to Colombia, South America, in a Swearigen Merlin III Aircraft, U.S. Registration Number NBC, and picked up a cargo of apprpoximately 500 kilograms of cocaine, which they then transported back to Norman's Cay, Bahamas.

9.    In or about March 1979, Edward Hayes Ward, and Leverett Merrill Francis, at the direction of Carlos Enrique Lehder-Rivas, flew from Norman's Cay, Bahamas, to Colombia, South America, in a Swearigen Merlin III Aircraft, U.S. Registration Number N-4BC and picked up a cargo of approximately 250-300 kilograms of cocaine, which they then transported back to Norman's Cay, Bahamas.

10.    On or about April 16, 1979, a cashier's check payable to the order of Carlos Enrique Lehder-Rivas in the amount of $50,000 was deposited into the Caribbean Ventures Leasing's bank account at the Barnett Bank of Orange Park, Florida.

11.    On or about April 26, 1979, $100,000 was transferred by wire from International Dutch Resources, Ltd., owned by Carlos Enrique Lehder-Rivas, into Caribbean Ventures Leasing, Inc.'s bank account at the Barnett Bank of Orange Park, Florida.

12.    In or about late Spring or early Summer, 1979, the exact date being unknown to the Grand Jury, Edward Hayes Ward, Carlos Enrique Lehder-Rivas, and Leverett Merrill Francis loaded approximately 250-300 kilograms of cocaine into a Twin Beechcraft Bonanza Aircraft, U.S. Registration Number N537ML on Norman's Cay, Bahamas, and Ward and Francis, at Lehder's direction, piloted the aircraft to an airstrip at Astor Park in Lake County, Florida, where the cocaine was offloaded.

13.    In or about the Summer of 1979, and prior to July 17, 1979, the exact date being unknown to the Grand Jury, Edward Hayes Ward, Carlos Enrique Lehder-Rivas, and Leverett Merrill Francis loaded approximately 400-500 kilograms of cocaine into a Twin Beechcraft Bonanza Aircraft, U.S. Registration Number N537ML, on Norman's Cay, Bahamas, and Ward and Francis, at Lehder's directions, piloted the

- 4 -

14.  On the same date described in Overt Act 13, Paul S. Alexander, Jr. delivered the cocaine offloaded at the Astor Park airstrip by automobile to Miami, Florida, where he turned the cocaine over to other employees of Carlos Enrique Lehder-Rivas.

15.  On or about July 17, 1979, at Norman's Cay, Bahamas, Carlos Enrique Lehder-Rivas and Edward Hayes Ward supervised the loading of approximately 400-500 kilograms of cocaine into a Twin Beechcraft Bonanza Aircraft, U.S. Registration Number N537ML, after which the aircraft was flown at Lehder's directions, by Leverett Merrill Francis and Robert L. Crouser, to an airstrip at Astor Park in Lake County, Florida, where the cocaine was offloaded.

16.  On or about July 17, 1979, Paul S. Alexander delivered the cocaine offloaded at the Astor Park airstrip by automobile to Miami, Florida, where he turned the cocaine over to other employees of Carlos Enrique Lehder-Rivas.

17.  In or about mid-September 1979, Edward Hayes Ward and Charles Gregory Von Eberstein, at the direction of Carlos Enrique Lehder-Rivas, flew a Beechcraft Bonanza U.S. Registration No. N537ML, from Norman's Cay, Bahamas to Colombia, South America, where approximately 250 kilograms of cocaine was loaded on the aircraft, which they then transported to Norman's Cay, Bahamas.

18.  In or about late September 1979, Edward Hayes Ward, and Charles Gregory Von Eberstein, at the direction of Carlos Enrique Lehder-Rivas, transported approximately 250 kilograms of cocaine from Norman's Cay, Bahamas to "Prison" Airport, Reidsville, Georgia, where the cocaine was offloaded.

19.  On about the same date described in Overt Act 18, Paul Alexander transported approximately 250 kilograms of cocaine from "Prison" Airport, Reidsville, Georgia, by automobile through the Middle Judicial District of Florida, to Miami, Florida, where it was turned over to other employees of Carlos Enrique Lehder-Rivas.

- 5 -

20.  In early December 1979, Heinrich Rogoll stood guard and supervised the unloading of a quantity of cocaine from a jet Aerocommander, at Norman's Cay, the cocaine having been flown to Norman's Cay from Colombia, South America, by other employees of Carlos Enrique Lehder-Rivas.

21.  In or about early December 1979, a few days after the events described in Overt Act 20, Edward Hayes Ward and Charles Gregory Von Eberstein, at the direction of Carlos Enrique Lehder-Rivas, transported by aircraft, that is, a Swearigen Merlin III, U.S. Registration No. N4BC, approximately 250-300 kilograms of cocaine, from Norman's Cay, Bahamas, to "Prison" Airport, Reidsville, Georgia, where the cocaine was offloaded.

22.  On the same date described in Overt Act 21, Paul S. Alxander, Jr., transported the 250-300 kilograms of cocaine which had been unloaded at "Prison" Airport, Reidsville, Georgia, through the Middle Judicial District of Florida, to Miami, Florida, where he delivered it to other employees of Carlos Enrique Lehder-Rivas.

23.  In or about the latter part of February 1980, Edward Hayes Ward and Charles Gregory Von Eberstein, at the direction of Carlos Enrique Lehder-Rivas, transported approximately 350 kilograms of cocaine from Norman's Cay, Bahamas, to "Prison" Airport, Reidsville, Georgia, in a Beechcraft Bonanza, Registration No. 537ML, where the cocaine was offloaded.

24.  On the same date specified in Overt Act 23, Paul S. Alexander, Jr., transported the cocoaine unloaded at "Prison" Airport, Reidsville, Georgia, by automobile through the Middle Judicial District of Florida, to Miami, Florida, where it was turned over to other employees of Carlos Enrique Lehder-Rivas.

25.  On or about April 16, 1980, Edward Hayes Ward and Charles Gregory Von Eberstein, accompanied by Jürgen Schmidt, at the direction of Carlos Enrique Lehder-Rivas, transported approximately 100-150 kilograms of cocaine from Norman's Cay, Bahamas, to the vicinity of "Prison" Airport, Reidsville, Georgia in a Beechcraft Bonanza, Registration No. N537ML, but aborted their landing at the last moment because Paul S. Alexander radioed to the plane that law enforcement

- 6 -

26.  In or about the first half of September, 1980, Jack Carlton Reed, at the direction of Carlos Enrique Lehder-Rivas, instructed Edward Hayes Ward, Charles Gregory Von Eberstein, and their associates, to leave Norman's Cay, Bahamas, on a permanent basis in order to facilitate the continuation of Carlos Enrique Lehder-Rivas' smuggling operation.

All in violation of Title 21, United States Code, Section 963.

### COUNT TWO

In or about the late Spring or early Summer, 1979, the exact date being unknown to the Grand Jury, at an airstrip at Astor Park, Lake County, in the Middle Judicial District of Florida,

CARLOS ENRIQUE LEHDER-RIVAS, a/k/a JOE LEHDER,

defendant herein, and other persons known and unknown to the Grand Jury, did knowingly and intentionally import and caused to be imported into the United States of America from a place outside thereof a quantity of cocaine, a Schedule II controlled substance, in violation of Title 21 United States Code, Sections 952, 960 and Title 18 United States Code, Section 2.

### COUNT THREE

In or about the late Spring or early Summer, 1979, the exact date being unknown to the Grand Jury, at an airstrip at Astor Park, Lake County, in the Middle Judicial District of Florida,

CARLOS ENRIQUE LEHDER-RIVAS, a/k/a JOE LEHDER,

defendant herein, and other persons known and unknown to the Grand Jury, did knowingly and intentionally possess, and caused to be possessed, with intent to distribute, a quantity of cocaine, a Schedule II controlled substance, in violation of Title 21 United States Code, Section 841 and Title 18 United States Code, Section 2.

### COUNT FOUR

In or about the Summer of 1979, prior to July 17, 1979, the exact date being unknown to the Grand Jury, at an airstrip at Astor Park, Lake County, in the Middle Judicial District of Florida,

- 7 -

defendant herein, and other persons known and unknown to the Grand Jury, did knowingly and intentionally import and caused to be imported into the United States of America from a place outside thereof a quantity of cocaine, a Schedule II controlled substance, in violation of Title 21 United States Code, Sections 952, 960 and Title 18 United States Code, Section 2.

COUNT FIVE

In or about the Summer of 1979, prior to July 17, 1979, the exact date being unknown to the Grand Jury, at an airstrip at Astor Park, Lake County, in the Middle Judicial District of Florida,

CARLOS ENRIQUE LEHDER-RIVAS, a/k/a JOE LEHDER,

defendant herein, and other persons known and unknown to the Grand Jury, did knowingly and intentionally possess, and caused to be possessed, with intent to distribute, a quantity of cocaine, a Schedule II controlled substance, in violation of Title 21 United States Code, Section 841 and Title 18 United States Code, Section 2.

COUNT SIX

On or about July 17, 1979, at an airstrip at Astor Park, Lake County, in the Middle Judicial District of Florida,

CARLOS ENRIQUE LEHDER-RIVAS, a/k/a JOE LEHDER,

defendant herein, and other persons known and unknown to the Grand Jury, did knowingly and intentionally possess, and caused to be possessed, with intent to distribute, a quantity of cocaine, a Schedule II controlled substance, in violation of Title 21 United States Code, Section 841 and Title 18 United States Code, Section 2.

COUNT SEVEN

On or about July 17, 1979, at an airstrip at Astor Park, Lake County, in the Middle Judicial District of Florida,

CARLOS ENRIQUE LEHDER-RIVAS, a/k/a JOE LEHDER,

defendant herein, and other persons known and unknown to the Grand Jury, did knowingly and intentionally possess, and caused to be possessed, with intent to distribute, a quantity of cocaine, a Schedule II controlled substance, in violation of Title 21 United States Code, Section 841 and Title 18 United States Code, Section 2.

- 8 -

### COUNT EIGHT

In or about late September 1979, at Jacksonville and elsewhere in the Middle Judicial District of Florida,

CARLOS ENRIQUE LEHDER-RIVAS, a/k/a JOE LEHDER

defendant herein, did posses and caused to be possessed with intent to distribute a quantity of cocaine, a Schedule II controlled substance, in violation of Title 21 United States Code, Section 841 and Title 18 United States Code, Section 2.

### COUNT NINE

In or about early December 1979, at Jacksonville and elsewhere in the Middle Judicial District of Florida,

CARLOS ENRIQUE LEHDER-RIVAS, a/k/a JOE LEHDER,

defnendant herein, did possess and caused to be possessed with intent to distribute a quantity of cocaine, a Schedule II controlled substance, in violation of Title 21 United States Code, Section 841 and Title 18 United States Code, Section 2.

### COUNT TEN

In or about the latter part of February, 1980, at Jacksonville and elsewhere in the Middle Judicial District of Florida,

CARLOS ENRIQUE LEHDER-RIVAS, a/k/a JOE LEHDER,

defendant herein, did possess and caused to be possessed with intent to distribute a quantity of cocaine, a Schedule II controlled substance, in violation of Title 21 United States Code, Section 841, and Title 18 United States Code, Section 2.

### COUNT ELEVEN

On or about April 16, 1980, in the Middle Judicial District of Florida,

CARLOS ENRIQUE LEHDER-RIVAS, a/k/a/ JOE LEHDER and

JÜRGEN SCHMIDT,

defendants herein, did possess and cause to be possessed with intent to distribute a quantity of cocaine, a Schedule II controlled substance, in violation of Title 21 United States Code, Section 841, and Title 18 United States Code, Section 2.

- 10 -

1.   All stock, financial, and/or other ownership interest of CARLOS ENRIQUE LEHDER-RIVAS in the following corporations: Air Montes Ltd.; International Dutch Resources, Ltd.; and Titanic Aircraft Sales, Ltd.

2.   All real property on Norman's Cay Bahamas, under the control of or in the name of International Dutch Resources, Ltd.

A TRUE BILL

_____
                    FOREMAN

GARY L. BETZ
United States Attorney

_____
ERNST D. MUELLER
Assistant United States Attorney

E2

MN 1-19-94

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

   vs.

CARLOS ENRIQUE LEHDER-RIVAS

Case No. 81-82-Cr

RECEIVED

FEB 1 1994

INMATE MONITORING SECTION
BUREAU OF PRISONS

## ORDER ON DEFENDANT'S MOTION FOR REDUCTION OF SENTENCE

This cause is before the Court on the defendant's pro se in
camera motion for reduction of sentence pursuant to former Rule
35(b) Fed.R.Crim.P., applicable to offenses committed before
November 1, 1987, (Doc. S-1), filed October 7, 1992. Both the
defendant and the government have filed numerous documents in
support of the motion, but have taken different positions regarding
the appropriate reduction.

The United States' [In Camera] Supplemental Response to Motion
for Reduction of Sentence (Doc.S-36), filed August 26, 1993,
contains its recommendation that the defendant's "sentence be
reduced to a total of fifty-five (55) years imprisonment,
structured so that the Continuing Criminal Enterprise sentence is
fifty-five (55) years [without parole], with the other counts
running concurrently in a manner that their total not exceed 55
years."

The Court has carefully reviewed all of the documents
submitted by both parties as of the date of this Order. The
reduction of the defendant's sentence is within the sound
discretion of the Court. The Court is convinced that the defendant

Verified w/ Tony
Mirralla of SHIG on

RECEIVED
JAN 24 1994

Exhibit # 07

has rendered substantial assistance to the government that warrants a reduction of his original sentence. The Court also concurs with the defendant that his cooperation has been significant.[1]

Nevertheless, having presided over the trial of his case and having heard testimony over a period of several months regarding the offenses for which defendant was convicted, the Court also is mindful of the severity of those offenses. The extensive drug activities of the defendant warrant a lengthy sentence, even taking into account his cooperation with the government.

While not obligated to follow the government's recommendation, the Court is of the opinion that the sentence reduction proposed by the government is appropriate in light of the defendant's cooperation and the seriousness of his underlying offenses.[2]

---

[1]   The Court declines to make any factual findings regarding disputed factual matters between the defendant and the government. For purposes of ruling on his motion for reduction of sentence, the Court has viewed disputed factual matters in the light most favorable to the defendant.

[2]   The defendant asserts that the recommended reduction proposed by the United States Attorney's Office for the Middle District of Florida exceeds the recommendation promised to him by the United States' Attorney's Office for the Southern District of Florida. The Court need not determine whether a lesser recommendation was promised to the defendant by the United States Attorney's Office for the Southern District for two reasons. First, any recommendation for a greater of lesser sentence is not binding upon the Court. Second, the Court has independently determined, after consideration of all the circumstances in the light most favorable to the defendant, that following the recommendation of the United States Attorney's Office for the Middle District results in the appropriate sentence reduction.

Accordingly, it is

ORDERED AND ADJUDGED:

1.    That defendant's motion for reduction of sentence (S-1) filed October 7, 1992, is granted to the extent set forth below;

2.    That the Judgment of the Court (Doc.1156), filed July 21, 1988, is amended to reflect a reduction in the defendant's sentence of incarceration as follows:

IT IS THE JUDGMENT OF THIS COURT THAT: the defendant is hereby committed to the custody of the Attorney General or her authorized representative for imprisonment for a term of fifty-five (55) years, without parole, and fined the sum of $100,000.00, on count 11.

IT IS ADJUDGED that on count 1 the defendant is hereby committed to the custody of the Attorney General or her authorized representative for imprisonment for a term of fifteen (15) years and fined the sum of $25,000.00, to run concurrently with the sentence imposed on count 11.

IT IS ADJUDGED that on counts 2 and 4 the defendant is hereby committed to the custody of the Attorney General or her authorized representative for imprisonment for a term of fifteen (15) years on each count and fined the sum of $25,000.00 on each count.
IT IS FURTHER ORDERED that the defendant serve a Special Parole Term of Life on each of counts 1, 2, and 4.  The sentences on counts 2 and 4 shall run concurrently with the sentence imposed on count 11, consecutively to each other, and consecutively to the sentence imposed on count 1.

IT IS ADJUDGED that on counts 5, 6, 7, 8, 9, and 10 the defendant is hereby committed to the custody of the Attorney General or her authorized representative for imprisonment for a term of fifteen (15) years on each count and fined the sum of $25,000.00 on each count.
IT IS FURTHER ORDERED that the defendant serve a Special Parole Term of Life on each of counts 5, 6, 7, 8, 9, and 10.  The sentences on counts 5, 6, 7, 8, 9, and 10 shall run concurrently with each other, concurrently with the sentence imposed on count 11, consecutively to the sentences imposed on counts 1 and 2, and concurrently with the sentence imposed on count 4.

3

IT IS ADJUDGED that on count 3 the defendant is hereby committed to the custody of the Attorney General or her authorized representative for imprisonment for a term of ten (10) years and fined the sum of $25,000.00.

IT IS FURTHER ORDERED that the defendant serve a Special Parole Term of Life on count 3. The sentence on count 3 shall run concurrently with the sentence imposed on count 11, and consecutively to the sentences imposed on counts 1, 2, 4, 5, 6, 7, 8, 9, and 10; and

3.    That all other portions of the Judgment of this Court (Doc.1156) filed July 21, 1988, shall remain in full force and effect.

DONE AND ORDERED in Chambers at Jacksonville, Florida, this ____19th____ day of January, 1994.

Howell W. Melton
UNITED STATES DISTRICT JUDGE

Copies to:
Defendant
AUSA (Mueller)
Law Clerk (JS)

U.S.Probation (Owens)
Bureau of Prisons



BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO:(Name and Title of Staff Member) *I.S.M. Ms. Frederikson* | DATE: *Ap. 2-2002-* |
|---|---|
| FROM: *C.L.* | REGISTER NO.: *06461-018* |
| WORK ASSIGNMENT: *Orderly.* | UNIT: *"5"* |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.)

*Please, am in need to present to my lawyer the exact amount of time I would have to serve incarcerated once my sentence is reduce to 30 years- I am under the old sentencing law. Thank much.    C.L.*

(Do not write below this line)

DISPOSITION:

Attached is a calculation performed on a 30 year sentence.  Note your release date will
be March 27, 2007 (STAT REL DT).  I note you are not earning Extra Good Time.  If
your work supervisor recommends you for extra good time and the Unit Team approves,
you can further reduce this release date.

Additionally, I discovered you worked in Industries (UNICOR) for a period of time
in 1993 which is an automatic award of Extra Good Time.  You earned five days of
Extra Good Time which currently reduced your release date from 01-08-24 to 01-03-24.

If you received a 30 year sentence, your release date with these five days of Extra
Good Time will be March 22, 2007.

| Signature Staff Member *D. M. Frederiksen, ISM* | Date 04-14-2002 |
|---|---|

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form repl
and BP-S148.07

Exhibit # 08



```
SENTENCE PROCEDURE: 10    4205(A)REG ADULT
SPT/PAR/MR VIOL...: N    MAN SGT RATE:
TERM IN EFFECT YRS: 30   MOS:    DAYS:       OR LIFE/DEATH:
TIE CONVERTED  YRS: 30   MOS:    DAYS:
MINIMUM TERM   YRS:      MOS:    DAYS:
JAIL CREDIT    FROM:             THRU:          =        DAYS
               FROM:             THRU:          =        DAYS
               FROM:             THRU:          =        DAYS
TOTAL JAIL CREDIT DAYS: 532
INOP TIME      FROM:             THRU:          =        DAYS
               FROM:             THRU:          =        DAYS
TOTAL INOPERATIVE TIME DAYS:
                                 SGT RATE......: 10
DT SENT BEGAN: 07-20-1988        SGT TOTAL DAYS: 3600
                                 STAT REL DT...: 03-27-2007 TUE → Release Date
                                 180 DAY DT....: 08-06-2016
                                 PAROLE ELIG...: 02-02-1997 Not Elig.
                                 2/3 OR 30YR DT: 02-03-2007
HARDCOPY Y/N: N                  EFT DT........: 02-02-2017
```

G0005      TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED

Exhibit # 08



RECEIVED
NMATE MONITORIN
PROGRAM

# The Noriega Prosecution:

# What Price the General?

April 1992[1]

Exhibit # 09

---

[1]Chairman Charles E. Schumer of the House Judiciary Committee's Subcommittee on Crime and Criminal Justice directed the Subcommittee majority staff to prepare this report. This report has not been reviewed or approved by other Members of the Subcommittee.

**Introduction**

By some estimates, the capture and prosecution of Gen. Manuel Antonio Noreiga will cost American taxpayers close to $200 million. Yet the expenses of the invasion of Panama and the General's 8-month trial pale in comparison to the unprecedented costs prosecutors incurred in cutting deals with scores of convicted drug traffickers and other felons who helped build their case.

Through a review of Noreiga trial transcripts, news reports, court documents and other public records, the majority staff of the House Judiciary Subcommittee on Crime and Criminal Justice has confirmed that the Justice Department paid some informants hundreds of thousands of dollars in direct payments or compensation and shielded millions in drug profits and drug-financed property from forfeiture. Other witnesses and informants were immunized from prosecution for past crimes or excused from paying tax penalties. Still others were exempted from deportation and promised placement in the federal Witness Protection Program (WPP), along with family members and friends. The government also has found a place in the program for a baby-sitter and a mother-in-law--maybe even a maid.

A full accounting of the true costs of the Noreiga prosecution is not possible at this time, since the government has not publicly disclosed all of the related plea agreements and since many plea-bargain beneficiaries did not testify against Noreiga in open court. This report, however, represents an initial attempt to assess these costs. Even at this early stage of inquiry, the price is staggering.

The government reportedly courted 60 to 80 crime figures to testify against Gen. Noreiga. At trial, prosecutors called more than 40 witnesses, the majority of whom were previously convicted drug traffickers. And the bulk of these convicts who testified entered into plea agreements like the 15 presented below. While the charges against Gen. Noreiga are not to be minimized, in many cases, the crimes for which these "Felonious Fifteen" have been excused are worse than those for which Gen. Noreiga stands trial. Between them, they were responsible for shipping hundreds of thousands of kilograms of cocaine and millions of pounds of marijuana to the United States. They made--and laundered--billions. Yet despite the magnitude of their crimes, the Felonious Fifteen are likely to spend a total of about 150 years behind bars, less than 10 percent of what they faced. (See Appendix, p. 1, for a detailed chart of each witness's admitted crimes and plea agreements.)

Cutting deals with low-level criminals to obtain evidence against kingpins is routine in major drug and racketeering cases. But clearly something has gone awry when defense lawyers are boasting about getting their clients a "deal of a lifetime" and former federal prosecutors are blasting their old colleagues for making pacts with liars.

The lenient treatment of the Felonious Fifteen is a marked departure from the normal practices in the Southern District of Florida, where the Noreiga case is being tried. The district has a well-deserved reputation for strong and effective prosecution of drug traffickers. The U.S. Attorney's Office in Miami has consistently taken a stronger sentencing posture than the national average since the passage of the Anti-Drug Abuse Act of 1986, which permits giving reduced sentences to defendants who lend "substantial assistance" in other prosecutions. According to preliminary 1991 figures from the U.S. Sentencing Commission, 87 percent of the defendants in the Southern District of Florida were sentenced within federal guidelines, substantially higher than the national average of 80 percent. (See Appendix, p. 2) In addition, only 8.9 percent

were granted weaker sentences for "substantial assistance," lower than the national average of 11.3 percent. Despite this record, the Miami prosecutors routinely departed from their own sentencing practices and the federal guidelines in arranging deals for Noriega witnesses. Still more deals will be cut following the conclusion of the case.

Another particularly questionable tactic was giving these criminals-turned-collaborators cash payments from federal law enforcement informant funds. For example, Max Mermelstein, the "godfather of cocaine" according to the federal prosecutors, received more than $250,000 in direct payments from the government. On top of that, he has received more than $400,000 for expenses. Five other informants, not even among the Felonious Fifteen, reportedly received a total of more than $1.2 million.

With the heavy reliance on direct and indirect payments to informants in the Noriega prosecution, and the increase in the use of paid informants in general ($41 million in 1991 from the Department of Justice alone; see Appendix, p. 3), it clearly is time to conduct an independent review of federal law enforcement's practices in this area. Questions such as "Should a convicted criminal be able to benefit as much as an upstanding citizen?" and "Should there be formal criteria for when criminals are rewarded by arrangements that shield their ill-gotten gains from forfeiture?" need to be addressed. Payments to criminal defendants and informants must be more carefully monitored.

Prosecutors accused Gen. Noriega of being "nothing more than a corrupt, crooked and rotten cop" who made Panama a safe haven for drug traffickers and money launderers, permitting "tons and tons of powdery white death" to flood American neighborhoods. Yet despite the general's removal, drug trafficking and money laundering are flourishing in Panama. In fact, by some U.S. government estimates, the amount of cocaine transiting Panama en route to American streetcorners has doubled. (See Appendix, p. 4)

Based on these preliminary findings, Chairman Charles E. Schumer will send a letter to the Attorney General requesting a complete account of the plea bargains struck with the Justice Department's Noriega witnesses. Chairman Schumer also will ask the U.S. General Accounting Office (GAO) to perform a full-scale audit of the federal law enforcement informant funds and operations.

## The Felonious Fifteen

The Felonious Fifteen provide an initial insight into how the government built its case against Noriega. The 15 individuals are all criminals who clearly will benefit or have already benefitted by bargaining their assistance and/or testimony with the Noriega prosecutors.

Each case strains credulity; they are profiled below in alphabetical order:

## Ricardo Bilonick

Ricardo Bilonick was a former Panamanian Ambassador at Large in Washington, D.C. He admitted in his Noriega trial testimony that he made $47 million from smuggling cocaine and laundering money for the Medellin cartel.

Bilonick moved back to Panama after being educated and receiving a law degree in the United States. He was a prominent businessman and practicing lawyer who at one time controlled and owned approximately 75 percent of Panama's domestic airlines. Prior to his appointment as Ambassador-at-Large in 1979, Bilonick served as the Judicial Counselor of the Panamanian Embassy in D.C. where he served as one of the Panama Canal Treaty negotiators with the White House.

At the Noriega trial, Bilonick testified that:

- He earned $47 million from his illegal activities: $10 million from commissions on $300-$350 million of laundered drug funds brought into Panama; $12 million from commissions on $800 million of cocaine flown from Panama on one of his airline chains; and $25 million derived from earned commissions paid per kilo of smuggled cocaine;

- He oversaw all drug-smuggling operations "from the airport in Panama to Miami," including making the "plans" and "decisions" for packaging the cocaine inside crates of "kitchen appliances, electronic domestics, ...t.v.'s...and osterizer machines;"

- He arranged separate bribery payments of $500,000 for "security" for each of the 14 drug flights into Panama;

- He moved the smuggled cocaine inside of U.S. Customs bonded warehouses in Miami;

- He testified falsely and gave false statements to Panamanian officials regarding two previous seizures of airplanes carrying smuggled cocaine which were under his control;

- He paid Pablo Escobar "almost $20 million dollars" to replace "880 kilos"

of cocaine which had been stolen from his hangers in the United States.

Bilonick's plea agreement was arranged after months of discussions with the Drug Enforcement Administration (DEA) and prosecutors. He could have spent 60 years behind bars for his alleged involvement in three counts of the Noriega indictment. But so far, Bilonick has spent only a few months in jail and the government will recommend no more than 10 years with the possibility of a further reduction.

Bilonick has also been able to keep nearly $4 million in assets shielded from forfeiture, including his property in the United States, half ownership of a farm in Venezuela and bank accounts. No tax charges have been filed against Bilonick for his failure to report his illegal drug profits. Furthermore, Bilonick has been given immunity for all non-violent prior criminal conduct and the government will also recommend to foreign nations, including Panama, that they not prosecute him. Bilonick's wife, three children, mother-in-law and maid accompanied him to Miami. The government will recommend their placement as well in the WPP if Bilonick requests it in the future.

Even his defense lawyer boasted:

"This is a deal of a lifetime for a guy like this. Given the level of this guy's activity and the type of conduct he was involved in, this is the type of defendant who would have been looking at a lot more time."

## Jose Cabrera

Jose Cabrera, an associate of the Medellin cocaine cartel, is one of the biggest drug kingpins ever brought to justice in an American court. In 15 years of drug smuggling, Cabrera earned some $50 million in illicit profits, according to his own testimony.

Cabrera's illegal career began in the early 1970s. A Colombian, he was living in New York, importing drugs and laundering money for other traffickers. After he was indicted by a federal court in 1974, he fled to Colombia and established himself as a major-league drug smuggler:

- Cabrera owned a small air force, including a Merlin turbo prop and a Titan-404. These planes carried loads of up to 700 kilograms of cocaine from Colombia to Belize or the Bahamas for eventual shipment to the United States. When Cabrera was asked at the Noriega trial how many such shipments he sent, he replied: "Too many to remember." He stated that he transported more than 20,000 kilos of cocaine through one particular route alone.

- Cabrera owned a 400-foot, 2,300-ton boat that he used to transport marijuana, as much as 170,000 pounds in each shipment, to the United States.

- Members of Cabrera's group planned, with his knowledge, the

assassination of Colombian Justice Minister Lara-Bonilla.

Each time the authorities have closed in on Cabrera, he has managed to escape. He became a fugitive after the 1974 indictment. He was captured in 1980 while traveling to Miami for drug business, but he posted a $1 million bond in cash and fled again to Colombia. In 1986, Cabrera was finally apprehended by the Colombian government and extradited to the United States. A Miami state court promptly convicted him of two counts of drug smuggling, the judge sentenced him to a 30-year term of imprisonment, and a federal grand jury in New York returned yet another drug trafficking indictment against him.

But now, as the result of a plea agreement with the Noriega prosecutors, Cabrera is likely to go free in just a few years. The Florida state's attorney has acceded to the federal prosecutor's request for a recommendation of reduction in Cabrera's sentence. Also, under the plea agreement, the New York indictment was reduced to a single count, to which Cabrera pled guilty. He will not be sentenced on this plea until after the Noriega trial, and the sentence will run concurrently to whatever the Florida sentence is reduced to. Cabrera was immunized from any other potential prosecution.

No attempt will be made to recover any of Cabrera's $50 million in illicit profits. Cabrera now expects his total term of imprisonment to end within a few years--which he will be permitted to serve in a federal minimum security facility, rather than a Florida state penitentiary. Upon release, instead of facing deportation, as convicted felons ordinarily do, Cabrera and his wife and seven children will be relocated and placed in the WPP.

## Floyd Carlton Caceres

Floyd Carlton Caceres was a drug pilot for the Medellin cartel, ferrying cocaine from Panama to the United States, and an arms courier. Carlton reportedly netted approximately $1 million per load for each of his half-dozen drug flights which carried an average of 500 kilograms of cocaine.

His admissions at the Noriega trial included:

- Transporting weapons, including submachine guns, to El Salvador from Panama "around 17 times" for which he and his co-pilot received $35,000 per flight;

- Overseeing the supply of uniforms to the Sandinistas and equipment for their air operations in Nicaragua;

- Selling arms to Colombians;

- Organizing a network of landing strips for Pablo Escobar and the Medellin cartel;

- Training pilots who transported arms to the Contras;

- Lying under oath to the offices of Panama's State Security and Attorney General regarding the arm shipments to the Contras;

- Bribing Costa Rican officials.

Carlton turned informant following the filing of a secret Federal indictment in Miami in January 1986 which charged him with smuggling 400 kilos of cocaine, conspiracy and money laundering. He was arrested by DEA agents in July 1986 in Costa Rica after one of his co-conspirators ostensibly set up a meeting in concert with the DEA. Carlton vigorously fought extradition to the United States but was brought to Miami in January 1987, where a 9-count superseding indictment was filed against him.

The government relied heavily on Carlton in bringing its indictment against Noriega. In return, Carlton was able to secretly plead to only one count charging him with conspiracy to bring cocaine into the United States from 1983-1986, thereby avoiding a possible 145-year maximum penalty in prison plus maximum penalty of life with no parole. Carlton was able to walk out a free man when the government moved in November 1990 to suspend his 9-year sentence for cocaine conspiracy to probation for a period of three years.

At the time that he signed his plea agreement in June 1987, Carlton owned four homes, three farms, three airplanes and two fishing boats, all in Panama. While the government is entitled to seize Carlton's property within the United States, if any, it expressly exempted the Panamanian properties, all of which Carlton admitted were bought with drug money. Furthermore, Carlton is insulated from criminal tax evasion charges and the government has yet to make him pay any monies for civil tax liability.

Carlton is presently in the WPP with his wife and three children. The government has paid over $211,000 to support Carlton and his family--even protecting their baby-sitter--since he was released from prison in late 1990.

## Cesar Cura

Cesar Cura was a prized operative in the Ochoa cocaine smuggling organization, one of the two top families in the Medellin cartel. A cattle rancher seeking a better lifestyle, Cura approached the Ochoas and throughout the 1980s was assigned to a variety of supply operations, including managing an airstrip in Colombia from which 200 to 2,000 kilos of cocaine left each day on their way to the United States. All told, Cura is primarily or partially responsible for at least 300,000 kilos of cocaine and several hundred thousand pounds of marijuana ending up on American streets. He made over $10 million in the drug trade.

Cura's criminal career spans nearly two decades:

- 1972: Cura is indicted in federal court in New York for selling cocaine. He flees to Colombia, but is convicted in absentia and sentenced to 15 years in prison.

- 1983: While still a fugitive, Cura is indicted in federal court in Miami for

illegal weapons purchases. He eventually pleads guilty and is sentenced to five years in prison.

- 1984: Cura is indicted in federal court in Louisiana for importing 750 kilos of cocaine. He is still a fugitive; in 1990, when he is finally brought to trial, Cura is convicted and sentenced to 20 years in prison.

- 1986: Still a fugitive, Cura is indicted in federal court in Florida for conspiring to import 400,000 pounds of marijuana into the United States. Cura was paid $2 million for this deal.

- 1989: Cura is indicted, again in federal court in Florida, for seven counts of cocaine smuggling--including a continuing criminal enterprise charge that carries a maximum sentence of life in prison. DEA agents apprehend Cura in Mexico and bring him to the United States to stand trial on the accumulated charges against him.

Cura's global plea agreement covers five separate indictments. Already in prison on sentences of 5, 15, and 20 years, and he was facing an additional possible sentence of life plus 60 years for new charges, Cura bargained to plead guilty only to one count in each of the Florida indictments. He will get a certificate of cooperation not only in those cases, but also in each of the convictions for which he is now serving time. He was immunized from further prosecution, and he will not be required to forfeit a penny of his drug fortune.

Cura's sentence reduction will not be announced until after the Noriega trial--it could be as low as immediate probation. As Cura himself said at the trial, he hopes to be out of jail very soon. That would make him "the most happy of human beings."

## Brian A. Davidow

Brian Davidow, the only American named in the Miami Noriega indictment, is another three-time loser who decided "to get the lowest sentence possible" and who has yet to spend a day in jail.

Davidow started in the narcotics business in 1983, jettisoning his real estate career for "immediate financial reward." Soon he was traveling to Panama, Colombia and to Brazil. He became trilingual, learning to speak Spanish and Portuguese. But his wanderlust and thirst for money brought him trouble. Besides a federal conviction for participating in a guns-for-cocaine deal between Panamanians and Colombians and a subsequent plea agreement to a separate conspiracy to import 1,000 kilos of cocaine, Davidow was also a Noriega co-defendant for arranging a 300-kilo shipment of cocaine to Miami.

In addition, he admitted in trial testimony that:

- He transported 350 pounds of marijuana in Florida in 1983;

- He orchestrated cocaine transactions in California of up to 40 kilos;

- He worked with Ramone Navarro, a Colombian drug dealer who also received leniency and who died shortly before the Noriega trial;

- He received kilos of cocaine in Panama off a barge bringing coffee from Colombia to Panama;

- He placed about 1,500 kilos of smuggled cocaine on a luxury boat for import to the United States in return for trading 1,000 automatic rifles to a Colombian guerrilla group.

The government has wailed about Davidow "pack[ing]" the luxury boat "to the gunnels with cocaine." And even Davidow himself has admitted that "[i]t can be hard to sleep with yourself sometimes knowing you have been involved with these things in the past." Nevertheless, prosecutors granted him complete immunity for all his other cocaine dealings during the last six to eight years.

Moreover, despite facing 55 years in prison, Davidow was able to get the government to agree to a concurrent sentence recommendation so that he will face only one prison term. As Davidow described it during his Noriega trial testimony, "I would be serving them both at the same time." Meanwhile, he continues to be out of jail on bond.

## Luis del Cid Agular ("del Cid")

Colonel Del Cid was the commander of the Chiriqui Province at the time of the American invasion in December 1989. At the Noreiga trial, he described himself as Noriega's "errand boy." The Justice Department called him "a liaison, courier and emissary for General Noriega in his transactions with drug traffickers" and prosecutors have charged that del Cid was Noreiga's "chief of intelligence" and that he directed the murder of Dr. Hugo Spadafora, one of Noriega's chief political opponents. He was indicted with Noriega in Miami and named in four of the counts for illegal racketeering activities, conspiracy to import cocaine and distribution of cocaine.

In his testimony at the Noreiga trial, del Cid admitted that:

- He had ordered the blowing up of the airport in the provincial capital of David in order to prevent the landing of American aircraft during the invasion;

- He had lied under oath to the Supreme Court of Panama which was conducting its own investigation into the drug trafficking charges;

- He had knowledge of about $20-$22 million in drug proceeds being laundered each week;

- He customarily dropped off large amounts of cash to a variety of banks in Panama, including a $1 million drop-off to Bank of Credit and Commerce International (BCCI);

● He carried an Uzi submachine gun on a regular basis.

After he surrendered himself and the 2,000 troops under his command, Del Cid was taken by American military plane from Panama to Miami. Within a year, he had arranged a 1-count plea agreement. Instead of facing a possible 70-year sentence, del Cid now faces at most 10 years with the government even considering a further recommendation to three years if he cooperates fully. In fact, his defense counsel expects only a 2-1/2 year sentence. His plea admits only to his delivery of money to Noriega which he received from the pilot, Floyd Carlton Caceres.

Despite the government's earlier claim that "[t]here is reason to believe that there very well may exist accounts outside of Panama in safer banking havens," the government also agreed that "it will recommend through official channels, that the Government of Panama release any and all pension funds of the defendant currently frozen by the government of Panama." Del Cid estimated in his testimony that the pensions funds totalled $94,000. Furthermore, del Cid will be allowed to stay in the United States and will never be deported to Panama. In so doing, del Cid is insulated from any Panamanian prosecution. This component was critical to the plea agreement, according to del Cid's defense counsel, because the U.S. officials had failed to deter the Panamanians from agreeing not to prosecute del Cid.

Del Cid is not yet in the WPP. The government will, however, recommend that he be considered for it. Whether this will include his wife and ten children remains to be seen.

## Steven Michael Kalish

Steven Kalish first began selling marijuana to his high school classmates in Texas. Since he dropped out, he has made hundreds of millions of dollars as a world-class professional drug smuggler who at one time oversaw 200-person organization. Testifying at his own trial in Tampa, Kalish said his "currency filled entire rooms... We used money-counting machines, but we could not keep up with the volume." To cope with this problem, Kalish started shipping cash from his home in Tampa to Panama in sums of $2-$3 million. The funds were deposited in dummy accounts at BCCI's Panama offices.

Over his career Kalish smuggled 1.5 million pounds of marijuana and at least a ton of cocaine, clearing $20 million in profits.

In 1984, Kalish was caught in Tampa after fleeing from Texas, where he had been convicted of racketeering and trafficking in marijuana. However, by this time he had accumulated enough charges on five separate indictments, including operating a continuing criminal enterprise, that he faced life in prison without parole, plus at least 285 years.

Kalish first began to provide information to the government on Noriega in 1986 and a formal plea agreement was signed in 1987, committing him to full cooperation. He is currently in a federal prison serving a 10-year sentence for drug smuggling. But under a plea agreement worked out with federal prosecutors, he expects to be free sometime in 1993. In exchange, Kalish secured promises from the government that:

- He will be allowed to keep $500,000 worth of assets and about $200,000 in drug proceeds;

- Neither he nor his wife and family can be prosecuted for previous acts;

- No forfeiture actions will be taken against any other assets;

- He and his family will be placed in the WPP.

## Carlos Lehder-Rivas

As co-founder of the murderous, multi-billion dollar Medellin Cartel, Carlos Lehder was perhaps the U.S. government's ultimate enemy in its war on drugs. Lehder was once described by federal prosecutors as the "Henry Ford" of the cocaine business, pioneer of the mass marketing of cocaine in the United States. He patented the air drop and cigarette-style, speed-boat smuggling methods popularized in the TV series Miami Vice, earning an estimated $300 million in the early 1980s. The cartel ruled the drug world for more than a decade and was responsible for as much as 80 percent of the cocaine smuggled into the United States. Lehder expressed his fondness for Adolf Hitler and proclaimed cocaine trafficking the "revolutionary weapon against North American imperialism."

Robert Merkle, the former U.S. attorney who prosecuted Lehder in Jacksonville, Florida, in 1988 said:

"I don't think the government should be in the business of dealing with Carlos Lehder, period... This guy is a liar from beginning to end...It's an occasion for increased public cynicism with regard to the criminal justice system. It tells John and Mary Public that they should be outraged if their son is ever sent to jail on drug charges."

Testifying at the Noriega trial, Lehder said "I was a smuggler, I was a criminal and I was a rascal..." In addition, he admitted that:

- He shipped more than 125 tons of cocaine into the United States;

- He made and laundered $40 million in drug profits between 1982 and 1984;

- He bought a private island in the Bahamas, Norman's Cay, for $2.2 million to use as a transshipment point for drugs;

- He successfully negotiated with the Castro government to ship drugs through and over Cuba;

- He supported the efforts of Medellin Cartel colleagues who ordered assassinations of Lara-Bonilla, 11 Supreme Court justices and two newspaper editors, among countless other murders.

In 1981 Lehder faced 11 counts of conspiracy to import cocaine and operating a continuing criminal enterprise. He was captured in Colombia and taken to the United States in February 1987. Within a year he was tried, convicted, and sentenced to life in prison without the possibility of parole, plus 135 years.

Lehder has three other criminal indictments pending in Florida and California. If he were to be tried and convicted on all of the drug and racketeering counts listed in these indictments he could have an additional 375 years of imprisonment tacked onto his current sentence of life without parole, plus 135 years—a total of 510 years after serving a life sentence without parole. Noriega's defense counsel cited "[t]alk around the courthouse" that Lehder was attempting "to get out in the next couple of years." Lehder admitted only that he "hopes and prays" to get out sooner. So far, he has served about five years.

In exchange for his testimony, prosecutors have agreed to let the sentencing judge know of his cooperation in the Noriega trial in conjunction with Lehder's request for a reduction of his no-parole life sentence. In addition, Lehder has been relocated from his maximum security prison cell at the FCI-Marion, Illinois to a new prison under the WPP. Finally, Lehder hopes the Government will agree that his cooperation warrants immunity from all other outstanding charges and a sharp reduction in his current sentence so that he may go free after a few more years.

Asked under cross examination how much of the $40 million he made dealing drugs he still has, Lehder said:

"I will have to consult my accountants in Colombia, sir. But I know for a fact that I own about 5 million dollars in real estate right now in Colombia, sir...Some of my planes have disappeared...but I would say in the neighborhood of 8 million dollars..."

If Lehder is ever allowed to leave the United States, as some have feared, he may be able to recoup that $8 million, 20 percent of the estimated $40 million he made trafficking drugs. Furthermore, he has yet to pay a dime on his fine of $350,000 or make any payments on the $98 million in taxes owed the IRS while his conviction is on appeal in the 11th Circuit Court of Appeals. While the government continues to wait for its money, it has acceded to Lehder's wish to have eight of his family members and friends added to the WPP.

## Max Mermelstein

Max Mermelstein, the first fact witness called by the government against Noriega, has been described by federal prosecutors as the "Godfather of Cocaine." Mermelstein professes himself the "transportation arm" of the Medellin cartel.

During his Noriega trial testimony, for which he was granted immunity, Mermelstein admitted:

- Probable involvement in a number of murders, including one in which the victim was killed in a van that he was driving;

- Smuggling "pretty close to 56 tons" of cocaine to be distributed within the United States, which represented "25 percent" of the cartel's total amount of imported cocaine for that period;

- Paying pilots between $80-$90 million from 1981-1985, approximately $3,500 per kilo of cocaine; and

- Shipping firearms into Colombia and shipping ether for cocaine production from Germany through London and Colon to Colombia;

- Smuggling aliens into the United States;

- Importing marijuana, approximately 42,000 pounds in one instance;

- Illegally converting semi-automatic firearms into machine guns;

- Bribing officials in Colombia, Panama and the Bahamas.

Mermelstein was arrested in 1985 and charged in an 11-count federal indictment in California on charges involving cocaine importation, conspiracy and possession which could have resulted in a sentence of life without parole, plus 90 years.

Yet, the prosecutors allowed him to select any four charges to plead guilty to and Mermelstein served only 2 years and 21 days in prison pursuant to his 1987 sentence of "time served, plus lifetime special parole." He was also granted immunity in the Middle and Southern Districts of Florida, the Middle District of Louisiana and the State of Louisiana.

Mermelstein has received approximately $700,000 in reward money and WPP expenses. He was given $255,900 in direct payment by the federal government and as of the end of August 1991, another $414,345 to pay all of his family's expenses. This does not include the $900 paid by the government into his commissary fund so that he could buy snacks and sodas while in prison. Originally 17 family members were placed in the WPP but Mermelstein admitted during his testimony that he did not know "where the number stands now" because some of his relatives "have had babies."

Mermelstein did forfeit "a little over a million dollars" in drug proceeds but he guessed that he made "somewhere around 2 and a half million dollars." He was excused from all criminal tax-related offenses for his failure to report his drug proceeds.

Although Mermelstein has not gone to work, he has been able to jointly write a book entitled "The Man Who Made it Snow" about his time with the cartel. And yes, he has been able to keep his royalties.


## Juan Mora

Juan Mora testified that he had been lifelong friends of Pablo Escobar and the Ochoas. He set up an office in Miami to receive drug money for the Ochoas but was quickly arrested in

1981 for cocaine smuggling.

At the Noreiga trial, he confessed to:

- Violating his parole on his first day out of jail by partying with drug traffickers;

- Laundering between $40-$60 million in 1986 from Miami to the Bahamas to Panama;

- Obtaining a fictitious Social Security card;

- Filing a tax return under a false name one year and failing to file for other years;

- Receiving a federal complaint for forfeiture for properties including one boat, two docks, a lot, a house and a warehouse;

- Being charged with assault for attacking a DEA agent.

Mora was a surprise witness for the prosecution, cutting his deal only a week before his testimony at the end of the government's case. He was the only witness to testify about an alleged meeting between Noriega and Medellin Cartel leader Jose Gonzalo Rodriquez Gocha. Defense counsel quickly pointed out that he had been incarcerated with other government witnesses, that all of the other witnesses at the meeting were dead, that he had taken a secret plane flight to the meeting despite not having a passport, and that he had only used public pay phones to carry on conversations with the cartel.

Faced with a possible life sentence on a 2-count indictment in 1987 for more drug trafficking in South Carolina, Mora now will plead to only one count. His South Carolina drug charges will result in a sentence that will be concurrent with his imprisonment for his parole violations. Despite federal law allowing a criminal penalty of 20 years for a second felony drug conviction, Mora expects the government to recommend a reduction well below that following the Noriega trial.

Mora will not be prosecuted for any criminal tax offenses. He also will not have to pay the previously imposed fine of $4 million. He will not be deported and the government will recommend that his family be allowed to come to live in the United States. Mora currently is incarcerated in a minimum security facility and the government has guaranteed that he will finish his reduced imprisonment in the same circumstances.

## David Rodrigo Ortiz-Hermida

David Ortiz was a fighter pilot for the Colombian Air Force before he began flying drugs for the Medellin cartel. Having fled Colombia in 1984 after the cartel was blamed for assassinating Colombia's justice minister, Ortiz was caught in three separate schemes: He was indicted on drug charges in Texas in 1985; arrested, tried and jailed in France for drug

trafficking on the Caribbean island of Guadeloupe; and, finally, he was named as one of Noriega's co-defendants.

Ortiz's Noriega trial admissions include:

- Receiving between $10,000 and $50,000 per drug flight;

- Meeting with Pablo Escobar and fellow cartel leader Gustavo Gaviria to discuss and plan his drug flights;

- Flying between 250 to 400 kilos of cocaine in military bags;

- Shopping in the United States for a large-capacity 5- to 6-ton capacity airplane for the cartel.

Ortiz faced a possible 45-year sentence for a 3-count cocaine indictment for unlawfully importing 300 kilos of cocaine into the United States from Mexico. He admitted at the French trial to flying another 400 kilos of cocaine and was a co-defendant of Pablo Escobar, who was tried in absentia. He was sentenced to 14 years in prison by French authorities, and he faced another 40 years for his role in the Noriega indictment.

But, after discussions with prosecutors who traveled to France, Ortiz waived his extradition rights and was secretly brought to Miami to testify against Noreiga, even though he had never before laid eyes on the general. Instead of facing a return to French jail following his Noriega case imprisonment, the prosecutors orchestrated a plea agreement which permitted a concurrent sentence of no greater than 10 years with a further understanding that U.S. authorities would recommend an earlier release from his French sentence as well.

Ortiz' family is currently in the WPP and Ortiz himself hopes to enter as soon as he is released.

## Amet Paredes

Amet Paredes comes from one of the most powerful drug smuggling clans in Panama. Paredes' brother Ruben was killed in 1986 when he was in Medellin for meetings with the cocaine cartel. The brothers' father, General Ruben Darios Paredes, is a former commander of the Panamanian Defense Forces and one of the biggest gun merchants in Panama. When Gen. Paredes ran for president of Panama in 1984, Medellin drug kingpin Jorge Ochoa contributed more than $200,000 to his campaign. But Gen. Noreiga doomed Gen. Paredes' campaign for the presidency by withdrawing his support, and he virtually ruined the family's business by canceling most of its government contracts for spare military parts.

In his Noriega testimony, Paredes acknowledged his involvement in the family's drug smuggling enterprise:

- He engineered at least nine shipments of cocaine into the United States between 1985 and 1988, the largest of which was a 322-kilo cocaine

shipment to be sent to drug dealers in the United States in return for some 1,000 M-16 rifles. U.S. officials intercepted the cocaine in transit--aboard a boat owned by the Paredes family;

- He oversaw the production of multi-ton quantities of cocaine in the Tranquilandia area of Colombia;

- He purchased large quantities of ether and acetone for use in processing coca leaves into cocaine.

Paredes was named in five counts of the Noriega indictment, including charges that he participated in two racketeering conspiracies, manufactured cocaine for sale in the United States, conspired to import cocaine into the United States, and distributed cocaine in the United States. If Paredes had been prosecuted and convicted of these offenses, he would have faced up to 95 years in prison and more than $1 million in fines.

In return for his testimony, however, Paredes' plea agreement permitted him to plead guilty to a single count of drug selling. He will spend no more than 10 years in jail, he will not be required to forfeit any of his profits from smuggling cocaine, and he was given immunity from deportation. The agreement further provides that Paredes will not be sentenced until after the Noriega trial. This gives the prosecutors the opportunity to reduce Paredes' sentence still further, well below the 10-year cap.

## Enrique A. Pretelt

Enrique "Kiki" Pretelt, a self-described "close confidant" of Noreiga, was first indicted in Tampa in 1988 with Noriega for conspiracy to import 1.4 million pounds of marijuana into the United States and two counts of attempting to import marijuana. The indictment also alleged that Pretelt tried to launder hundreds of thousands of dollars in drug profits.

At the general's trial in Miami, Pretelt said that he:

- Pleaded guilty to two counts in the Tampa indictment where he was the sole defendant other than Noriega;

- Started the illegal marijuana business with Steven Kalish--"because the money involved was attractive;"

- Introduced Kalish to Anwar Awan, general manager of the BCCI in Panama, who was later indicted in Tampa in the money laundering case;

- Witnessed Kalish pull $2.5 million out of two bags in the BCCI back offices for deposit purposes;

- Concocted fraudulent paperwork to mask the marijuana transhipment as plantain cargo;

- Realized that the Kalish business involved illegal trafficking under the laws of Panama.

Prosecutors ordered an "intense search" abroad for Pretelt, which resulted in his surrender in January 1990. Faced with a possible 35-year sentence, he agreed to testify against Noreiga. Instead of facing further charges in Miami, Pretelt was able to get the U.S. attorneys in both Tampa and Miami to cap his possible sentence at 10 years with at most a probable imprisonment of no more than 40 months. He now expects to be released shortly after the Noriega trial when the government is obligated to recommend a further reduction in his term of imprisonment. Pretelt's defense lawyer justifiably boasts that his client's plea agreement "was so good, we couldn't really turn it down, when you consider his liability all over the place."

Pretelt currently resides in a minimum security prison, and despite earlier government opposition to his bond application on the grounds that he posed "a risk of flight," he was granted "special status" that permits his parole any time. Although he admits to making more than $500,000, he has only forfeited $108,000. Furthermore, the government will recommend against his deportation to Panama should he ever be in jeopardy of prosecution there. Finally, Pretelt was granted a fail-safe plea guarantee in that the government has given him an escape clause which allows him to withdraw his previous plea should the sentencing judge thereafter reject its terms.

## Roberto Striedinger

Prosecutors once called Roberto Striedinger, a.k.a. Roberto Steiner, the Medellin cartel's "number one man in the U.S." Striedinger, a Colombian, started out as a pilot for the cartel, working directly for Pablo Escobar and Gustavo Gaviria. From 1983 to 1990, he managed a crucial part of the air "pipeline" that brought cocaine from Colombia, through Central America, into the United States. Striedinger or pilots under his control transported tons of cocaine that ended up in the United States. He is now under investigation in Colombia and Germany, and he has admitted trafficking drugs in or through Bolivia, Panama, Belize and Mexico.

Striedinger is widely thought to have received one of the most favorable plea agreements in the Noriega case. The agreement relieved Striedinger of responsibility for all his past offenses, limiting his sentence to a maximum of 10 years--which can be reduced even further after the Noriega trial. The time Striedinger does serve will be in a minimum-security facility. The agreement specifies that Striedinger is to be granted temporary furloughs from the prison at least four times a month. The agreement also prevents prosecution of Striedinger's wife and pledges the United States will use its best efforts to seek immunity for the Striedingers in foreign countries.

Yet the best part of the agreement--for Striedinger--is that it permits him to keep the fortune he accumulated over a decade of drug dealing:

- The government seized but then returned to Striedinger a Beechcraft Excalibur aircraft, which Striedinger testified he purchased with drug money and used to transport drugs. The prosecutors were also good enough to pay the $5,500 in hangar fees that had accumulated during the

seizure period;

- The government seized but then returned to Striedinger a 40-foot yacht and a 21-foot speedboat;

- The government seized but then returned to Striedinger an extensive weapons collection, including two AK-47 military assault rifles, an AR-15 assault rifle, an Uzi assault pistol, a MAC-10 semi-automatic, and numerous other assault weapons;

- The government seized but then returned to Striedinger a Mercedes Benz automobile and two trucks;

- The government never seized millions of dollars in U.S. bank accounts that Striedinger concedes were fattened with cocaine money.

In fact, Striedinger's plea agreement specified that the government would seek no fine from him, despite the millions he made from smuggling cocaine. The government did confiscate Striedinger's $4 million home in Key Biscayne, Florida--a mansion once occupied by former President Richard Nixon--but then allowed Striedinger to use $500,000 from the proceeds of the sale of the home to pay his attorneys' fees.

After passing up the opportunity to claim Striedinger's drug profits, the prosecutors went on to commit the government to enormous expense on Striedinger's behalf. Not only will Striedinger be put in the WPP, so will his family and even some of his friends--all of whom will be specially paroled into the United States, pursuant to the plea agreement, just to keep Striedinger company.

## Gabriel Taboada

Gabriel Taboada, a marijuana and cocaine dealer turned luxury car dealer, was the sole witness to testify that he saw Noriega actually receive a cash payment. Noriega's defense counsel ridiculed Taboada's testimony which contradicted that of Roberto Striedinger who testified that he had not seen Noriega personally accept such a bribe during the same meeting.

Taboada's Noriega trial testimony was riddled with confessions:

- He smuggled 1,500 kilos of cocaine for which he has received no sentence;

- He smuggled 180,000 pounds of marijuana for which he has received no sentence;

- He imported cocaine five separate times during 1986-1989;

- He deposited more than $1.6 million in drug proceeds in a secret Swiss bank account;

- He lied under oath to Swiss authorities;

- He bribed dozens and dozens of diplomatic and customs officials in Panama, Honduras, Iran, Iraq, Finland, Peru, Venezuela, Mexico, Russia and the U.S. Permanent Mission to the United Nations relating to an elaborate, bogus importation scheme of foreign cars to Colombian cartel members.

Taboada's importation scam was simple. Colombia prohibited car imports but diplomats were exempted from the ban. By bribing diplomatic officials into ordering the cars, Taboada was able to deliver the car of choice to the cartel leaders. From 1982 to 1989, Taboada fraudulently imported at least 47 vehicles and made more than $800,000. His own lawyer pointed out the benefits to the cartel: First, the drivers were able to use the diplomatic plates, which gave the cartel drivers virtual immunity; and second, it gave the cartel "a wonderful sword" to hold over the diplomats' heads.

One unidentified "senior government official" described Taboada's operation in a news account as follows:

"It was a huge business. The traffickers created a process where they would contact diplomats while they were outside the country. Everyone knew the cars would end up with the traffickers, but the deals were made with 'legitimate' car dealers."

Whether or not his testimony about Noriega was truthful, Taboada's plea bargain certainly lived up to his prosecutorial nickname of "smart bomb." Arrested in Geneva while visiting his Swiss bank account and arranging another fraudulent luxury car import for the cartel, Taboada was extradited, tried and convicted in South Carolina in 1989 on a 6-count cocaine conspiracy indictment. Faced with a possible sentence of life without parole, Taboada began cooperating and then received a 21-year sentence. Admitting that he was still "concerned" about his sentence, Taboada volunteered to testify in other trials in order to get his sentence reduced and his sentencing judge has since agreed to review his sentence in the future.

## **APPENDIX**

## The Felonious Fifteen -- Costs of the Noriega Trial

| Witness | Role | Drug Profits (millions $) | Cocaine Imported (kilograms) | Marijuana Imported (pounds) | Drug Money Laundered (millions $) | Maximum Possible Sentence | Actual or Likely Sentence[1] | Other Concessions |
|---|---|---|---|---|---|---|---|---|
| Bionolt, Ricardo | Fmr. Ambassador Money launderer | 47 | 20,000 | | 800 | 60 | up to 10 | kept $4 million in assets; no tax penalties; no prosecution by Panama; mother-in-law & maid recommended for Witness Protection Program (WPP) |
| Cabrera, Jose | Importer | 40-50 | 500/600 kilos per day during the 1980's | 20,000-170,000 per shipment, 1975-1978, "too many to remember" | unk. | life + 200 | less than 15 | no action on $50 million in profits; single-count plea agreement; 9 in family to be put in WPP |
| Carlton-Caceres, Floyd | Pilot | 6 | 3,000 | | unk. | life + 154 | 9 | Panama properties shielded from seizure; no tax penalties; more than $211,000 in expenses; baby-sitter in WPP |
| Cura, Cesar | Importer | 10 | (est.) 300,000 | 366,000 | unk. | life + 145 | up to 20 | no forfeiture; plea covers 5 separate indictments; immunity from prosecution |
| Davidow, Brian | Smuggler | unk. | 1,000 | 350 | unk. | 55 | up to 10 | immunity from other previous offenses over past 6-8 years; no forfeiture |
| Del Cid, Luis | Military commander; emissary to cartel | unk. | unk. | | knowledge of 3,000 - 3,400 | 70 | up to 10 | no tracing of assets abroad; U.S. will seek to protect his pension; no deportation agreement protects him from prosecution in Panama |
| Kalish, Steven | Smuggler | 20 | 1,000 | 1,500,000 | 80 | life + 285 | up to 10 | to keep $700,000 in drug profits/assets; immunity from other prosecution; no forfeiture; he and wife in WPP |
| Lehder, Carlos | Cartel co-founder | 40 | 123,863 | 300 | unk. | life + 510 | up to 135 ("hopes" to get out sooner) | possibly will retain 20% ($8 million) of drug profits; not paying taxes; WPP candidate; 9 family and friends in WPP |
| Mermelstein, Max | "transportation arm of cartel" | 2.5 | unk. | 42,000 | 12,500 | life + 90 | 2 | $700,000 in payments/expenses; excused from tax penalties; 17 people in WPP |
| Mora, Juan | Money launderer | unk. | unk. | | 40 - 60 | life | less than 20 | no tax penalties; no payment of $4 million fine; no deportation; minimum security prison |
| Ortiz-Hermida, David | Pilot | unk. | 700 | | unk. | 99 | up to 10 | Concurrent sentencing; family in in WPP; U.S. to recommend early release from French sentence |
| Paredes, Amet | Maritime smuggler | (est.) 1 | (est.) 150 | | 0.1 | 95 | up to 10 | single-count plea agreement; no forfeiture and no deportation |
| Pretelt, Enrique | Noriega "confidant" | 0.5 | | 1,400,000 | 0.2 | 35 | up to 10 | probable 40-month sentence; special parole status; U.S. will recommend against deportation |
| Striedinger, Roberto | "number 1 cartel man in U.S." | "millions" | 400 | | .34 | 30 | up to 10 | immunity for previous offenses; minimum security prison; 4 furloughs; U.S. to recommend against foreign prosecution; assets shielded from forfeiture |
| Taboda, Gabriel | Smuggler & "scam" car dealer | 1.6 | 2,500 | 180,000 | unk. | 67 | less than 21 | no prosecution for other cocaine/marijuana smuggling; judge has agreed to review his sentence |

[1] The prosecutors will be seeking further reductions in many of the Felonious 15 sentences (as well as the others who cooperated with them) in return for their testimony

OFFICIAL TRANSLATION 6394 of a document in Spanish made on 23 November 1995 by Anthony Letts licensed translator per Res. 139 of 11 February 1980 Ministry of Justice Bogota Colombia

---

### OFFICE OF THE PRESIDENT OF THE REPUBLIC
### THE HUMAN RESOURCES AREA ADVISER
### CERTIFIES

That Dr. Carlos Eduardo Medellin-Becerra, ID 19460352 (Bogota) has been rendering his services to the Administrative Department of the Office of the President since August 9, 1994.

He is the Legal Secretary to the Office of the President of the Republic No. 140-41

This certificate is issued at the request of Mrs. Luz Stella Sierra O.

Given in Bogota, October 12, 1995
[signed] Marcela Quijano [seal]

Copy: Personnel files
Pilar P.

---

### OFFICE OF THE PRESIDENT OF THE REPUBLIC
Bogota. 16 June 1995                      No. 03647

Mr. Carlos Lehder
No. 06461-018
320 First St. N.W. , Room 524
Washington DC 20534, USA

Mr. Lehder.
I refer to your communication of February 24, 1995 and advise you that the point you raise is a provision of a Decree issued in 1989 under the special powers of granted in Art. 121 for a "State of Siege", in force at the time.

Art. 8(b) of Decree 1860 of August 18, 1989 states that "In no case will the extradition of a Colombian citizen be granted if the State demanding it does not offer full guarantees that it will not impose a sentence of imprisonment for more thna 30 years".

It should be noted that this Decree was declared to be constitutional by the Supreme Court of Justice in its finding of October 3, 1989.

Carlos Eduardo Medellin-Becerra
Legal Scretary.

---

Legalization of the Ministry of Foreign Relations  No. 284794 of 23 November 1995

---

This is  a true and faithful translation a copy of which is filed at AS Ltda Calle 84 No. 18-38 Of. 201 tel 6233301 fax 6233312

Anthony Letts
Alien ID 128089 Translator Res. 139/80 Ministry of Justice.

Exhibit  # 10

## PRESIDENCIA DE LA REPUBLICA

Santafé de Bogotá D.C.,    **16 JUN. 1995**

Señor
CARLOS LEHDER
No. 06461-018
320 First St. N.W.
Room 524
Washington DC 20534
USA



Señor Lehder:

En atención a su comunicación fechada el 24 de febrero del año en curso, debemos aclararle que el punto al cual usted alude   constituye una disposición de un Decreto  dictado en 1989 , en ejercicio de las atribuciones de estado de sitio conferidas por el artículo 121 de la Constitución Política vigente en ese entonces.

En efecto, el literal  B) del artículo 8o. del Decreto  1860 del 18 de agosto de 1989  dispuso lo siguiente: "En ningún caso se concederá la extradición de un nacional si  el Estado requirente no garantiza plenamente que no impondrá pena privativa de la libertad superior a treinta (30) años".

Es de anotar finalmente, que el citado Decreto fue declarado constitucional por la Corte Suprema de Justicia  en Sentencia del 3 de octubre de 1989.

CARLOS EDUARDO MEDELLIN BECERRA
Secretario Jurídico

Exhibit  # 10

JMC.

## AFFIDAVIT

I, Michael P. Sullivan, being duly sworn, state as follows:

1.   I am presently an Assistant United States Attorney for the Southern District of Florida, and have been since June, 1971. Since 1982, I have had the title of Senior Litigation Counsel.

2.   I was, and still am, the lead prosecutor for the Government in the case of United States v. Noriega, 88-0079-Cr-HOEVELER.   In that capacity, I, along with Assistant United States Attorney Ernst Mueller, negotiated the cooperation agreement of defendant Carlos Lehder on August 28, 1991.

3.   That cooperation agreement required, inter alia, that Carlos Lehder testify for the United States in the Noriega prosecution.   Lehder did so, and was one of the most significant and important witnesses that the Government utilized at trial. His forthright and accurate testimony was vital to the Government's case, and was undoubtedly a major reason for the jury's verdict of guilty.

4.   At no time has any prosecutor in the Southern District of Florida promised to Lehder or his ex-counsel, Sharon Talbot, that the Government would make a specific recommendation of 30 years' imprisonment to any court considering his Rule 35 motion.  However, after the conclusion of the Noriega trial, the undersigned did discuss with Ms. Talbot, and to a lesser degree with Lehder, those

Exhibit # 11

matters that should be brought to the sentencing court's attention regarding a reduction of sentence. Specifically, I have informed Ms. Talbot and Lehder what the sentences were of General Noriega's co-defendants who testified against him, as well as the sentences imposed on other testifying co-conspirators who were convicted in other districts. I also told them that I thought it likely that Lehder would receive a sentence reduction to a level equal to, if not lower than, General Noriega's own parolable sentence, which was 40 years. I did not tell them that any sentence imposed would be parolable, since I knew that Title 21, United States Code, Section 848, under which Lehder was convicted, forbade parole.

FURTHER AFFIANT SAYETH NOT

MICHAEL P. SULLIVAN
SENIOR LITIGATION COUNSEL

Sworn to and subscribed before me this ___9___ day of November, 1993.

NOTARY PUBLIC

OFFICIAL NOTARY SEAL
LOURDES E ROVIROSA
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. CC207121
MY COMMISSION EXP. JULY 31,1996

2

Exhibit # 11



**U.S. Department of Justice**

**United States Attorney**

*Southern District of Florida*



155 *South Miami Avenue, Suite 700*
*Miami, Florida 33130*

January 7, 1993

Ernst Mueller
Assistant U. S. Attorney
Sr. Litigation Counsel
Middle District of Florida
P. O. Box 600
Jacksonville, FL  32201

    Re:  Carlos Lehder cooperation

Dear Mr. Mueller:

    Pursuant to your request of December 22, 1992, we herein detail Carlos Lehder's cooperation, to date, with our district.

    As you know, shortly after Noriega's arrest in January, 1991, we were made aware in general terms that Lehder had information on drug trafficking through Panama. We learned that Lehder had in fact written directly to Noriega encouraging him to plead guilty. Further, we obtained DEA-6's by Special Agent Sheila Smith outlining in general several areas of Lehder's knowledge.

    We then pursued an interview to assess the potential value of his cooperation in our case. What we came to know and develop as a result of his cooperation was of invaluable assistance to us.

    Assistant U. S. Attorney Guy Lewis and Special Agent Henry Cuervo debriefed Lehder on multiple occasions. On each occasion, he was honest and forthright. The quality of the information was incredible.

    With the firm belief that Lehder's cooperation would significantly aid the United States in its prosecution of General Noriega, we then sought to enter into a cooperation agreement. With your help, this was accomplished in August, 1991, immediately prior to trial.

    During the trial we stayed in contact with Lehder, again questioning him on all matters of the drug trade. At all times, he was in our opinion truthful. Such intelligence proved very helpful.

Exhibit # 12

Ernst Mueller
Assistant U. S. Attorney
Sr. Litigation Counsel
January 7, 1993
Page 2

That fall, during trial, he was transported to Miami. AUSA Lewis and Special Agent Cuervo spent hour after hour debriefing Lehder and preparing him for Court.

Lehder was on the witness stand for a total of five days, longer than any other Government witness. During a two day direct, Lehder explained his ties to the Medellin Cartel and to Panama. Lehder's testimony was corroborated by multiple witnesses, including civilians and other traffickers as well. Lehder's testimony was devastating to the defendant.

Importantly, Lehder candidly stated that he had never met General Noriega personally. Given the circumstances, it would have been easy for Lehder to claim he had met Noriega (Lehder had entered and exited Panama often). We credit Lehder's veracity that he did not in any way attempt to "snow" the Government with information.

Lehder was cross-examined vigorously. He admitted his guilt with no excuses. His cross-examination lasted three days.

As indicated, we believe Lehder was honest and forthright in all facets. In terms of importance to our case, Lehder's testimony was critical. We introduced evidence that General Noriega maintained and laundered millions of dollars in cash. Lehder was critical in establishing that the Cartel had in fact paid Noriega millions of dollars. Lehder's testimony was extremely important to demonstrate the relevancy of the millions in cash. We respectfully request that based on this ground alone, his recommended reduction be meaningful.

In addition to testimony in the Noriega case, Lehder has cooperated on other matters as well. He has provided information, which has been extensively corroborated, regarding smuggling through Cuba. We anticipate placing Lehder before a federal grand jury in the near future. Lehder has been extremely helpful and we anticipate his continued assistance.

Lehder has also provided the DEA invaluable intelligence on other matters as well, ranging from narco-terrorism to guerilla movements.

All in all, Lehder has been very useful to us. While we at no time promised Lehder a specific recommendation, we ask that his reduction be substantial and meaningful based on his extraordinary significant cooperation.

Exhibit # 12

Ernst Mueller
Assistant U. S. Attorney
Sr. Litigation Counsel
January 7, 1993
Page 3


         If we may be of further service, please call us at (305) 536-
4917 (AUSA Sullivan) or (305) 536-7227 (AUSA Lewis).

                              Very truly yours,

                              ROBERTO MARTINEZ
                              UNITED STATES ATTORNEY


                              Michael P. Sullivan
                              _____
                              Michael P. Sullivan
                              Assistant U. S. Attorney
                              Sr. Litigation Counsel


                              _____
                              Guy A. Lewis
                              Assistant U. S. Attorney


cc:   Thomas V. Cash, SAC - DEA
      S/A Henry Cuervo, DEA


RM:MPS:GAL:bml


                                                    Exhibit # 12

FL-07

UNITED STATES DISTRICT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.

CARLOS ENRIQUE LEHDER-RIVAS

filed 8/20/93

Case No. 81-82-Cr-J-12

---

### SUPPLEMENTAL RESPONSE TO
### MOTION FOR REDUCTION OF SENTENCE
### (FILED IN CAMERA)

The United States wishes to advise the Court of the following additional matters occurring since the prior response to the defendant's Motion for Reduction of Sentence was filed:

1.  In May 1993, Carlos Lehder was transferred from the special facility at USP Leavenworth where he was being housed by the Bureau of Prisons to the witness protection unit at FCI Phoenix.  The conditions in this unit are standard, very good conditions of confinement.  This facility is Mr. Lehder's designated place of future confinement.

2.  On July 9, 1993, pursuant to a prior verbal commitment made by Carlos Lehder on June 10, 1993, Mr. Lehder signed an affidavit which may be utilized in the ongoing effort to extradite Everette Bannister from the Bahamas to the United States, where he (Bannister) is charged which conspiring to import cocaine, in this District, in Case No. 89-29-Cr-J-16.  Everette Bannister has been described as a significant and highly visible "influence peddler" in the Bahamas, and is charged with taking and being a conduit for bribes which permitted Mr. Lehder's cocaine smuggling operation to

Exhibit # 13

October 4, 2023.

Mr. Lehder is currently 43 years old.  He has served over six years of his term.  If the foregoing recommendation is accepted, Mr. Lehder would be seventy-four (74) years old upon release.

A reduction of Mr. Lehder's current sentence, of life without parole plus 135 years consecutive to that, in order to have any meaning, must be a reduction to a term of less than life imprisonment. Implementation of the foregoing recommendation would accomplish that.  At the same time, it would leave Mr. Lehder a serious sentence to serve for the serious crimes he has committed. This remaining sentence would amount to an acknowledgement by the Court of the proposition that cooperation with authorities, even though significant, cannot necessarily mitigate in totality prior crimes which were very serious.

No reduction of the fine previously imposed by the Court is recommended.

Respectfully submitted,

DOUGLAS N. FRAZIER
United States Attorney

ERNST D. MUELLER
Assistant United States Attorney
Senior Litigation Counsel
Post Office Box 600
Jacksonville, Florida  32201
Tel. No. (904) 232-2683

5

Exhibit # 13

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

FILED
1-19-94

UNITED STATES OF AMERICA

vs.                                    Case No.81-82-Cr-J-12

CARLOS ENRIQUE LEHDER-RIVAS

## O R D E R

This cause is before the Court on the following pro se motions filed by defendant:  1) in camera motion for a Rule 35 hearing (Doc.S-42);  2) in camera motion to compel production of information relating to executive branch extradition and sentencing agreements (Doc.S-44);  3) in camera motion requesting issuance of five subpoenas (Doc.S-46); and 4) in camera motion to compel performance of cooperation agreement (Doc.S-48).

The Court has reviewed all of the defendant's motions and upon due consideration will deny them.  Accordingly, it is

ORDERED AND ADJUDGED:

That defendant's pro se motions Docs. S-42, S-44, S-46, and S-48 are denied.

DONE AND ORDERED in Chambers at Jacksonville, Florida, this ___19th___ day of January, 1994.

Howell W. Melton
UNITED STATES DISTRICT JUDGE

Copies to:
Defendant
AUSA (Mueller)
Law Clerk (JS)

Exhibit # 14



**U.S. Department of Justice**

*United States Attorney*
*Middle District of Florida*

---

Post Office Box 600                                     904/232-2682
Room 409, Post Office Building
311 West Monroe Street
Jacksonville, Florida 32201

July 9, 1993


Carlos Enrique Lehder-Rivas


        Re:  United States v. Carlos Enrique Lehder-Rivas
             Case No. 89-29-Cr-J-16

Dear Mr. Lehder:

        In our previous agreements with you it was provided that we
would not use statements made by you in the course of cooperating
with United States law enforcement authorities against you in any
criminal proceeding.  You were not extended full "use immunity"
because the criminal case against you was on appeal and we wished
to avoid the necessity of a <u>Kastigar</u> hearing (see <u>Kastigar v.
United States</u>, 406 U.S. 441 (1972)), in the event that the case
was reversed and there had to be a retrial.

        At this point, since your appeal has been completed, we are
willing to grant you informal "use immunity" with respect to any
statements you may make in the course of cooperating with law
enforcement officials.  This "use immunity" is coextensive with
that provided for in 18 U.S.C. § 6002-6003 which provides that
your statements, and the fruits thereof, will not be used against
you in a criminal proceeding, *and is total use immunity.* $\frac{EWM}{TOM}$

        It is understood, however, that should you knowingly provide
incomplete or untruthful testimony, statements or information
pursuant to this agreement, or should you falsely implicate or
incriminate any person, or should you fail to voluntarily and
unreservedly disclose and provide full, complete, truthful and
honest knowledge, information, and cooperation regarding any of
the matters noted herein, this agreement will become null and
void and you may be prosecuted for any perjury or for giving a
false statement and for any federal criminal violation of which
the United States has knowledge, and the United States may use

Exhibit # 15

any information or evidence provided, and any leads derived therefrom, for any lawful purpose, including using such evidence against you.

Sincerely,

ROBERTO MARTINEZ
United States Attorney

DOUGLAS N. FRAZIER
United States Attorney

By: *Thomas J. Mulvihill*

Thomas A. Mulvihill
Assistant U.S. Attorney
Chief, Narcotics Division
Southern District of Florida

By: *Ernst D. Mueller*

ERNST D. MUELLER
Assistant U.S. Attorney
Senior Litigation Counsel
Middle District of Florida

2

Exhibit # 15



UNITED STATES OF AMERICA v. CARLOS ENRIQUE LEHDER·

Case No. 81-82-Cr-J-12

## Cooperation Agreement

The United States and Carlos Enrique Lehder-Rivas hereby agree to and adopt the following conditions relating to Carlos Enrique Lehder-Rivas' cooperation with the United States:

1.    Carlos Enrique Lehder-Rivas shall furnish complete and truthful information and shall testify completely and truthfully if called as a witness by the United States Attorney for the Southern District of Florida and/or the United States Attorney for the Middle District of Florida.

2.    Any statements and/or testimony given by Carlos Enrique Lehder-Rivas in the course of furnishing information and cooperation shall not be used directly against him in any criminal proceeding.    However, if Carlos Enrique Lehder-Rivas testifies in any criminal proceeding against him (Lehder), such information and statements may be used for purposes of cross-examination and impeachment.    Moreover, it is understood that the United States may use any statements or other information supplied by Carlos Enrique Lehder-Rivas for the purpose of locating other evidence or obtaining leads to other evidence, which evidence may be used by the United States

1

Exhibit # 16

INSERT:

PAGE 2)    COOPERATION AGREEMENT-    NORIEGA case.

UNITED STATES - CARLOS LEHDER.

"IT IS ALSO UNDERSTOOD THAT THE UNITED STATES WILL COMPLY
WITH THE TERMS OF THE ACT OF SURRENDER DOCUMENT PURSUANT
TO WHICH CARLOS LEHDER WAS EXTRADITED TO THE UNITED STATES
FROM COLOMBIA, A COPY OF WHICH IS ATTACHED HERETO UNLESS
SAID DOCUMENT IS SUPERSED BY SUBSEQUENT AGREEMENT BETWEEN
THE UNITED STATES AND THE GOVERNMENT OF COLOMBIA"

( Hand written by AUSA ERNST MUELLER)

=============================================

in any prosecution of Lehder; that is, the United States
may make derivative use of Carlos Enrique Lehder-Rivas'
statements in subsequent criminal proceedings against
him (Lehder). *It is also understood that the United States will comply with the terms of the act of surrender document pursuant to which Carlos Lehder was extradited to the United States from Colombia, a copy of which is attached hereto unless said document is superseded by another a subsequent agreement between the United States and the Government of Colombia.*

3.   In connection with the defendant's motion for
reduction of sentence, to be filed in this case later,
the United States shall furnish to the Court a truthful
assessment of the nature, extent and value, if any, of
all the information, cooperation, and testimony furnished
by  Carlos  Enrique  Lehder-Rivas  and  the  result  of
receiving same, if any.   Such information will also be
made known by the United States to parole authorities if
appropriate.    In  this  connection,  it  is  expressly
understood that the United States retains the right and
duty of also presenting to said authorities information
that is not favorable, if any, so that the Court and/or
parole  authorities  will  have  accurate  and  complete
information.


4.   The United States Bureau of Prisons will be
advised  of  Carlos  Enrique  Lehder-Rivas'  status  as  a
witness  so  that  it  may  modify  his  conditions  of
confinement so as to take into account security needs
generated by this status, and may place Carlos Enrique
Lehder-Rivas in a witness protection ~~unit~~ *facility.*

2

Exhibit # 16

5.    The United States will allow those close relatives of Carlos Enrique Lehder-Rivas whose names are set forth in Exhibit A, attached hereto, in Colombia, whose lives may be endangered by the fact of Carlos Enrique Lehder-Rivas' testifying on behalf of the United States, to enter and remain in the United States while such danger continues to exist.

a.    It is agreed and understood that the relatives identified in Exhibit A, if they choose to come to the United States, shall enter the United States by their own means and at their own expense.

b.    It is agreed and understood that the relatives identified in Exhibit A will either be placed in the witness protection program during the trial of the case of <u>United States v. Manuel A. Noriega, et al.</u>, Case No. 88-0079-Cr-HOEVELER, in which Carlos Enrique Lehder-Rivas is expected to testify, or will be otherwise assisted by the United States in obtaining secure living arrangements during said trial.

6.    In the event that the defendant Manuel A. Noriega pleads guilty in the case of <u>United States v. Manuel A. Noriega, et al.</u>, Case No. 88-0079-Cr-HOEVELER, the defendant's cooperation in said case will be made known to the Court and/or parole authorities pursuant to paragraph 3 above, even though Carlos Enrique Lehder-Rivas has not testified.

3

7. No additional promises, agreements, or conditions have been made by the United States or Carlos Enrique Lehder-Rivas other than those set forth above. The prior agreement between the United States and Carlos Enrique Lehder-Rivas entitled "Conditions Relating to Interview", dated November 23, 1988, shall be superseded by this agreement effective as of the time this agreement is entered.

The parties, by their signatures, hereby affirm their acceptance and understanding of the foregoing conditions.

_____
CARLOS ENRIQUE LEHDER-RIVAS

_____
CLYDE COLLINS, Esquire
Counsel for Carlos Enrique
    Lehder-Rivas

_____
DATE

_____
ERNST D. MUELLER
Assistant United States Attorney
Senior Litigation Counsel
Middle District of Florida
Jacksonville, FL  32201
Tel. No. (904) 791-2682

_____
DATE

_____
MICHAEL P. SULLIVAN
Assistant United States Attorney
Senior Litigation Counsel
Southern District of Florida
155 S. Miami Avenue
Miami, FL  33130
Tel. No. (305) 536-4917

_____
DATE   8/28/91

Exhibit # 16

# Witness, former Ochoa cohort sentenced to 14 years

**BY LARRY LEBOWITZ**

lebowitz@herald.com

A Colombian cocaine kingpin facing a life in prison received a 14½-year sentence Thursday for helping the federal government finally nail former Medellin cartel leader Pablo Ochoa and persuading a veritable rogue's gallery of narcotraffickers to plead guilty.

Alejandro Bernal Madrigal was the hub of a loose-knit consortium of Colombian traffickers who arranged to smuggle upwards of 30 tons of cocaine a month into the United States via Bernal's contacts in Mexico.

Colombian police wiretapped dozens of phones, fax machines and pagers, and planted a bug inside Bernal's office suite in Bogota that yielded most of the evidence in 1999's Operation Millennium.

Bernal quietly agreed to cooperate with federal prosecutors and the Drug Enforcement Administration in early 2002, and spent endless months in solitary confinement transcribing the poor-quality surveillance tapes. He did not plead guilty until this spring, once the Ochoa trial was drawing near.

Sentencing guidelines would have normally given Bernal a sentence ranging between 27 and 27½ years. But under the terms of Bernal's plea deal, prosecutors Ed Ryan and Rick Del Toro recommended an unusually large 50 percent reduction.

Ochoa was videotaped entering and leaving Bernal's offices at a time when a "who's who" of Colombian drug traffickers were coordinating a series of shipments.

Bernal testified that Ochoa was treated as an elder statesmen in the business, but was also "given" percentages of the multi-ton loads from another trafficker who owed Ochoa a multimillion-dollar debt.

"That's a very significant event that places Mr. Bernal and his family at risk," Del Toro said of Bernal's testimony.

Ryan said Bernal was just as important in persuading 18 other Millennium defendants to plead guilty and avoid prolonged trials.

Defense attorney Ruben Oliva Jr. drew a parallel to the deck of cards gimmick that the Pentagon used to highlight the pursuit of the 52 leading fugitives from the Iraqi War.

If the DEA issued a deck for the drug war, Oliva said, Bernal would be personally responsible for persuading many of the



BERNAL

biggest money launderers and cocaine suppliers to get out of the game. Oliva urged Judge K. Michael Moore to abide by the 50 percent cut: "This defendant said, 'I know what I did was wrong, I'll take my lumps. I'll plead guilty to the charges and try to make amends — even if those amends will put my life and my family's life in danger,' " he said.

But the judge wasn't feeling quite as generous. Moore, who had granted one-third sentence reductions for 20 other cooperating defendants, gave Bernal the same consideration, reducing his range to 14½-to-18 years.

The judge gave Bernal incentive to cooperate further if the seven fugitives in the Millennium case ever face trial in the U.S. — including Bernal's business associate Armando Valencia, who is considered one of Mexico's leading "cocaine cowboys."

Exhibit # 17

# 10.    The Man Behind
the General

IN THE SPRING of 1984, an honor guard assembled at the Kirya, the compound of the Israeli Ministry of Defense. They had gathered to greet a foreign general, a small, squat figure known to his detractors as "pineapple face," thanks to his unfortunate skin. The general looked resplendent in full dress uniform, with his Israeli paratrooper wings pinned just above his left breast pocket. Manuel Antonio Noriega, "Tony" to his friends, had flown thousands of miles from his home in Panama for the occasion. Flanked by Moshe Levi, commander in chief of the Israeli Defense Forces, and other top IDF commanders, Noriega had come to receive a decoration, reportedly for services performed providing fraudulent "end user" certificates for Israeli weapons secretly destined for Iran. For such requirements, Panama was a country of easy virtue and its commander in chief was ever available. As one of Noriega's American political consultants put it, "Noriega was a lovely hooker." The CIA thought the general lovely enough to keep on a retainer of up to $200,000 per year, the same salary as the president of the United States.

In a much-published photograph of General Noriega standing at the salute on the Kirya steps in Tel Aviv, his companions are all in uniform,

245

Exhibit # 18

246    DANGEROUS LIAISON

all saluting while the anthems of Israel and Panama fill the air—with the exception of one man. A lean, dark figure standing in the shadow of the Panamanian dictator, he wears a simple, expensive black suit and a carefully knotted silk tie. His black hair is slicked back and large sunglasses obscure his features. Michael Harari had once been chief of clandestine operations for Mossad. He was now inseparable from Manuel Noriega and had earned the reputation as the "brains" behind the General. The aging spy, known to Panamanians as "Mad Mike," had carved out a powerful and lucrative niche for himself as General Noriega's best friend, business associate, and as the general once said, his "mentor."

It was Harari who had arranged all of the trappings for Noriega's trip to Israel: the meetings with top government officials, the VIP tour of IDF bases, and a crack Mossad team to rescue the general from would-be assassins supposedly dispatched to Paris (where Noriega stopped on his way home) by the Medellin cartel. Before setting out for Israel, Noriega had alarmed cartel executives, who paid him a handsome percentage for the privilege of operating in Panama (their accountant put the figure at $10 million per month), by raiding one of their labs. Harari received intelligence, or so he said, that a "hit" had been planned, though one of Noriega's advisers later observed, "I always thought it was Mike who set that whole thing up." In fact, after the Darien raid, Noriega was receiving frantic scrambled messages in Israel from aides in Panama City that "El Padrino"—drug lord Pablo Escobar—wanted a "business meeting." As the telephone scrambler was made in Israel, it is doubtful these were private conversations. "El Padrino" and 120 cartel friends were residing in Panama at the time, in former U.S. officer housing at Fort Amador and in the very best suites at the Caesar Park Marriot Hotel. Good relations with the gentlemen from Medellin were eventually restored, but in the meantime Mike Harari took credit for saving Noriega's life.

The Mossad veteran was modest about his exploits and his status in Panama City. When he first met, in 1983, with Roberto Eisenmann, publisher of Panama's *La Prensa* newspaper, Harari delivered a brief and succinct introduction. "I'm Mike Harari. I am a member of Israeli intelligence and a good friend of Manuel Noriega." His official ties to Mossad had supposedly been severed three years earlier, when Harari briefly became chief executive officer of Israel's Migdal Insurance Company. But from the time Harari flew into Panama in 1982 to his

departure in the dead of night in December 1989, "the friend," as he was known at the Israeli Embassy in Panama, was accorded every privilege of a top Israeli official. As one former embassy employee observed, "This tale that Mike Harari operates in Panama as a private party has no basis in reality. Mike Harari enters the embassy in Panama not like a household member, but like an owner. I know this from close acquaintance, and I can say that Mike Harari enjoys all possible services in the Israeli Embassy in Panama. He uses the diplomatic mail, and in fact, he knows everything that occurs in the embassy, including secret cables."[1]

Harari had spent the better part of his life in the intelligence business. Born into a well-known Sephardic family in Tel Aviv in 1927, Harari joined the Palmach at the age of eighteen and graduated to the Gid'onim, the secret communications unit of the Jewish underground's illegal immigration operation. After World War II, Harari was posted to Rome, where he prospered and became commander of the Italian branch. His career there was immortalized in at least one Israeli novel (*The Gid'onim* by Shabtai Teveth), in which Harari is given yet another name, Alex. Following the War of Independence, Harari served briefly as a security officer in the Foreign Ministry, after which he joined the young Mossad. His reputation inside the spy agency was as someone infinitely forgettable; "an introverted, grey man." As one former colleague put it, "He was not groomed for the top."

Despite this inauspicious beginning, Harari surfaced in the early 1970s as the man in charge of Mossad assassination squads then combing Europe for Palestinian targets. Harari owed his promotions to his protector and mentor Zvi Zamir, who rose to chief of Mossad under Prime Minister Golda Meir. "Zvi Zamir raised him," said one former colleague. Harari, unfortunately, did not distinguish himself in his role as European hit-squad coordinator, with the result that his patron the spy chief was dismissed.

Harari's path to exile in the Americas started in Munich, with the bloody events of the 1972 Olympics. Just before dawn on September 5, eight men armed with Kalashnikov machine pistols and hand grenades walked through an unlocked door into the Israeli Pavilion of the Olympic Village. The men shot a weight lifter from the Israeli team and a security guard and proceeded to tie up nine more athletes. At five A.M., the gunmen threw a note out the window demanding that two hundred Palestinians be released from Israeli jails within four


250    DANGEROUS LIAISON

throughout Central and South America. He and Noriega refined an end-user racket that would eventually attract the admiration and patronage of the Reagan White House.

Like Nicaragua under the first General Somoza, Panama had been used to smuggle arms to the Haganah before the founding of the state of Israel. The ubiquitous arms dealer Al Schwimmer had smuggled World War II surplus arms from the United States via Panama to Palestine. The underground set up a Panamanian aviation company to facilitate the transfers. At times, when Israel's excellent relations with Noriega came under attack, the alliance could be justified as a repayment of debts from 1948.

With a guiding hand from Mike Harari, Israel did a brisk business with Panama, shipping $500 million worth of arms during the 1980s. At least $100 million worth of rifles, machine guns, explosives, and advanced communications equipment was dispatched *after* Noriega had been exposed by the Senate Foreign Relations Committee in early 1988 as being heavily involved in narcotics trafficking. Harari's orders for Panama were filled without protest. As one Israeli commentator put it, the Ministry of Defense in Tel Aviv "routinely approves all arms and equipment sales requested by Harari." Harari was influential enough in Jerusalem and Panama City to fire both Panama's ambassador to Israel and Israel's ambassador to Panama. He was sensitive to the extensive security needs of a man like General Noriega, who was adept at collecting enemies. Harari "provided Noriega with sophisticated Israeli-made eavesdropping and security equipment—installed by Israeli experts—which allows Noriega to spy on political opponents." Along with the equipment came advisers. Israeli military advisers, recruited by Harari to serve as Noriega's elite bodyguards, supervised the crackdown on political opponents. Harari even equipped Noriega's bunker, where the general had reportedly hung portraits of Adolf Hitler and Moshe Dayan. (Harari is credited with counseling Noriega that the Hitler portrait was in bad taste and should be removed.) Along with the arms, advisers, and listening devices, Harari extended his services to financial planning. "Israeli and Panamanian financial sources" told Israeli journalist Uri Dan that "Harari provided the means for laundering Noriega's profits in Swiss and other foreign banks and has used the money for arms purchases."

Home for Harari was a plush oceanfront apartment in the Mirador del Pacifico complex in Panama City. He was easily recognized driving

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 1:05cr225 |
| | ) | |
| STEVEN J. ROSEN and | ) | |
| KEITH WEISSMAN. | ) | |

## MEMORANDUM OPINION

In this prosecution for conspiracy to violate the Espionage Act, defendants have moved for an evidentiary hearing and eventually, dismissal of the indictment to remedy the government's alleged constitutional violations. Defendants allege that the government relied on the Thompson Memorandum[1] to pressure defendants' employer, the American Israel Public Affairs Committee (AIPAC), to terminate defendants from their jobs and to cease advancing defendants' attorneys' fees for their defense in this case. According to defendants, this pressure violated their constitutional rights under the Fifth and Sixth Amendments by depriving them of both due process of law and the right to counsel.

For the reasons that follow, that defendants' motion must be denied, for even assuming the government engaged in the conduct alleged, it did not prejudice the defense. Importantly, however, the result reached here is neither an endorsement of the Thompson Memorandum policy, nor does it diminish the conclusion that defendants' allegations, if true, reflect government conduct that is inappropriate and fraught with the risk of constitutional harm.

---

[1] The Thompson Memorandum, described in more detail *infra*, refers to *Principles of Federal Prosecution of Business Organizations* (Jan. 20, 2003), a policy directive from then-Deputy Attorney General Larry D. Thompson to United States Attorneys intended to guide charging decisions in cases of putative organizational wrongdoing.

Exhibit # 19

defendants were employed by AIPAC – Rosen as AIPAC's Director of Foreign Policy Issues, and Weissman as AIPAC's Senior Middle East Analyst. It was part of defendants' AIPAC duties to meet regularly with government officials of both the United States and Israel. Defendants contend that all the conduct alleged in the indictment was within the scope of their employment with AIPAC and was undertaken for AIPAC's benefit.[6]

Defendants allege that the government's investigation in 2004-2005 focused on AIPAC as well as defendants. The investigation of AIPAC lasted into early 2005 and involved, *inter alia*, FBI interviews of numerous AIPAC officers and employees, searches of AIPAC offices, and meetings between prosecutors and AIPAC officials. Defendants retained counsel in August 2004 and have been billed monthly for legal fees since then. When the government's investigation of defendants became public knowledge, AIPAC stated that it would pay for and advance defendants' attorneys fees. It also entered into a joint defense agreement with defendants. An engagement letter endorsed by defendants, AIPAC, and defense counsel was signed September 1, 2004, and allegedly included an agreement that AIPAC would advance fees. The joint defense agreement was signed the same day. For several months thereafter, AIPAC advanced defendants' attorneys' fees. During that period, AIPAC counsel orally assured defense counsel that it would continue to make these advances. This arrangement did not last; it ended in the spring of 2005 when AIPAC terminated defendants' employment, terminated the joint defense agreement, and ceased advancing defendants' legal fees. This occurred, defendants

---

[6] While it was unquestionably within the scope of defendants' employment to meet with government officials and to obtain information pertinent to policies in which AIPAC had an interest, it is doubtful that AIPAC would consider that obtaining or passing NDI without authorization was within the scope of defendants' employment.

allege, because during meetings between AIPAC and government prosecutors, the prosecutors

implicitly or explicitly (i) threatened AIPAC with criminal charges, and/or (ii) threatened further

intense scrutiny of AIPAC in the event the government perceived AIPAC's cooperation as

unsatisfactory. Alternatively, the government (i) offered AIPAC reduced charges and/or (ii)

offered to halt further investigation of AIPAC should AIPAC's cooperation satisfy the

government. Importantly, according to defendants, cooperation satisfactory to the government

included, *inter alia*, terminating defendants and ceasing to advance defendants' legal fees.

Specifically, defendants allege that in a December 2004 meeting with AIPAC officials

prosecutors stated that the investigation was analogous to one in the "corporate fraud arena," and

they criticized AIPAC's leadership for "circling the wagons" by denying wrongdoing. Later, in a

February 15, 2005 meeting, prosecutors allegedly stated that satisfactory cooperation from

AIPAC could "get AIPAC out from under all of this." Defendants allege these two statements

confirm that AIPAC was at least a subject, if not a target, of investigation.[7] On March 18, 2005,

defendants allege that then-U.S. Attorney Paul McNulty and an unnamed Assistant U.S. Attorney

told AIPAC counsel that AIPAC needed to fire defendants. The next business day, March 21,

2005, AIPAC fired defendants and terminated the joint defense agreement, but intended to keep

---

[7] A subject is a "person whose conduct is within the scope of the grand jury's investigation." A target is a person "as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." *See United States Attorney's Manual* § 9-11.151 (June 2000). The government contends that AIPAC was neither a subject nor a target and thus that any alleged threats concerning AIPAC's payment of defendants' attorneys fees gained the government no leverage over AIPAC. Put differently, the government contends that because AIPAC was neither a subject nor a target, the government neither sought nor needed leverage over AIPAC. In any event, the analysis here proceeds on the assumption, given defendants' allegations, that AIPAC was at least a subject of investigation.

this fact secret from the public. Yet, AIPAC did inform the government of the terminations on March 22, 2005. In the words of AIPAC counsel, this action was taken to gain "credibility with the government," *i.e.*, to be able to claim compliance with the Thompson Memorandum.

On learning that defendants had been fired and the joint defense agreement terminated, prosecutors allegedly continued to inquire whether AIPAC was continuing to pay defendants' legal fees. At an April 29, 2005 meeting between AIPAC and the government to resolve the fees issue, defendants allege that the government pointedly asked AIPAC why it was paying defendants' legal fees, severance pay, and health benefits. According to defendants, AIPAC counsel responded that defendants could not otherwise afford counsel. Prosecutors allegedly indicated their displeasure on the fees matter and informed AIPAC counsel that it should not only cease paying defendants' attorneys fees, but also cut off defendants' severance pay and benefits. Both AIPAC counsel and the prosecutors later confirmed to defense counsel that the government had raised the issue of AIPAC's payment of counsel fees and health benefits at the April 29 meeting.

In sum, AIPAC advanced payment for Rosen's attorney's fees from September 2004 to March 2005, and for Weissman's attorney's fees from September 2004 to June 2005. AIPAC has not advanced or paid any of defendants' attorneys' fees since then. It is unclear whether defendants continue to receive benefits. Defendants further allege that once AIPAC attained some degree of certainty that it would not be prosecuted, it offered to pay a "deeply discounted sum" to defense counsel in satisfaction of any obligations to defendants, but not to pay defense counsel in full.

**II.**

7

choice is a *defendant's* right, no relief is warranted here, as no prejudice to the defense resulted

from the government's interference with defendants' right to have AIPAC pay their attorneys.

An appropriate Order will issue.


Alexandria, Virginia
May 8, 2007

_____/s_____
T. S. Ellis, III
United States District Judge

27

# U.S. District Court
## Eastern District of Virginia (Alexandria)
## CRIMINAL DOCKET FOR CASE #: 1:05-cr-00225-TSE All Defendants

Case title: USA v. Franklin                     Date Filed: 05/26/2005
Magistrate judge case number: 1:05-mj-00309-BRP

Assigned to: District Judge T. S. Ellis,
III

### Defendant

**Lawrence Anthony Franklin (1)**          represented by   **John Francis Hundley**
*TERMINATED: 01/20/2006*                              Trout Cacheris PLLC
                                                      1350 Connecticut Ave NW
                                                      Suite 300
                                                      Washington, DC 20036
                                                      (202) 464-3300
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*
                                                      Designation: Retained

                                                      **Plato Cacheris**
                                                      Trout Cacheris PLLC
                                                      1350 Connecticut Ave NW
                                                      Suite 1220
                                                      Washington, DC 20036
                                                      (202) 464-3300
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*
                                                      Designation: Retained

### Pending Counts                              ### Disposition

                                                120 mos. on Count 1s, concurrently w/
                                                sentence on the criminal Info. in
                                                1:05cr421, and consecutively to
                                                sentence on Count 5s in this matter, for
                                                total custody sentence of 151 mos. in
                                                both matters. 3 yrs. of supervised
18:793(g) Conspiracy to Communicate             release on ea. of Counts 1s and 5s in
National Defense Information                     this matter, and and the crim. Info. in
(08.27.04)                                       1:05cr421, concurrently, and w/ conds.
(1s)                                             $10,000 fine total (on the two counts
                                                sentenced in this matter and the Info.
                                                sentencing in 1:05cr421). Deft cont'd.
                                                on current bond conds. to self-
                                                surrender, w/ delayed reporting date.

                                                31 mos. on Count 5s, concurrently w/
                                                sentence on the criminal Info. in
                                                1:05cr421, and consecutively to



FD-36 (Rev. 8-26-85)

FBI

TRANSMIT VIA:
- ☐ Teletype
- ☐ Facsimile
- ☐ AIRTEL

PRECEDENCE:
- ☐ Immediate
- ☐ Priority
- ☐ Routine

CLASSIFICATION:
- ☐ TOP SECRET
- ☐ SECRET
- ☐ CONFIDENTIAL
- ☐ UNCLAS E F T O
- ☐ UNCLAS
- Date 6/29/84

S E C R E T

TO:        DIRECTOR FBI

FROM:      SAC, SAN FRANCISCO

SUBJECT:   ROBERT MAXWELL, DBA
           Pergamon International

           OO:  AQ

This entire communication is classified "SECRET."

Re Albuquerque airtel dated 6/13/84.

San Francisco indices negative regarding Pergamon International and ROBERT MAXWELL. The following is that information obtained from San Francisco file regarding INFORMATION ON DEMAND, INC.

In October, 1983, INFORMATION ON DEMAND, INC., 2111 Berkeley Way, Berkeley, California, came to the attention of the San Francisco FBI. On 10/11/83, SUE RUGGE, President, INFORMATION ON DEMAND was interviewed at her place of business. RUGGE described her company as an information and research services which provides a full range of information gatherings for a spectrum of clients worldwide for such areas as agriculture and nutrition, bibliography books, memographs, periodicals, business, economics, chemistry, current affairs, directories, education, energy, environment, foundations, grants, law, government, medicine, biosciences, patents, science and technology, social science and humanities.

Classified by: G-3
Declassify on: OADR

2 - Bureau (RM)
2 - Albuquerque (105C-3262)(RM)
1 - San Francisco

S E C R E T

Approved: _____    Transmitted _____    Per _____
                              (Number)    (Time)

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
EXCEPT WHERE SHOWN

Exhibit # 20

Washington D.C. 20535

ROBERT MAXWELL

Captioned individual, who you advised was born October 6, 1923, may be identical to Ian Robert Maxwell, born June 10, 1923, in Czechoslovakia, who was the subject of a security investigation by the FBI from 1953 - 1961. Attached are eight memoranda and ten reports concerning this investigation. (U)

105-25063

Maxwell was the President of the "Pergamon Press," which had its headquarters in London, England. There is attached a report and memorandum concerning "Pergamon, Press." (U)

65-67359

In addition, in 1974 information was received that Robert Maxwell was one of the defendants in a civil suit against Leasco Data Processing Equipment Corporation. Attached is a copy of an indictment, newspaper article and a memorandum concerning this matter. (U)

163-387V5

The central files at FBI Headquarters, the records of the Identification Division and appropriate computer data bases contain no additional pertinent information identifiable with the captioned individual based upon background information furnished in connection with this name check request. (U)

Enclosures 23

SECRET MATERIAL ATTACHED

62-5-68126

Classified by: 762
Declassify on: OADR

ENCLOSURE

SECRET

Room 4371

NOV 21 1988

(5)

B7C

NOTE: Per request from Arthur B. Culvahouse, Jr., Counsel to the President, at the White House. (S?)

DELIVERED TO LIAISON
DATE 11-7-88

SEE REVERSE SIDE FOR SECRET.
ADD. DISSEMINATION

NOV 0

Bicentennial of the United States Constitution (1787-1987)

**SECRET** ~S b1

AQ [105C-3262]

⌐4704, with Telephones (415) 644-4500 and (800) 227-0750. The president of this firm is a woman known as SUE RUGGE. The nature of this firm is that it is a firm which has compiled data base information and for a fee will provide them to customers. The data base information relates to a wide variety and to the best of their knowledge is not classified in any manner. However, it includes information concerning government and various available means of tapping government information data bases. The information provided by the Sandia employees was received from employees of the National Security Agency (NSA) and has to do with the purchase of Information On Demand, Inc., by one ROBERT MAXWELL, the owner of Pergamon International, a British information firm. According to NSA,

(S) b1 b3 pw NSA

The information received from these Sandia employees is computerized data bases on behalf of the Soviets.

b1 b3 pw NS

Albuquerque indices are negative regarding Pergamon International, ROBERT MAXWELL, Information On Demand, Inc.

b7C

According to the Sandia employees, there is a New Jersey Pergamon International Office; however, they did not know where it was located.

LEADS

NEW YORK CITY DIVISION

AT NEW YORK CITY, NEW YORK

Search indices regarding Pergamon International, ROBERT MAXWELL, Information On Demand, Inc.

b7C

NEWARK DIVISION

AT NEWARK, NEW JERSEY

Will check indices as set forth for New York Office.

SECRET  /S

- 2 -



S E C R E T

SF

RUGGE advised that INFORMATION ON DEMAND's (IOD) sources include over 250 computer data bases which provide information in two main categories, research and document delivery.

According to RUGGE, all data bases that IOD has access to provide only public source information and nothing of a known or sensitively classified nature.  She explained that it is a data base called the Defense Technical Center which is connected to the Department of Defense (DOD) which contains classified information, however, IOD has no password for access and further no need for access.

RUGGE advised that requests of IOD are approximately 50% business related and 40% technical and medicine related. She advised that IOD taps most publicly available computerized data bases including Lockheed's Dialog, System Development Corporation's Orbit, the New York Times Information Bank, the National Library of Medicine's MEDLARS, and the Bibliographic Retrieval Service.

Relative to research, RUGGE advised that IOD provides information to the business, technical, and professional communities, as well as to individuals.  According to RUGGE, IOD can locate single facts as well as provide answers to complex questions dealing with such areas as comprehensive marketing research, custom data summaries, sophisticated literature searching, current awareness service, and global information capability.

Relative to document delivery, RUGGE advised that IOD locates photocopies or acquires published information in any form, whether they are manuals, conference papers, patents, or theses, as well as reports, catalogues, brochures, articles, etc.  She advised that requests are received at IOD by telephone, mail, and electronically, and that information is sent to clients by the same means.

RUGGE advised that under the law and government heading, IOD has access to the American Statistics Index (ASI) and Congressional Information Service (CIS), the Commerce Business Daily, the Congressional Record Abstracts, the Criminal Justice Periodical Index, the Federal Index,

- 2 -



S E C R E T

**2B** Saturday, September 8, 2007 **The News Herald** Panama City, Florida

# Noriega's lawyers plan



Manuel Noriega is charged in France with laundering more than $3 million in drug proceeds.

### The Associated Press

**MIAMI**

Manuel Noriega's attorneys turned Friday to a federal appeals court to halt the former Panamanian dictator's extradition to France after a judge ruled against him for a second time.

Noriega attorney Frank Rubino filed a notice that he will ask the Atlanta-based 11th U.S. Circuit Court of Appeals to review orders clearing the way for the extradition.

The notice was filed moments after Senior U.S. District Judge William Hoeveler rejected Noriega's argument that he should not be extradited because of questions about whether France will honor his status as a prisoner of war.

Hoeveler also lifted a temporary stay he had issued earlier in the week to halt the extradition. But exactly when or if Noriega might leave the United States remained uncertain, even though his prison sentence on a 1992 U.S. drug racketeering conviction ends Sunday.

U.S. officials have said that Noriega will continue to be held in a minimum-security prison near Miami until his extradition orders are finalized by the State Department.

In an e-mail to The Associated Press, Rubino said he had received assurances from federal officials that Noriega will not be moved while his appeals are pending. Rubino's co-counsel, Jon May, said the 11th Circuit case could take several weeks.

"We are looking at a lot of litigation yet to be done," May said.

Tom Casey, deputy State Department spokesman, said Friday he expected "pretty quick action" to approve Noriega's extradition once the legal proceedings end — unless

Noriega wins his appeals.

Noriega, 73, is charged in France with laundering more than $3 million in drug proceeds through French banks and using some of the money to buy luxury apartments in Paris. He was convicted in 1992 of U.S. drug charges in a trial before Hoeveler, who declared him a POW based on his capture after a 1989 U.S. invasion of Panama.

Hoeveler previously rejected claims by Noriega's lawyers that his POW status required his repatriation to Panama, where he was convicted in absentia of embezzlement, corruption and murdering political opponents. Noriega's lawyers say he wants to return home to fight those charges.

In his six-page order Friday, Hoeveler said it appeared France would comply with Geneva Conventions requirements for POWs based on U.S. statements. That includes monitoring by the International Committee of the Red Cross, certain basic accommodations and the right to wear military insignia and uniform.

"This court notes the United States' assertions that the Convention is being followed, and anticipates full compliance with the Convention based on those assertions," Hoeveler wrote.

Rubino had pointed as evidence to recent news articles in Panama and elsewhere in which French officials were quoted as saying Noriega would be treated as a "common criminal" rather than a POW. That would violate his Geneva Conventions rights, Rubino argued.

But Hoeveler was not persuaded.

"Nothing from the defendant compels the court to change its prior conclusion that the Convention does not prohibit legitimate extraditions," the judge wrote.

Exhibit # 21

**MiamiHerald.com** ⊞

Posted on Mon, Aug. 13, 2007

# Noriega to ask judge to block extradition

### BY JAY WEAVER

Manuel Antonio Noriega is set to appear Monday morning before the same federal judge who presided over his drug-racketeering trial in 1992.

But this time, the convicted former Panamanian dictator will ask U.S. District Judge William Hoeveler for a favor: stop his extradition to France because he is a prisoner of war.

Noriega, 72, is awaiting release from a federal prison in Southwest Miami-Dade County on Sept. 9, after serving about 18 years behind bars for letting a Colombian cartel ship tons of cocaine through Panama to the United States. The U.S. attorney's office has sought to extradite Noriega to France to serve 10 years for his conviction in absentia on related money-laundering charges.

His extradition hearing is scheduled for Aug. 28 before a U.S. magistrate judge.

French authorities claim Noriega funneled about $3.15 million to a bank account in France in the late 1980s and used part of the cash to buy three pricey apartments in Paris, according to prosecutors.

Noriega, who was toppled by a U.S. invasion in late 1989, prefers to be returned to Panama. Authorities there want him to serve multiple prison terms for, among other things, the murders of critic Hugo Spadafora and 10 leaders of a failed 1989 coup. His lawyers said France could seek his extradition from the Panamanian government.

They argue that Noriega's extradition to France would violate his rights as a prisoner of war under the Geneva Conventions. It was Hoeveler who, in 1992, declared the ex-general a POW after his sentencing.

Prosecutors counter that Noriega's separate challenge is not ``ripe.''

Assistant U.S. Attorney Michael "Pat" Sullivan, who was a member of the original prosecution team, said the U.S. government "has fully complied" with Hoeveler's initial ruling that Noriega is a prisoner of war and has treated him accordingly under the Geneva Conventions' mandates.

Sullivan added: 'The defendant can be extradited to France in accordance with all of the United States' treaty obligations -- including its obligations under the Geneva Conventions."

Noriega's attorneys, Jon May and Frank Rubino, attacked that assertion in court papers filed Friday.

"The United States has already entered into an agreement with France for France to afford General Noriega the protections of the Geneva Convention, despite the fact that General Noriega could not be a prisoner of war of France," the attorneys wrote.

``These agreements undoubtedly were negotiated at the highest levels by or with the participation of the Department of State."

The State Department declined to comment, citing policy on extradition matters.

Exhibit # 21

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

UNITED STATES ATTORNEY
PAUL PEREZ
400 N. TAMPA Suite 3200
TAMPA FLORIDA 33602

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____ ☐ Agent
                   ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

FEB 2 3 2007

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

USPS 33602

3. Service Type
   ☐ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7000 1670 0003 4259 7403

PS Form 3811, February 2004       Domestic Return Receipt       102595-02-M-1540

Exhibit # 22



**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

| | |
|---|---|
| Postage | $ |
| Certified Fee | 2. |
| Return Receipt Fee (Endorsement Required) | 1.05 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here
FEB 16 2007
USPS

Sent To
AUSA JAMES KLINDT,
Street, Apt. No.; or PO Box No.
300 North Hogan St.
City, State, ZIP+4
Jacksonville Florida 32202

PS Form 3800, May 2000          See Reverse for Instructions

7000 1670 0003 4259 7410



SENDER: COMPLETE THIS SECTION

COMPLETE THIS SECTION ON DELIVERY

1. Article Addressed to:

AUSA JAMES KLINDT
UNITED STATES ATTORNEY'S OFFICE
300 North Hogan St.
Jacksonville, FLORIDA
32202

2. Article Number
(Transfer from service label)   7000 1670 4259 7410

PS Form 3811, August 2001    Domestic Return Receipt

 

Exhibit # 23

## TABLE  OF CASE LAW

1. WRIT FOR HABEAS CORPUS UNDER TITLE 28 U.S.C. § 2241.

2. U.S. V. RAUSCHER, 119 U.S. 407,  7, S.Ct 234, 30 L Ed 425 (1886)

3. U.S. V. ABELLO-SILVA 948, F 2d, 1168 (10th Cir) 1991.

4. United States Constitution,Article IV, and the First, 4th 5th, 8th and 14th Am.

5. Title 28 U.S.C. § 1331, 1361, 1391.

6. 5 U.S.C. § 702, the All Writs Act (28 U.S.C. § 1651, 42 U.S.C. § 1981

7. Bivens V. Six Unknown Named Agents of the Federal Bureau of Narcotics
   404 U.S. 388 (1971)

8. The Extradition Treaty between the United States and the Republic of Colombia.

9. JURISDICTION: Title 28 U.S.C. § 1350, 1361 and 1391.

10. VENUE. 28 U.S.C. § 13919b) (e)

11. U.S. Distasio, 820  F 2d. 20- First Circuit (1987) Page 24.

12. CABA 241 F 3d. at 101, Id U.S. V. La Freniere 236 F 3d 41-49-50.

13. HARRIS 376, F 3d. 1282 (11th Cir 2004)

14. TEAGE, LANE 489, U.S. 28, 109, S. Ct. 1060, 103, L Ed 2d 334, (1989)

15. Extradition of Burt 737, F 2d. 1477, 1484, (7th Cir)

16. State V. Clark Wash App Div. 2, 844 P 2d 1029, 68 Wash App 592 (1993)

17. People V. BROADIE, (1975) 332 N.E. 2d 338, 37 N.Y. 2d 100, 371 N.Y.
    S 2d. 471. Cer denied, 96 S, Ct. 372, 423 U.S. 950, 46 L Ed 2d 287.

18. U.S. V. Garcia 240  F 3d, 180, 183, (2nd Cir 2001)

19. APPRENDI 120 S. Ct. at 2354-2367.

20. Extradition of Drayer, 190, F ed, 410 (6th Cir) 1999.

21. U.S. V. Vreeken 803.  F 2d. 1085, 1088 (10th Cir 1986)

22. Title 18 Rule 35(B) Statute.

23. Mabry V. Johnson 467, US, 504, 104, S Ct. 25 43. 81 L Ed 2d. 437 (1984)

RESPONDENT's ADDRESSES

| SENDER: *COMPLETE THIS SECTION* | *COMPLETE THIS SECTION ON DELIVERY* |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X                  ☐ Agent<br>                   ☐ Addressee<br>B. Received by (*Printed Name*)    C. Date of Delivery |
| 1. Article Addressed to:<br><br>DIRECTOR FBI,<br>ROBERT S. MUELLER III<br>FEDERAL BUREAU OF INVESTIAGTION<br>-EDGAR HOOVER BUILDING-<br>10th and Constitution Ave N.W.<br>WASHINGTON DC 20530 | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☒ No<br><br>3. Service Type<br>☒ Certified Mail  ☐ Express Mail<br>☐ Registered  ☒ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (*Extra Fee*)  ☐ Yes |
| 2. Article Number<br>(*Transfer from service label*)  7006 2760  0002  6516  8561 | |

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

| | |
|---|---|
| CONGRESSMAN CHARLES E. SCHUMER<br>DIRKSEN SENATE OFFICE BUILDING<br>WASHINGTON DC 20510-6275 | |
| | 3. Service Type<br>☒ Certified Mail  ☐ Express Mail<br>☐ Registered  ☒ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (*Extra Fee*)  ☐ Yes |
| 2. Article Number<br>(*Transfer from service label*)  7006 2760  0002  6516  8554 | |

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

| | |
|---|---|
| ■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | ☐ Addressee<br>B. Received by (*Printed Name*)    C. Date of Delivery |
| 1. Article Addressed to:<br><br>PAUL CLEMENT, Attorney General<br>Of The United States<br>Department Of Justice<br>Constitution Avenue and Tenth<br>Street N.W. Washington DC 20530 | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☒ No<br><br>3. Service Type<br>☒ Certified Mail  ☐ Express Mail<br>☐ Registered  ☒ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (*Extra Fee*)  ☐ Yes |
| 2. Article Number<br>(*Transfer from service label*)  7006 2760 0002 6516  8547 | |

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

| | |
|---|---|
| HARLEY G. LAPPIN,<br>Director US Bureau Of<br>Prisons. 320 First St N.W.<br>Washington DC 20534. | |
| | 3. Service Type<br>☒ Certified Mail  ☐ Express Mail<br>☐ Registered  ☒ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (*Extra Fee*)  ☐ Yes |
| 2. Article Number<br>(*Transfer from service label*)  7006 2760 0002 6516 8585 | |

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

CARLOS LEHDER

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF __11001__
(EXCEPT IN U.S. PLAINTIFF CASES)

PRO SE DR

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
# 06461-018

## DEFENDANTS

HARLEY G. LAPPIN,
ETAL

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

Case: 1:07-cv-01733
Assigned To : Roberts, Richard W.
Assign. Date : 9/26/2007
Description: Habeas Corpus-2255

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
    Plaintiff

☐ 3 Federal Question
    (U.S. Government Not a Party)

☒ 2 U.S. Government
    Defendant

☐ 4 Diversity
    (Indicate Citizenship of Parties
    in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)  FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ☐ A. Antitrust
☐ 410 Antitrust

### ☐ B. Personal Injury/ Malpractice
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ☐ C. Administrative Agency Review
☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ☐ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ☐ E. General Civil (Other)  OR  ☐ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

## No Summons Issued

| ○ **G.** *Habeas Corpus/* 2255 | □ **H.** *Employment Discrimination* | □ **I.** *FOIA/PRIVACY ACT* | □ **J.** *Student Loan* |
|---|---|---|---|
| ○ 530 Habeas Corpus-General<br>○ 510 Motion/Vacate Sentence | □ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | □ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| □ **K.** *Labor/ERISA (non-employment)* | □ **L.** *Other Civil Rights (non-employment)* | □ **M.** *Contract* | □ **N.** *Three-Judge Court* |
|---|---|---|---|
| □ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding   □ 2 Removed from State Court   □ 3 Remanded from Appellate Court   □ 4 Reinstated or Reopened   □ 5 Transferred from another district (specify)   □ Multi district Litigation   □ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 USC 2241 - Habeas Corpus -

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS   □ ACTION UNDER F.R.C.P. 23   **DEMAND $**   Check YES only if demanded in complaint   **JURY DEMAND:** □ YES ○ NO

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   □ YES □ NO   If yes, please complete related case form.

**DATE** 9-26-07   **SIGNATURE OF ATTORNEY OF RECORD** NCD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd

